## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| IN RE APPLICATION OF THOMAS P. ) | Case No. 1:25-mc-138 |
| WINDOM FOR ORDER DETERMINING ) | |
| WHETHER CERTAIN INFORMATION ) | Chief Judge James E. Boasberg |
| IS PROTECTED FROM DISCLOSURE ) | |
| BY FEDERAL RULE OF CRIMINAL ) | **UNDER SEAL** |
| PROCEDURE 6(e) ) | |
| ) | |

## RESPONSE OF THE COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES TO APPLICATION FOR ORDER DETERMINING WHETHER CERTAIN INFORMATION IS PROTECTED FROM DISCLOSURE BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e)

Thomas P. Windom claims that he has filed this Application "to resolve a dispute over whether a congressional committee may compel him to answer certain questions at a deposition noticed for September 30, 2025."[1]  For the reasons explained below, granting this request would not only result in an advisory opinion, but would also improperly interfere with an ongoing Congressional investigation.

To start, any potential "dispute" between Windom and the Committee on the Judiciary of the U.S. House of Representatives (Committee) has not ripened.  Among other things, Mr. Windom does not know what questions the Committee will ask him on September 30, how those questions will be precisely worded, whether and how they might be adjusted if his counsel makes an objection, and how the Chairman of the Committee will rule on any objection.  Windom also does not face an imminent threat of concrete injury.  Even if Windom refuses to answer certain questions at the deposition and his counsel's objections are overruled, a long chain of events contingent on the decisions of numerous independent actors would have to take place before he

---

[1]  Mem. of P. & A. in Supp. of Appl. of Thomas P. Windom for Order Determining Whether Certain Information Is Protected from Disclosure by Federal Rule of Criminal Procedure 6(e) (Mem.), at 1.

1

RECEIVED

SEP 22 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

could incur any cognizable injury. And even then, Windom could suffer no such injury until a court had the opportunity to consider and rule upon his argument that he was unable to answer particular questions because of Federal Rule of Criminal Procedure 6(e). In short, Windom asks this Court to insert itself unnecessarily into a Congressional investigation to issue an advisory opinion. It should not take up that invitation.

If this Court nonetheless concludes that there is a ripened dispute between Windom and the Committee that it would normally have the power to resolve, the Speech or Debate Clause would bar it from doing so. The Clause would clearly preclude this Court from adjudicating a lawsuit seeking to quash the Committee's subpoena. For the same reasons, this Court should not countenance Windom's attempt to circumvent the Clause's protections by choosing a creative litigation vehicle where the Committee is not technically a defendant. It should not elevate form over substance when it comes to the important constitutional principles the Clause protects. Windom's application necessitates that the Committee come before this Court to preserve its ability to conduct a deposition without judicial interference. For all intents and purposes, the Committee is the defendant in this proceeding.

This Congress, the Committee has interviewed or deposed eight current or former federal prosecutors as part of its oversight of the Department of Justice (Department). In seven instances, Rule 6(e) did not pose a significant obstacle to the Committee obtaining the information that it was seeking from witnesses; Windom's transcribed interview was the outlier. The interpretation of Rule 6(e) that Windom has taken to date is overbroad. Indeed, were this Court to embrace it here, it could conceivably put other prosecutors who have testified in front of the Committee this Congress in legal jeopardy, yet another reason for this Court not to unnecessarily resolve this Application.

Here, the Committee's main interest is in collecting information to advance its investigation, not engaging in lengthy litigation with witnesses or manufacturing contempt proceedings. The Committee is therefore hopeful that the recent clarification from the Department regarding the scope of Windom's authorized testimony, additional preparation undertaken by the Committee and Windom since the transcribed interview, and give-and-take at the deposition will result in a productive proceeding on September 30. Judicial intervention before the deposition occurs is neither warranted nor appropriate, and this Court should dismiss or deny Windom's application.

## BACKGROUND

The Committee is conducting oversight of the programs and operations of the Department on an ongoing basis. *See* Mem. Ex. B, at 1. As part of this oversight, the Committee has sought to question Department employees about specific matters like former Special Counsel Jack Smith's investigation. *See* Mem. Ex. H, at 1. This includes Windom, a former Assistant United States Attorney, who worked on investigations relating to the events of January 6, 2021, and in Special Counsel Jack Smith's office, where he served as Senior Assistant Special Counsel.

Windom initially cooperated with the Committee's investigation. On April 7, 2025, the Committee requested a voluntary transcribed interview. Mem. Ex. B, at 1. Windom agreed to participate, and the interview took place on June 12. Mem. Exs. E, G (hereinafter Tr.). Prior to that date, Windom received a letter from the Department authorizing him to give "unrestricted testimony" to the Committee about five topics, which included his "interactions with [Department] officials, including JP Cooney" and his "knowledge of interviews conducted [and] subpoenas issued (including those related to the Willard Hotel)." Mem. Ex. F, at 1, 2. The

Department added, however, that Windom was not permitted to provide information subject to Rule 6(e). *Id*. at 2.

During his transcribed interview, Windom declined to answer certain of the Committee's questions related to his interactions with Department officials, including J.P. Cooney, and his knowledge of interviews conducted and subpoenas issued, including those related to the Willard Hotel. *See* Ex. H, at 1-4. With respect to the former topic, Windom believed it to implicate grand jury matters protected by Rule 6(e). *See* Tr. at 19-21. For the latter topic, Windom believed it to implicate Rule 6(e), but also maintained that the Department had not authorized him to answer questions about that topic, *see id*. at 33-35, which is an objection that Windom raised frequently throughout his interview for other topics about which the Committee questioned him, *see, e.g.*, *id*. at 23, 85, 112, 124.

In response, the Committee issued a subpoena compelling Windom's testimony at a deposition scheduled for September 30, 2025. Mem. Ex. H, at 1, 5. The Committee took this step because (1) Windom had "declined to answer multiple questions on the basis that the Department had not authorized testimony about those topics" and (2) the Committee was not "persuaded by … [Windom's] … overly expansive interpretation of Rule 6(e)," and thus its investigation was stymied by his "refusal to answer these questions during [his] voluntary transcribed interview." *Id.* at 1. The Committee's letter accompanying its subpoena rebutted Windom's cramped view of what the Department had authorized him to testify about and his overly broad application of Rule 6(e), and explained the importance of Windom's testimony to its oversight investigation, including to legislative efforts to develop reforms to the Special Counsel regulations. *Id*. at 3-5.

On September 3, Windom filed this Application under seal, asking this Court for an order to determine whether certain topics that the Committee may inquire about in Windom's forthcoming deposition are protected by Rule 6(e). On September 8, Windom filed a supplemental memorandum informing the Court of a September 4 letter that he had received from the Department, which, according to him, "appears to significantly expand the topics" that the Committee may ask him about. Suppl. Mem. at 3. In that letter, the Department advised that Windom may provide "unrestricted testimony to the Committee[]," including "the names of line attorneys and agents in the Department," on certain topics, such as "[i]nteractions related to this investigation with the [FBI] and Main Justice," and "[i]nteractions with other prosecutors related to this investigation." Suppl. Mem. Ex. 1, at 1, 2. The Committee hereby responds.

## ARGUMENT

As a threshold matter, this Court should not entertain Windom's application for three independent reasons. First, it is procedurally improper and seeks an impermissible advisory opinion. Second, it prematurely requests relief from harms that are either nonexistent or speculative. Third, it amounts to an improper end run around the Speech or Debate Clause.

If this Court nonetheless reaches the merits of Windom's application, it also fails because Windom's interpretation of the scope of Rule 6(e) is overly broad. Notwithstanding Windom's complaints, the Committee's lines of inquiry on which Windom focuses generally do not concern or seek to reveal the inner workings of the grand jury. Further, even if those matters had at one point implicated grand jury secrecy, that is no longer the case given the extensive public coverage of them.

I.    **WINDOM'S REQUESTED RELIEF IS PROCEDURALLY IMPROPER, PREMATURE, AND CONSTITUTIONALLY BARRED**

A.    **The Application is Procedurally Improper, Particularly Given the Context of a Congressional Investigation**

While Rule 6(e) permits certain requests to be submitted to a court to authorize the disclosure of grand jury information, Fed. R. Crim. P. 6(e)(3)(E), Windom makes no such request in his application here; he is not asking this Court to permit the disclosure of information covered by Rule 6(e).[2]  Instead, Windom asks the Court to opine on whether certain, often amorphous, categories of information are covered by Rule 6(e) before Windom and the Committee have had the opportunity to work through and refine those issues during the upcoming deposition.  In other words, Windom wants the Court to advise him upfront on the proper application of Rule 6(e) before the Committee has had the opportunity to ask (or modify) a single question at the deposition, before a single objection has been lodged against those questions, and before the Chairman of the Committee has ruled upon a single objection.  Simply put, Windom seeks an improper advisory opinion.

Windom cites no case or authority supporting his novel theory that the Court should deviate from the ordinary investigatory process here, much less that it should consider this kind of application for preliminary relief before a *Congressional* deposition has taken place.  His application is premature and procedurally improper, particularly when juxtaposed against Congress's constitutional authority to conduct oversight and investigate the Executive Branch. For a Court "[t]o deny the Committee the right to ask the question" and "to limit congressional inquiry to those areas in which there is not the slightest possibility" of prejudice to the witness

---

[2]  Furthermore, Rule 6(e)(3)(E) only contemplates requests by a defendant or the government.  Fed. R. Crim. P. 6(e)(3)(E)(ii)-(v).  Windom is neither.

constitutes a "restriction upon congressional investigatory powers [that] should not be countenanced." *Hutcheson v. United States*, 369 U.S. 599, 619 (1962).[3]

Instead, because "it is not until the question is asked that the interrogator can know whether it will be answered or will be met with some … objection," the Court must not interfere with the "power of (congressional) inquiry" here, a power which "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Hutcheson*, 369 U.S. at 619 (citation omitted); *see also id.* at 618-19 (concluding that a witness's fear that answering certain Senate committee questions truthfully might jeopardize his defense during pendency of state court prosecution did not override Congressional authority to depose the witness on those subjects); *id.* at 622 (The Constitution "imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers.").

### B.    Windom Lacks Article III Standing and the Application Is Not Ripe

Windom's application suffers from an even more fundamental defect: He lacks Article III standing.  As described below, any immediate action he faces at the hands of the Committee (like deposition questioning) does not qualify as an injury in fact.  Furthermore, because Windom's alleged future injury is entirely speculative and based on an attenuated chain of future events that may or may not happen, it is not sufficiently concrete or imminent to give rise to standing. Finally, his alleged future "injury" is not fairly traceable to the Committee because it would be

---

[3] This is also generally the procedure followed in the civil discovery context. *Cf. Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 103 (D.D.C. 2005) (denying motion to quash civil deposition subpoena due to the court's "preference that a deposition proceed and the deponent assert her objections during the deposition, thus allowing the deposing party to 'develop circumstantial facts in order to explore the propriety of the … objection'" (alteration in original) (citation omitted)); *Goldstein v. FDIC*, 494 B.R. 82, 91 (D.D.C. 2013) (denying motion to quash deposition subpoena because petitioner needed to "assert claims of privilege on a question by question basis" at the deposition).

largely at the hands of other actors.

In all matters before it, "the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. Const. art. III, § 2, cl. 1). That limit on judicial authority "require[s] that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020); *see also Coleman v. Miller*, 307 U.S. 433, 460 (1939) ("[I]t was not for courts to pass upon ... abstract, intellectual problems."). To establish Article III standing, Windom bears the burden of proving a "concrete and particularized" "injury in fact" that is "actual or imminent," "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court," and that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in original) (citations omitted).

Relatedly, the ripeness doctrine addresses when a federal court can or should decide a case. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). At a "constitutional minim[um]," *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999), the doctrine of ripeness "prohibits courts from issuing advisory opinions on speculative claims," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014); *see also Am. Petroleum Inst.*, 683 F. 3d. at 386 (noting that part of the ripeness doctrine is "subsumed into the Article III requirement" that an injury be "'imminent' or 'certainly impending'" (citation omitted)).

Here, Windom cannot show injury in fact because being asked questions in a deposition

does not injure him; the mere act of receiving a subpoena or being deposed is insufficient on its own to confer Article III standing. *See, e.g.*, *Williams v. Parker*, 843 F.3d 617, 623 (5th Cir. 2016) (finding no injury because "it is not sufficient for Article III purposes to state that the issuance of a subpoena in and of itself" causes cognizable harm). And even if being asked questions could somehow qualify as an injury (which it does not), it would still not be "concrete" at this stage: the specific contours of the Committee's deposition questioning are being shaped in real time, which will continue up until September 30. Indeed, Windom now claims that the September 4 letter he received from the Department shows that the topics of questioning have "significantly expand[ed]" to a "longer and broader list of topics" since the transcribed interview. *See* Suppl. Mem. at 3.

Similarly, far from demonstrating a likelihood of suffering any imminent adverse effect from the Committee's deposition subpoena, Windom's application relies on speculative future harm that is many steps removed from the Committee's questioning on September 30. Specifically, Windom argues that the Committee's subpoena forces him to choose between two options that both would allegedly cause him injury: "Door #1" is to accede to the Committee's interpretation of Rule 6(e) and risk criminal contempt for violating Rule 6(e),[4] and "Door #2" is to decline to answer the Committee's questions and risk prosecution for contempt of Congress. Mem. at 9. As an initial matter, as outlined in Section II below, the Committee disputes that Door #1 imposes any meaningful risk of criminal contempt for violating Rule 6(e).[5] But setting

---

[4] While the Committee maintains that Windom's interpretation of Rule 6(e) outlined in his application is overly broad, *see infra* at II, below, the Committee does not dispute that Windom has a duty to comply with the legal obligations imposed by Rule 6(e).

[5] Indeed, the Committee itself emphasized that it specifically caveated questions during the transcribed interview to exclude information learned from a grand jury. *See, e.g.*, Mem. Ex. G, at 20-21, 67; *id.* Ex. H, at 4.

that issue aside, Windom's description of the injury he will allegedly incur from taking Door #2 is both unsubstantiated and entirely speculative. *See infra* at I.B.

To begin with, Windom simply does not know which specific questions the Committee will ask him on September 30. This alone makes his fear of future prosecution for contempt of Congress entirely hypothetical rather than concrete. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (A claim is not ripe if it depends upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)).

Windom's claim is thus akin to that advanced by the plaintiff in *Bragg v. Jordan*, 669 F. Supp. 3d 257 (S.D.N.Y. 2023). There, the plaintiff sought quashal of a Congressional deposition subpoena that, among other things, allegedly sought grand jury material. *Id.* at 272. However, the Court determined his claim was not ripe; the subpoena only sought testimony rather than documents, and the Court would not "blindly speculate about what questions might hypothetically be posed to [the witness] at the deposition." *Id.* (emphasis omitted). Plaintiff's assumption "that the questioning [would] stray into impermissible territory" was insufficient. *Id.* As the *Bragg* Court explained, "[f]ederal courts may not give an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (quoting *Ass'n of Car Wash Owners v. City of New York*, 911 F.3d 74, 85 (2d Cir. 2018)). Windom's application (which is actually a motion to quash in substance, *see infra* at I.D.), likewise asks this court to render an advisory opinion about speculative future questions the Committee may ask in its upcoming deposition. Separate from obvious judicial economy concerns, this kind of upfront judicial micromanagement of Congress's constitutional duty would undermine interests of comity for a coordinate branch of

government.[6]

Moreover, if Windom believes, during his upcoming deposition, that the Committee is asking for information covered by Rule 6(e), his counsel is free to raise objections. In response, the Committee may seek to rephrase questions in an effort to allow Windom to answer. And if the Committee overrules his counsel's objections and he refuses to answer, should it become necessary, Windom can then make his argument to a court at the appropriate time and have that court rule on his position, whether in a civil or criminal case.[7] For instance, if the Committee were to file a civil lawsuit to compel his compliance with the subpoena, that action would first require a referral by the Committee either to the full House of Representatives or to the Bipartisan Legal Advisory Group (BLAG),[8] which would then need to vote to authorize litigation before suit could be filed. Assuming each of these steps were met and a suit was brought, Windom could then raise his defense under Rule 6(e) at that point and have a court determine whether it applies under a more developed record.

Regarding his concern about prosecution for contempt of Congress, this threatened harm is conjectural rather than "certainly impending," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 401

---

[6] *See Hutcheson*, 369 U.S. at 606 ("[T]he scope of the power of (congressional) inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (second alteration in original) (citation omitted)).

[7] A subpoena respondent whose objections have been overruled and who has been ordered by a committee to comply with a subpoena obtains judicial review by disobeying that command and asserting his legal grounds to a court in defense of any criminal prosecution or civil enforcement action that may ensue. *See, e.g.*, *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1088-89 (D.C. Cir. 2017).

[8] BLAG comprises the Speaker of the House, Majority Leader, Majority Whip, Minority Leader, and Minority Whip, and it "speaks for, and articulates the institutional position of, the House in all litigation matters." Rule II.8(b), Rules of the U.S. House of Representatives, 119th Cong. (2025), https://perma.cc/QD7D-WRAX.

(2013) (citation omitted), because it is several steps removed from the deposition itself, requiring a series of inferential leaps to arrive at his future injury. First, Windom assumes that the Committee will be unable to ask (or revise) its questions at the upcoming deposition without running afoul of Rule 6(e) (as he interprets it). Windom also necessarily assumes he will be unable to answer the questions in a way that complies with that rule. Furthermore, he assumes that the parties will not be able to work through differences while deliberating over his objections. The inevitability of such an outcome is belied by the factual record of the Committee's transcribed interview. *See, e.g.*, Tr. at 16, 20-21, 33-35, 68-69, 112-13, 123-24 (illustrating how when Rule 6(e) objections were raised, the Committee often rephrased the question in a way that allowed Windom to answer without providing what he considered to be grand jury information).

Second, even assuming Windom and the Committee reach an impasse, the Committee would still need to vote to refer Windom to the full House for contempt of Congress based on his refusal to answer certain questions. The full House would then need to take up the matter, vote to hold him in contempt of Congress, and refer the matter to the Department. *See* 2 U.S.C. §§ 192, 194. For a sense of perspective, the House only made one contempt referral last Congress[9] and has yet to do so this Congress. The Department would then need to convene a grand jury, and that grand jury would then have to decide to return an indictment. And even after all of this, Windom would still have the opportunity to assert his Rule 6(e) defense to a court, and if that court agreed, no criminal liability would attach to him. Because Windom's "theory

---

[9] *See* H. Res. 1293, 118th Cong. (2024) (enacted), https://www.congress.gov/bill/118th-congress/house-resolution/1293/all-actions?s=2&r=6.

of *future* injury is too speculative to satisfy the well-established [Article III standing] requirement that threatened injury must be 'certainly impending,'" *Clapper*, 568 U.S. at 401 (citation omitted), his application is not ripe for adjudication.

Finally, Windom's alleged future injury is not "fairly traceable" to the Committee's actions. *Id.* at 409 (citation omitted). Instead, his attenuated causal chain of injury depends on independent actions from others whom the Committee has no control over, including the full House of Representatives, the Department of Justice, and a future (yet-to-be empaneled but currently nonexistent) grand jury.

In sum, this Court should follow the approach taken in *In re Harrisburg Grand Jury-83-2*, 638 F. Supp. 43 (M.D. Pa. 1986). There, the Department filed a motion asking the court to determine whether the production of certain documents subpoenaed by a House subcommittee would violate Rule 6(e) and thus subject the Department to potential contempt of court. *Id.* at 45. The court there held that because the Department was asking for an advisory opinion regarding a "hypothetical state of facts," the Department's motion presented "no case or controversy over which this court has jurisdiction." *Id.* at 46 (citation omitted); *see also id.* at 50 ("If the Department persists in maintaining that certain documents can be withheld pursuant to Rule 6(e), that position may be tested, if at all, in an appropriate court, with a proper factual predicate established."). Additionally, the court held that the case was not ripe, noting, among other things, that "it may be that Congress would forego instituting contempt proceedings should the Department not comply with the Congressional subpoena. This 'contingency' renders the instant matter incapable of judicial resolution at this time." *Id*. at 50 (citation omitted).

Likewise, here, Windom also asks for the court's upfront guidance on whether complying with a Congressional subpoena would subject him to contempt under Rule 6(e); accordingly, he

too "seeks a generalized determination which, pursuant to Constitutional standards, this court cannot make and which, for pragmatic reasons, the court is unable to resolve." *Id.*; *see also In Re Grand Jury Proceedings, Newport News Drydock & Shipbuilding Co.*, (E.D. Va., Oct. 17, 1984) (denying Department's motion requesting court guidance on whether certain materials had been correctly withheld in response to Senate subcommittee subpoena pursuant to Rule 6(e) on grounds that the motion was "no more than a request for an advisory opinion," meaning there was "no controversy") (attached as Ex. A).[10]

As a result, this matter is not ripe, and the Court lacks Article III jurisdiction to consider it.  It should therefore be dismissed.

## C.    The Prudential Ripeness Doctrine Also Prevents Exercising Jurisdiction

Even supposing that this action is "constitutionally ripe," which it is not, the prudential ripeness doctrine would still "provide an independent basis for a court not to exercise its jurisdiction." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 269 (D.D.C. 2015).  Under that doctrine (often applied in the administrative context), prudence "restrains courts from hastily intervening into matters … when the uncertain nature of an issue might affect a court's 'ability to decide intelligently.'" *La. Env't Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C. Cir. 1996) (citation omitted).  Courts will thus "declin[e] jurisdiction over a dispute

---

[10]  By contrast, *In re Grand Jury Impanelled Oct. 2, 1978 (79-2)*, 510 F. Supp. 112 (D.D.C. 1981), is limited in its persuasive authority on this point because it entirely failed to address threshold Article III jurisdictional issues, including ripeness.  *See generally id.*  There, the Department, in response to a Senate subcommittee's request for investigatory records, filed a motion seeking the court's guidance regarding whether particular categories of documents could be disclosed under Rule 6(e), which the court did provide.  *See id.* at 114.  But beyond its failure to grapple with weighty constitutional issues, that case is also distinguishable: Unlike Windom's request, in that case the court provided guidance on specific categories of already existing documents; in other words, a concrete and defined universe.  *See id.*  By contrast, Windom's request here asks this Court to speculate on a currently undeveloped universe of potential questions that the Committee has yet to ask in a deposition.

while there is still time" for the parties to alter their positions or correct mistakes, "potentially

eliminating the need for (and costs of) judicial review." *Am. Petroleum Inst.*, 683 F.3d at 387. If

the interests of the Court and the respondent in declining review outweigh the interests of those

seeking relief, e.g., where "judicial review might prove unnecessary" down the road, *see id.*,

prudence and judicial economy dictate that courts not intervene. In making this decision, courts

balance the "fitness of the issue[] for judicial decision and the hardship to the parties of

withholding [its] consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

      First, for similar reasons that this action is not constitutionally ripe, it is also not fit for

judicial decision. The fitness requirement protects the court's interest in "avoiding unnecessary

adjudication and in deciding issues in a concrete setting." *Am. Petroleum Inst.,* 683 F.3d at 387

(citation omitted). In making this determination, courts consider whether they "would benefit

from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*,

523 U.S. 726, 733 (1998). As described above, until the Committee has had an opportunity to

ask (or reframe) actual questions in the deposition, and Windom has lodged specific objections,

Windom's claims are "[u]nmoored from a fleshed-out factual setting," *Matthew A. Goldstein,*

*PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 338 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C.

Cir. 2017), because concrete actions still need to be taken. Consequently, as described *supra* at

I.B., to grant Windom's requested relief would require the Court to guess at which kinds of

questions the Committee is most likely to ask and adjudicate those hypothetical applications of

Rule 6(e). Moreover, if future courts were to entertain Windom's novel approach, they could

soon be overwhelmed with requests for pre-deposition advisory opinions regarding all kinds of

purportedly protected subjects to adjudge them off limits to the questioning party. Windom's

application thus poses the very scenario that prudential ripeness is designed to address.

Second, Windom fails to demonstrate that deferring judicial review will cause real or unique hardship to him, much less "immediate and significant" hardship sufficient to "outweigh[]" the institutional interest in declining review here. *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 301 (D.D.C. 2018) (citation omitted). Instead, his interest in immediate review is virtually nonexistent: "mere uncertainty" regarding a legal rule does not constitute "hardship" under the prudential ripeness doctrine. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003). The only hardship Windom will endure from delayed consideration of the disputed issue is the burden of having to perhaps argue the issue again down the road if he wishes to maintain his objection to the Committee's interpretation of Rule 6(e)'s scope in hypothetical future legal proceedings. This is insufficient to overcome the weighty prudential reasons for the Court to dismiss the Application.

> ### D.    The Application Attempts an Improper End Run Around the Speech or Debate Clause

At its core, the Application challenges the Committee's subpoena authority, which is core legislative activity immunized by the Speech or Debate Clause. Indeed, Windom forthrightly admits that he has filed this Application "to resolve a dispute over whether a congressional committee may compel him to answer certain questions at a deposition noticed for September 30, 2025." Mem. at 1. This requested relief would hinder the Committee's ongoing oversight by limiting its questioning at the deposition. That Windom has not sued the Committee directly to obtain this relief, presumably in an effort to evade the Speech or Debate Clause, does not change the fact that he is challenging a legislative act by the Committee. And just as the Speech or Debate Clause immunizes the Committee against any attempt to quash, enjoin, or modify the subpoena by bringing an action directly against the Committee, it prevents Windom from

obtaining a court order opining on which questions the Committee is permitted to ask in his

upcoming deposition.  The Clause precludes any such attempt to "question" the Committee's

decision to compel Windom to answer questions at his upcoming deposition.

The Speech or Debate Clause mandates that Senators and Representatives "shall not be

questioned in any other Place" for "any Speech or Debate in either House."  U.S. Const. art. I, §

6, cl. 1.  It provides absolute immunity from civil actions that challenge all acts "within the

'legislative sphere.'"  *See Doe v. McMillan*, 412 U.S. 306, 312 (1973) (quoting *Gravel v. United

States*, 408 U.S. 606, 624-25 (1972)).  The Clause applies to committees of Congress just as it

does individual Members.  *See Musgrave v. Warner*, 104 F.4th 355, 361-65 (D.C. Cir. 2024)

(holding that Speech or Debate Clause barred suit against Senate committee and its chairman

seeking a legislative document); *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 991-93 (D.C. Cir. 2021)

(same for House committee and chairman).  The Supreme Court has stated unequivocally that

when the challenged actions "fall within the sphere of legitimate legislative activity," they "shall

not be questioned in any other Place about those activities since the prohibitions of the Speech or

Debate Clause are absolute."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975)

(internal quotation marks and citations omitted); *see also id.* at 503, 509 n.16, 509-10; *Gravel*,

408 U.S. at 623 n.14.  Accordingly, "when the actions upon which a plaintiff seeks to predicate

liability are legislative acts, the Speech or Debate Clause operates as a jurisdictional bar,

conferring absolute immunity from suit."  *Musgrave*, 104 F.4th at 361 (internal quotation marks

and citation omitted).

The Speech or Debate Clause's absolute immunity extends to *all* civil actions.  *See

Eastland*, 421 U.S. at 503.  The Clause protects federal legislators "not only from the

consequences of litigation's results but also from the burden of defending themselves."

*Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam).  "The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently*. … [T]he central role of the Clause is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary."  *Eastland*, 421 U.S. at 502 (emphasis added) (internal quotation marks omitted).  By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel*, 408 U.S. at 618, the Clause both "preserve[s] the independence and ... integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421 U.S. at 502 (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)).

The Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes."  *Eastland*, 421 U.S. at 501; *Gravel*, 408 U.S. at 617 ("[C]ases have plainly not taken a literalistic approach in applying the privilege. … Committee reports, resolutions, and the act of voting are equally covered … .").  Thus, it has been well-established that Committee investigations, including the issuance of subpoenas and the taking of compelled testimony, are legislative acts covered by the Clause.  *See Eastland*, 421 U.S. at 504 (holding the "power to investigate and to do so through compulsory process" is activity within the legislative sphere); *see also id.* ("Issuance of subpoenas … has long been held to be a legitimate use by Congress of its power to investigate.").  Courts have consistently held that once the legislative-act test is satisfied, that is "the end of the matter."  *See, e.g.*, *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418 (D.C. Cir. 1995) ("Once the legislative-act test is met, … the privilege is absolute." (citation omitted)).

Here, the Application seeks to interfere with a Committee investigation and subpoena, which are absolutely protected by the Speech or Debate Clause. By asking the Court "to resolve a dispute over whether a congressional committee may compel him to answer certain questions at a deposition," Mem. at 1, and seeking "a ruling … on whether the topics on which the Committee seeks to compel [his] testimony implicate the secrecy mandate of Rule 6(e)," *id.* at 9, the Application is an attempt to quash, enjoin, or modify the subpoena masquerading in another form. The Court should deny this attempt for the same reasons it has denied similar efforts to enlist courts to superintend ongoing Congressional investigations. *See, e.g.*, *Budowich v. Pelosi*, 610 F. Supp. 3d 1, 15-16 (D.D.C. 2022) (Boasberg, J.) (holding the Clause was an absolute jurisdictional bar to claims brought by a recipient of a House committee subpoena against House defendants); *see also De La Torre v. Cassidy*, No. 24-cv-2776, 2025 WL 2651248, at *1 (D.D.C. Sept. 16, 2025) (holding the Clause barred a doctor from challenging a subpoena compelling his attendance at a hearing because it "grants Congress absolute immunity from suits based on legislative actions").

Courts have held that the Speech or Debate Clause bars improper attempts to interfere with Congressional investigations, regardless of how the party bringing the action attempts to frame it. For example, in *Bragg*, a district attorney sought to enjoin this same Committee from compelling a former prosecutor in his office to answer questions in an upcoming deposition, including those alleged to seek grand jury material. 669 F. Supp. 3d at 261, 272. The court saw the lawsuit for what it was, "merely a motion to quash a subpoena dressed up as a lawsuit," *id.* at 264, and ultimately rejected this ploy. In doing so, the court declined the prosecutor's invitation

to "blindly speculate about what questions might hypothetically be posed" at the deposition. *Id.* at 271-72 (emphasis omitted).[11]

Further, the Clause bars any legal action that would "question" a committee's legislative activity, regardless of whether the action seeks to impose any civil or criminal liability on the committee. In *Judicial Watch v. Schiff*, the D.C. Circuit held that the Clause barred an action seeking disclosure of subpoenas issued to any telecommunications provider by a House Committee as part of an investigation. 998 F.3d at 990. The court rejected plaintiff's attempt to avoid the Clause by arguing that its suit seeks "only the disclosure of public records" rather than to establish any civil or criminal liability because it was "no more entitled to compel … production of documents … than it is to sue congressmen." *Id.* at 992 (alterations in original) (quoting *Brown & Williamson*, 62 F.3d at 421); *see also Jud. Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 318 (D.D.C. 2020) ("[T]he fact that plaintiff seeks disclosure, rather than to establish criminal or civil liability, has no bearing on the application of the Clause to bar this lawsuit.").

*Eastland* confirms the exceedingly limited role of the Judiciary in determining whether a Congressional committee's issuance of a subpoena involves legislative matters protected by the Speech or Debate Clause. In that case, the recipient of a Senate committee subpoena sued to enjoin a subpoena for bank records. *Eastland*, 421 U.S. at 495-97. The Supreme Court rejected the notion that the subpoena could be judicially quashed because "the Speech or Debate Clause provides complete immunity for the Members for issuance of this subpoena." *Id.* at 507. In declining to rule on the "propriety of making [the subpoena target] a subject of the investigation

---

[11]  Notably, Windom himself acknowledged at the transcribed interview that he did not yet know what questions the Committee would ask him. Mem. at 7 n.5 ("[Windom] also stated that Rule 6(e)'s requirements *may* be implicated, depending on the Committee's *unknown future questions* … ." (emphasis added)).

and subpoena," *id.* at 506, the Supreme Court emphasized that "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province," *id.* (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)). "Courts should instead cabin themselves to only a 'cursory look at the facts presented by the pleadings' to conclude that the subpoena at issue has a legitimate target and scope." *Budowich*, 610 F. Supp. 3d at 14 (quoting *Eastland*, 421 U.S. at 506). The Speech or Debate Clause "was written to prevent the need to be confronted by such 'questioning' and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority." *Eastland*, 421 U.S. at 511.

Likewise, here, the Clause precludes Windom's attempt to dictate the specifics of the Committee's investigation. The Court should look beyond the procedural posture of Windom's application and instead focus on the core constitutional protections provided by the Clause. No matter how it is dressed up, the Application requests relief that is no different from a direct challenge to the Committee's ability to conduct its investigation as it sees fit. Investigative decisions, including what witnesses to subpoena and what questions to ask in a deposition, are core legislative activities. *See id.* at 504. If Windom wishes to object on Rule 6(e) grounds, he is free to do so at the deposition. But the legislative acts themselves—the Committee's investigative steps, including its decision to compel Windom to answer questions pertinent to its investigation—are not subject to "questioning" in court. *Id.* at 511. That Windom seeks to question the Committee's legislative activity via an application rather than a civil complaint or motion to quash or modify the subpoena has no bearing on the applicability of the Clause. The Application has required the Committee to come to court to preserve its ability to conduct its upcoming deposition as it sees fit. As a practical matter, the Committee is the defendant in this

matter, especially when viewed through the lens of the principles for which the Speech or Debate Clause stands.

Finally, Windom's claim that the Committee intends to impermissibly seek grand jury information during the upcoming deposition does not abrogate the Clause's protections. The Clause applies to activities "within the 'legislative sphere' even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25). A version of "[t]his 'familiar' argument — made in almost every Speech or Debate Clause case — has been rejected time and again." *Budowich*, 610 F. Supp. 3d at 15 (alteration in original) (quoting *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015)). Whether the Committee's questions could be viewed as asking Windom to violate Rule 6(e) "or even the Constitution" does not diminish the legislative nature of the Committee's investigation and subpoena. *See id.* Although there are potential costs associated with this broad and unique constitutional protection, it must be broadly construed because that was "'the conscious choice of the Framers' buttressed and justified by history." *Eastland*, 421 U.S. at 510 (quoting *Brewster*, 408 U.S. at 516).

At bottom, the Application is a misguided attempt to interfere with the Committee's ability to conduct its oversight investigation. The Speech or Debate Clause precludes this effort for the same reason it precludes similar attempts to enlist courts as supervisors of Congressional investigations.

## II.    WINDOM'S INTERPRETATION OF RULE 6(e) IS OVERBROAD

For the reasons set forth above, the Court should not issue an advisory opinion addressing whether particular topics or questions involve grand jury information protected by Rule 6(e).

But if it chooses to wade into the merits, the Court should reject Windom's overbroad interpretation of Rule 6(e)'s secrecy requirement.

Windom focuses on two topics that are "[r]elevant to []his application": the Committee's inquiries pertaining to (1) Windom's knowledge of J.P. Cooney's "proposal" for "a potential course of investigation," and (2) his "interactions with the FBI to obtain billing records from the Willard Hotel."[12]  Mem. at 6-7.  Contrary to Windom's assertions, the Committee's inquiry into these topics will not breach grand jury secrecy because these are not matters "occurring before the grand jury" as they do not reveal the "inner workings of the grand jury."  *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1002 (D.C. Cir. 1999) (per curiam) (citations omitted).  Further, given that these matters were the subject of extensive public reporting, even if they were at one point secret grand jury information, they generally have since "lost [their] character as Rule 6(e) material."  *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006) (quoting *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)).

## A.    The Committee's Inquiry Into Windom's Two Identified Topics Does Not Concern Matters "Occurring Before the Grand Jury"

Rule 6(e)(2)(B) states that "an attorney for the government" "must not disclose a matter occurring before the grand jury."  From here, Windom argues that a "matter[] occurring before the grand jury" includes "*the strategy or direction of the investigation*," Mem. at 10 (quoting *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499-500 (D.C. Cir. 1998)), and that because

---

[12] Windom's Supplemental Memorandum identifies other potential topics that he asks the Court to consider as part of his application.  *See* Suppl. Mem. at 3-4.  But as explained above in Section I.B., these topics lack sufficient development and background and are in flux.  Indeed, Windom himself appears unsure if the Committee will cover these topics in his deposition, stating only that it "appears" that the Court will need to address these topics.  Suppl. Mem. at 3.  All of this, and the fact that Windom presents barely any argument as to why these additional topics might infringe on grand jury secrecy, renders them ill-suited for the Court to adjudicate at this juncture.

asking about an "investigative proposal by another prosecutor" and "[p]urported interactions with the FBI about obtaining records from the Willard Hotel via a grand jury subpoena" would reveal "the strategy or direction of the investigation," *id*. at 11-12 (quoting *Dow Jones*, 142 F.3d at 499-500), these matters fall under Rule 6(e).  But Windom is incorrect; not only does he rely on case law that has been subsequently narrowed, but he conflates his investigation with that of the grand jury's.

As an initial matter, the D.C. Circuit has clarified and narrowed the language that Windom relies on: "[d]espite the seemingly broad nature of the statements in *Dow Jones*, we have never read Rule 6(e) to require that a 'veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.'"  *In re Sealed Case No. 99-3091*, 192 F.3d at 1001-02 (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc)).  In fact, the D.C. Circuit has "cautioned" that it is "problematic" to "apply[] [a] broad … definition, *especially as it relates to the 'strategy or direction of the investigation,'* to the inquiry as to whether a government attorney has made unauthorized disclosures."  *Id.* at 1001 (emphasis added) (quoting *In re Sealed Case No. 98–3077*, 151 F.3d 1059, 1071 n.12 (D.C. Cir. 1998)).

The D.C. Circuit's warning against a broad claim of secrecy for matters that allegedly reveal the strategy or direction of the grand jury's investigation is particularly warranted here when the interests justifying grand jury secrecy are not implicated.  In cases where the release of information "would encourage the flight of suspects or jury tampering or subornation of perjury or discourage persons with information from coming forward or harm the innocent[,] the courts will no doubt give careful thought to the application of Rule 6(e)."  *In re Grand Jury Impanelled Oct. 2, 1978 (79-2)*, 510 F. Supp. at 114-15 (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219 n.10 (1979)).  But here, Windom has not presented any reason why his mere knowledge

of another prosecutor's investigative proposal, or his interactions with agents, would implicate witnesses. And since the investigation is closed, jury tampering and suspect apprehension are not concerns. While there is a "heighten[ed] … need for maintaining grand jury secrecy" when the "investigation is ongoing," that is simply not the case here. *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1141. As a result, this is not a case where disclosure would "frustrate the purpose of grand jury secrecy," *In re Grand Jury Impanelled October 2, 1978 (79-2)*, 510 F. Supp. at 115, meaning, broad 6(e) protection pertaining to the strategy or direction of the investigation is not warranted.

More fundamentally, "the 'touchstone' is whether the information sought would reveal something about the *grand jury's* identity, investigation, or deliberation." *Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 529 (D.C. Cir. 2016) (emphasis added) (quoting *Senate of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 582 (D.C. Cir. 1987)). "[T]he grand jury and a prosecutor are two separate, independent entities, [and] either the prosecutor or the grand jury may investigate evidence of criminal wrongdoing." *United States v. Drake*, 310 F. Supp. 3d 607, 621 (M.D.N.C. 2018). Thus, as *In re Grand Jury Matter*, 682 F.2d 61 (3d Cir. 1982) explained:

> materials obtained in the course of the FBI's investigation of possible unlawful activity, including tape recordings and transcripts of consensually monitored conversations, FBI 302's, documents obtained without grand jury subpoena, and a prosecution memorandum summarizing the information compiled by the FBI investigation. … [T]hese materials were the product of an FBI investigation, were not generated by the grand jury, and were not requested or subpoenaed by the grand jury. [Thus, …] this was not information "occurring before a grand jury" and hence was outside the disclosure ban of Rule 6(e). … The information developed by the FBI, although perhaps developed with an eye toward ultimate use in a grand jury proceeding, exists apart from and was developed independently of grand jury processes.

*Id*. at 64. As a result, given that "the text of the Rule itself[] reflect[s] the need to preserve the secrecy of the *grand jury* proceedings," "a distinction of the utmost significance" exists between "statements by a prosecutor's office [that reveals aspects of] its own investigation,

and statements by a prosecutor's office [that reveals aspects of] a *grand jury's* investigation." *In re Sealed Case No. 99-3091*, 192 F.3d at 1002.

Here, Windom ignores that distinction and conflates himself with the grand jury. In explaining why Windom would not be answering the Committee's questions about J.P. Cooney's investigative proposal, Windom's counsel stated that "if you're asking about a proposal for a course of an investigation, *the only investigation is going to be a grand jury investigation*." Tr. at 19-20 (emphasis added). But Windom fails to offer any evidence that the two topics the Committee inquired about pertain to the grand jury's investigation as opposed to Windom's independent thoughts and actions.

Consider Cooney's investigative proposal. Windom's application wholly fails to provide any basis for the Court to determine that Cooney's investigative proposal relied on grand jury (as opposed to non-grand jury) investigative tactics. Indeed, it appears that after significant deliberation, Cooney's proposal was never even implemented.[13] "[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *In re Sealed Case No. 99-3091*, 192 F.3d at 1003. Further, during the transcribed interview, the Committee did not ask Windom about the contents or merits of Cooney's proposal, instead, it merely inquired if Windom was *aware* of Cooney's proposal. Tr. at 19:15-21.

As for the Willard Hotel, the Committee asked, "[d]id you ever have discussions with Mr. D'Antuono regarding seeking information from the Willard Hotel?" *Id.* at 33:12-13. While "seeking information" would include grand jury subpoenas, the question is worded broadly to include any method of seeking information from the hotel, such as "consensually monitored

---

[13] *See* Carol D. Leonnig & Aaron C. Davis, *FBI Resisted Opening Probe into Trump's Role in Jan. 6 for More Than a Year*, Wash. Post (June 20, 2023), https://perma.cc/G43R-WLMV.

conversations," "documents obtained without grand jury subpoena," or other "[non-]grand jury processes." *In re Grand Jury Matter*, 682 F.2d at 64. In any case, the Committee did not inquire about the contents of any subpoena, what it sought or produced, or the like.[14] Instead, the Committee's question centered on Windom's discussions with the FBI regarding the subpoena. Mem. Ex. H, at 4 ("Our questions on this topic related to *your general knowledge and interactions* with Department officials, including ADIC Steven D'Antuono, about obtaining this material." (emphasis added)). "A discussion of actions taken by government attorneys or officials—e.g., a recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual—does not reveal any information about matters occurring before the grand jury." *In re Sealed Case No. 99-3091*, 192 F.3d at 1003 (quoting *In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980)).

Simply put, there must be "some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." *Senate of P.R.*, 823 F.2d at 584. Windom has failed to affirmatively demonstrate that the Committee's two lines of inquiry seek the "inner workings of the grand jury," *In re Sealed Case No. 99-3091*, 192 F.3d at 1002 (internal quotation mark and citations omitted), as opposed to non-grand jury actions and information.

---

[14] For this reason, *Lopez v. DOJ*, 393 F.3d 1345 (D.C. Cir. 2005) is inapposite. In that case, the court explained that "[b]ecause the evidence and testimony subpoenaed is that which is intended to be used by the grand jury, the subpoenas and the dates on which they are issued tend to reveal the direction of the relevant investigation." *Id*. at 1350. But here, there does not appear to be any public confirmation that the FBI ever served a subpoena on the hotel, and as explained above, the Committee was not asking questions about the contents of the potential subpoena.

Windom's overbroad application of Rule 6(e) also conflicts with the Department's instructions, both generally and as specific to him.  First, the Justice Manual, which Windom is "generally familiar with," Tr. at 98:15, states that federal prosecutors have "the discretion to notify an individual, who has been the target of a grand jury investigation, that the individual is no longer considered to be a target."  U.S. Dep't of Just., Justice Manual § 9-11.155, https://perma.cc/2KLL-5AXV.  Notification may happen even if the investigation is "continuing."  *Id*.  The existence of this provision suggests that notification does not reveal "the strategy or direction of the investigation" in every case.  But Windom's expansive interpretation of Rule 6(e) would mean that every notification would reveal the strategy or direction of the investigation, directly conflicting with this provision.  After all, if Windom believes that Rule 6(e) prevents him from revealing even the fact that he talked to other people or any information about subpoenas (including the dates they are issued, *see* Mem. at 10), it is difficult to understand how telling people that they are no longer targets, which reveals far more about the direction of the investigation than the former, could ever be permissible.

As specific to him, Windom's interpretation renders meaningless important aspects of the Department's two authorization letters.  Both the Department's June 4 and September 4 letters instructed Windom to give "unrestricted testimony to the Committees" on various topics due to "exceptional circumstances warranting an accommodation to Congress."  Mem. Ex. F, at 1-2; Suppl. Mem. Ex. 1, at 1-2.  For the June 4 letter, the topics included "interactions with DOJ officials, including JP Cooney" and Windom's "knowledge of interviews conducted [and] subpoenas issued (including those related to the Willard Hotel)."  Mem. Ex. F, at 1.  For the September 4 letter, the topics included "[i]nteractions related to this investigation with the [FBI] and Main Justice," as well as "[i]nteractions with other prosecutors related to this investigation."

Suppl. Mem. Ex. 1, at 1. Windom, however, essentially failed to answer any question pertaining to Cooney's proposal or the potential Willard Hotel subpoena during his interview. Indeed, Windom's counsel claimed that "[a]ny subpoena issued would be, by definition, a grand jury subpoena and, therefore, that topic is off limits by the terms of Rule 6(e)." Tr. at 34:18-19. Such an interpretation renders important aspects of the Department's authorization letters a nullity. After all, if Rule 6(e) does not permit Windom to answer any questions regarding these topics, it begs the question of why the Department bothered to authorize Windom to give "unrestricted testimony" on those topics. Instead, the Department's authorization letters should be viewed as evidence that Windom has an overly broad view of Rule 6(e).

Finally, Windom's broad interpretation of Rule 6(e), were it to be adopted by the Court, would place other federal prosecutors in potential jeopardy. For example, just months ago, the Committee interviewed former United States Attorney for the District of Delaware and Special Counsel for the Hunter Biden investigation David Weiss, who had no problem answering questions about the Justice Department personnel that he talked to and the content of his conversations about issuing subpoenas:

> I had been having conversations with … the Attorney General's Office, the Office of the Deputy Attorney General, and regular communications with public integrity about these such things. … I think, my recollection is we had had recent discussions with perhaps the PADAG and PIN about subpoenas and whether subpoenas, document subpoenas, were appropriate or necessary as of I think the end of August or early September, and the response as I recall was, "No, let's wait until after the election." Unless there was urgency or the risk of evidence being lost, there's no way a search warrant for one of the candidates['] residences would have been authorized because it introduces politics into what we're doing.

Transcript of Interview of David Weiss, Special Couns., DOJ, at 109:4-14 (June 6, 2025), https://perma.cc/QF2Y-XLMG. In another section, in response to a Committee question about a potential search warrant for a storage unit, Weiss responded:

> I do recall the dispute and the discussion about whether to proceed with a search warrant versus a subpoena, but I know there was discussion about that. I believe we sought input from Office of Investigative Enforcement … . And ultimately the decision was made, because of the privilege complications and the fact that, even under a search warrant process, you were going to have to involve a magistrate to review the privilege material before production or defense counsel himself in an overt investigation, and we were overt then, was going to have the opportunity to look at privileged material. So the decision was made, "Let's just do it by subpoena. It's not worth it."

*Id*. at 110:11-111:3. It is hard to square Windom's refusal to even acknowledge conversations that he had with his investigators, *see* Tr. at 34:1-4 ("I would not be able to talk about specific interactions with Mr. D'Antuono. … [T]o the extent that it occurred or did not occur, my understanding would fall, as my counsel indicated, within Rule 6 obligations … ."), with Weiss's discussion of his thought process behind issuing or not issuing subpoenas, to whom he spoke, and the details of conversations he had with other prosecutors and investigators. Weiss, moreover, is not the only one. Since the start of this Congress, the Committee has interviewed other federal prosecutors, and based on the responses they provided to the Committee's questions, at least four of them could be in legal jeopardy if the Court were to adopt Windom's interpretation of Rule 6(e).[15] This is a further reason why the Court should not accept Windom's interpretation to issue an advisory opinion at this time.

### B. Substantial Information Regarding Windom's Two Identified Topics Is Now Publicly Known and Therefore Not Subject to Rule 6(e)

Even if information sought by the Committee was at one time protected by Rule 6(e), much of it has become public and is no longer entitled to 6(e) protection. It is "common-sense … that secrecy is no longer 'necessary' when the contents of grand jury matters have become public." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d at 1140. Thus, for example,

---

[15] The transcripts for the transcribed interviews and depositions of these four witnesses have not been released by the Committee and are not publicly accessible.

"staffers at the Office of the Independent Counsel could not have violated Rule 6(e) when they told the *New York Times* they believed then-President Clinton should be indicted for perjury and obstruction of justice" because they "'did not reveal any secret, for it was already common knowledge' both that President Clinton had testified and that the grand jury was investigating possible perjury and obstruction charges against him." *Id.* (quoting *In re Sealed Case No. 99-3091,* 192 F.3d at 1001-05); *see also In re North*, 16 F.3d at 1244 (finding that while the Independent Counsel's report relied on grand jury material, there was no Rule 6(e) violation because the information was previously and publicly disclosed to Congress and the court); *In re Petition of Craig*, 131 F.3d 99, 107 (2d Cir. 1997) ("[Whether] grand jury material in a particular case has been made public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy.").

Here, Windom cannot invoke Rule 6(e) to avoid answering all questions about Cooney's investigative proposal or his interactions with the FBI about the Willard Hotel subpoena; these topics have not only been extensively publicized, their publicization *is the basis* for the Committee's inquiry. During Windom's transcribed interview, the Committee entered as an exhibit a "Washington Post article from June 19th, 2023, titled 'FBI resisted opening probe into Trump's role in Jan. 6 for more than a year.'" Tr. at 36:5-9. Regarding Cooney's investigative proposal, the article details that "[i]n February 2021, Cooney took his proposal to investigate the ties with people in Trump's orbit directly to a group of senior agents in the FBI's public corruption division, a group he'd worked with over the years and who were enmeshed in some of the most sensitive Jan. 6 cases underway." Leonnig & Davis, *supra* note 13. The article then provides extensive details of Cooney's plan from "three people who either viewed or were briefed on Cooney's plan." *Id*. Compare the detailed Washington Post article to the tame

31

Committee question (which is worded similarly to the Washington Post article) that Windom refused to answer on Rule 6(e) grounds during his transcribed interview:

> Q:  Did you ever become aware that in February 2021, Mr. Cooney had taken a proposal to his supervisors wanting to investigate President Trump and individuals within his orbit regarding the lead-up to and the events of January 6th? Did you ever become aware of that?"
>
> A:  <u>Mr. Burton</u>. I think asking about a proposal for a course of investigation would be Rule 6(e) type information.

Tr. at 19.  Windom cannot invoke Rule 6(e) when the national media has extensively covered not only the existence of the proposal, but specific details of it, sourced from insiders who may well be Windom's former colleagues.

The same is true for his interactions with the FBI about the Willard Hotel.  The Washington Post article has an entire subsection titled "'I'm not serving subpoenas on the friggin' Willard'" and details in over a dozen paragraphs a play-by-play of a plan to subpoena the Willard Hotel, including the fact that Windom spoke with D'Antuono.  Leonnig & Davis, *supra* note 13.  During the transcribed interview, the Committee specifically flagged that section of the article for Windom and walked him through it.  Tr. at 36-39.  Moreover, two months ago, Senator Charles Grassley, Chairman of the U.S. Senate Committee on the Judiciary, publicly released emails concerning the Willard Hotel subpoena,[16] which were extensively covered by national media.[17]  The public disclosure included emails to and from investigators and prosecutors, including Windom.  *See Willard Emails*, *supra* note 16.  Indeed, the last two pages are a

---

[16]  *See FBI Willard Emails Obtained by Chairman Grassley*, Sen. Chuck Grassley, https://perma.cc/W97U-3UT3.

[17]  *See, e.g.*, Katelynn Richardson, *FBI Official who Participated in Investigation Behind Trump Prosecution Still in Charge of Philadelphia Office*, Daily Caller (July 21, 2025, 9:15 AM), https://perma.cc/UH7H-U8AS.

document titled "Willard Hotel - Draft Investigative Steps," which specifically detail the contents of the potential Willard Hotel subpoena, such as ensuring that it includes a "[f]ull list of occupants by room January 1-7, 2021" and "[i]nternal security camera footage January 1-7, 2021." *Id*. at 8-9.

"The purpose in Rule 6(e) is to preserve secrecy. Information widely known is not secret." *In re North*, 16 F.3d at 1245. Given that the Committee's inquiry was inspired, at least in part, by the Washington Post article that contains extensive details about Cooney's investigative proposal and the potential Willard subpoena, and that Windom and his counsel are aware of this, *see* Tr. at 21:4-8 ("I am aware of [the] public reporting … I believe that Mr. Cooney was identified in whatever newspaper article I saw – had sought a series of investigative steps."); 34:15-17 ("I'm aware of the newspaper article that prompts this line of inquiry, which is supposedly about a subpoena to the Willard, as you just said … ."), 6(e) protection has been lost, and Windom has no basis for refusing to answer all the Committee's questions on these topics.[18] Simply put, "the cat is out of the bag," *In re North*, 16 F.3d at 1245, and this Court should not prevent Windom from answering the Committee's deposition questions.

---

[18] Windom's counsel curiously claims in a footnote to the Application that he "is not aware of anything implicated by the Committee's potential deposition topics that … has been sufficiently publicly disclosed such that it has 'lost its character as Rule 6(e) material.'" Mem. at 11 n.10 (quoting *Dow Jones*, 142 F.3d at 505). Yet, as described above, the Washington Post article served as the basis for the Committee's questions, which Windom's counsel himself acknowledges. Tr. at 34:15-17 ("I'm aware of the newspaper article that prompts this line of inquiry, which is supposedly about a subpoena to the Willard, as you just said … .").

**CONCLUSION**

For the above reasons, the Court should dismiss or deny the Application.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346)
  *Associate General Counsel*
Andy Wang (D.C. Bar No. 1034325)
  *Associate General Counsel*
Kenneth C. Daines (D.C. Bar No. 1600753)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Committee on the Judiciary of the U.S.
House of Representatives*

September 22, 2025

## CERTIFICATE OF SERVICE

I certify that on September 22, 2025, I filed the foregoing document with the Clerk's

Office of the U.S. District Court for the District of Columbia via electronic mail at

dcd_intake@uscourts.gov, and served one copy via electronic mail, as agreed to by all parties,

on:

Preston Burton, pburton@orrick.com
Rachel Li Wai Suen, rliwaisuen@orrick.com
Jackson Hagen, jhagen@orrick.com
Orrick, Herrington & Sutcliffe LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037-3202

*Counsel for Thomas P. Windom*


/s/ Matthew B. Berry
Matthew B. Berry