# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE APPLICATION OF THOMAS P. | : | Case No. 1:25-mc-138 |
| WINDOM FOR ORDER DETERMINING | : | |
| WHETHER CERTAIN INFORMATION | : | Chief Judge James E. Boasberg |
| IS PROTECTED FROM DISCLOSURE | : | |
| BY FEDERAL RULE OF CRIMINAL | : | **ORAL ARGUMENT REQUESTED** |
| PROCEDURE 6(e) | : | |
| | : | |

# APPLICATION OF THOMAS P. WINDOM FOR ORDER DETERMINING WHETHER CERTAIN INFORMATION IS PROTECTED FROM DISCLOSURE BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e)

Pursuant to Local Criminal Rules 6.1 and 57.6, Thomas P. Windom respectfully applies for an order determining whether certain information relating to grand jury investigations is protected from disclosure by Federal Rule of Criminal Procedure 6(e). A supporting memorandum of points and authorities and proposed order are attached.

Thomas P. Windom, a former federal prosecutor detailed to the United States Attorney's Office for the District of Columbia in late 2021 and then detailed to the Office of Special Counsel Jack Smith in late 2022, has been subpoenaed by the U.S. House of Representatives Committee on the Judiciary ("Committee") to appear for a deposition noticed for September 30, 2025. Mr. Windom previously appeared for a voluntary transcribed interview with the Committee on June 12, 2025. During the voluntary transcribed interview, Mr. Windom declined to answer certain questions because the inquiries implicated Rule 6(e)'s prohibition on disclosing matters occurring before a grand jury. In its cover letter accompanying the subpoena to Mr. Windom, the Committee stated that it disagrees with Mr. Windom's view of Rule 6(e) and that it intends to re-pose certain questions Mr. Windom declined to answer due to Rule 6(e) concerns.

The Committee maintains a narrow—and, we submit, legally incorrect—view of the scope of Rule 6(e). The Committee's attempt to compel Mr. Windom's testimony on the topics at issue

places Mr. Windom in an untenable position: if he responds to the Committee's questions, he risks

violating Rule 6(e), which is punishable by criminal contempt of court.  But should he decline to

answer the Committee's questions, he risks prosecution for contempt of Congress.  Accordingly,

Mr. Windom respectfully requests that the Court issue an order determining whether the topics

described in the accompanying memorandum and the Committee's cover letter are within the

scope of Rule 6(e).


DATED:  September 3, 2025

Respectfully submitted,

*/s/ Preston Burton*
Preston Burton (D.C. Bar No. 426378)
Rachel Li Wai Suen (D.C. Bar No. 500527)
Jackson Hagen (D.C. Bar No. 1671315)
Orrick, Herrington & Sutcliffe LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037-3202
Telephone: +1 202 349 8065
Facsimile:  +1 202 339 8500
pburton@orrick.com
rliwaisuen@orrick.com
jhagen@orrick.com

*Counsel for Thomas P. Windom*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE APPLICATION OF THOMAS P. | : | Case No. _____ |
| WINDOM FOR ORDER DETERMINING | : | |
| WHETHER CERTAIN INFORMATION | : | Chief Judge James E. Boasberg |
| IS PROTECTED FROM DISCLOSURE | : | |
| BY FEDERAL RULE OF CRIMINAL | : | **ORAL ARGUMENT REQUESTED** |
| PROCEDURE 6(e) | : | |
| | : | **UNDER SEAL** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**APPLICATION OF THOMAS P. WINDOM FOR ORDER DETERMINING WHETHER**
**CERTAIN INFORMATION IS PROTECTED FROM DISCLOSURE**
**BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e)**

Pursuant to Local Criminal Rules 6.1 and 57.6, Thomas P. Windom respectfully applies for an order determining whether certain information relating to grand jury investigations is within the scope of Federal Rule of Criminal Procedure 6(e). Mr. Windom files this application to resolve a dispute over whether a congressional committee may compel him to answer certain questions at a deposition noticed for September 30, 2025.

## I. INTRODUCTION AND STATEMENT OF THE APPLICANT'S INTEREST IN THE MATTER AS TO WHICH RELIEF IS SOUGHT

Thomas P. Windom, a former federal prosecutor detailed to the United States Attorney's Office for the District of Columbia in late 2021 and then detailed to the Office of Special Counsel Jack Smith in late 2022, has been subpoenaed by the U.S. House of Representatives Committee on the Judiciary ("Committee") to appear for a deposition noticed for September 30, 2025. In the course of his work in those two details, Mr. Windom was involved with numerous investigatory activities under the auspices of federal grand juries convened in this judicial district, some of which

resulted in the Indictment and Superseding Indictment of President Trump in a matter assigned to United States District Judge Tanya S. Chutkan.[1]

Mr. Windom previously appeared for a voluntary transcribed interview with the Committee on June 12, 2025. For purposes of that interview, the Department of Justice ("Department") authorized Mr. Windom to discuss certain limited topics, but directed Mr. Windom not to provide information if doing so would violate Federal Rule of Criminal Procedure 6(e) or other relevant laws or court orders. During the voluntary transcribed interview, Mr. Windom declined to answer certain questions because the inquiries implicated Rule 6(e)'s prohibition on disclosing matters occurring before a grand jury.

The Committee subpoenaed Mr. Windom on July 21, 2025, seeking to compel his appearance at a deposition. In its cover letter accompanying the subpoena to Mr. Windom, the Committee stated that it disagrees with Mr. Windom's view of Rule 6(e). The Committee stated that it intends to re-pose certain questions Mr. Windom declined to answer during his voluntary transcribed interview, including those Mr. Windom declined due to Rule 6(e) concerns.

The Committee's attempt to compel Mr. Windom's testimony on these topics places Mr. Windom in an untenable position: if he responds to the Committee's questions on the topics at issue, he risks violating Rule 6(e), which is punishable by criminal contempt of court. But should he decline to answer the Committee's questions, he risks prosecution for contempt of Congress. To our knowledge, neither the Department nor the Committee have sought a ruling from this Court

---

[1] *See United States v. Trump*, Case No. 23-CR-257 (D.D.C.). We are filing this application before the Chief Judge of this District in accord with the local rules of this Court regarding matters occurring before the grand jury. *See* Local Criminal Rules 6.1 and 57.6. The questions previously posed by the Committee to Mr. Windom at his voluntary transcribed interview, and which the Committee advises that it intends to revisit at his deposition, involve matters that pre-date the appointment of the Special Counsel and are not limited to grand jury matters directly related to the indictment of President Trump.

regarding whether the requested information is covered by Rule 6(e) and, if it is, permitting Mr. Windom nonetheless to share such information with the Committee. Left with no alternative means to resolve this critical issue before he is compelled to respond to questions from the Committee, Mr. Windom respectfully seeks an Order from this Court pursuant to Rule 6, and Local Criminal Rules 6.1 and 57.6, determining whether the identified topics implicate the secrecy obligations of Rule 6(e).

## II.    STATEMENT OF FACTS

Mr. Windom is a former federal prosecutor who served with distinction as an Assistant United States Attorney in the District of Maryland starting in February 2013. His work in that Office is not the subject of the Committee's inquiry.

In approximately November 2021, Mr. Windom was detailed to the United States Attorney's Office for the District of Columbia. In that capacity, he was assigned to review evidence derived from several grand jury investigations before this Court. In approximately November 2022, Mr. Windom was detailed to the Office of Special Counsel Jack Smith as a Senior Assistant Special Counsel on the team investigating matters including those that ultimately resulted in the federal criminal case *United States v. Donald Trump*, Case No. 23-CR-257 (D.D.C.). The investigations on which Mr. Windom worked involved appearances before grand juries in this District, the use of grand jury subpoenas, the use of evidence obtained during grand jury investigations, and internal deliberations regarding investigatory steps to further the course and direction of pending grand jury investigations.

Following the November 2024 Presidential election, the Special Counsel dismissed the then-pending charges against President-elect Trump on November 25, 2024. *See United States v. Trump*, Case No. 23-357 (D.D.C.), ECF Nos. 281, 283. In January 2025, Mr. Windom returned to the United States Attorney's Office in Maryland. On January 27, 2025, seven days after

3

President Trump was inaugurated, Mr. Windom was unlawfully terminated by the Department because he "played a significant role in prosecuting President Trump." *See* Exhibit A (January 27, 2025 Notice of Removal from Federal Service).

On April 7, 2025, the Committee's Chair sent Mr. Windom a letter requesting that he voluntarily appear for a transcribed interview to discuss his "role as a prosecutor on former Special Counsel Jack Smith's team." *See* Exhibit B (April 7, 2025 Letter from J. Jordan to T. Windom) at 1. In anticipation of agreeing to sit for a voluntary interview, undersigned counsel engaged in numerous communications and discussions with the Committee and the Department prior to the interview regarding various issues, including the scope of the testimony sought by the Committee and the legal and ethical rules potentially restricting Mr. Windom's ability to respond to questions about certain subject matters, such as Rule 6(e).

Undersigned counsel raised these and other issues with Committee staff in calls on April 24, 2025; May 27, 2025; and June 2, 2025; with Department personnel in email exchanges on May 20 and May 29, 2025; and in a letter to the Committee dated June 11, 2025. *See* Li Wai Suen Decl. ¶¶ 2-9; Exhibits C, D, E (correspondence with Committee). On April 24, Committee staff identified a broad set of potential topics for Mr. Windom's voluntary interview including "the constitutionality of [the Special Counsel's] appointment" and how the Special Counsel "ran his investigation." *See* Li Wai Suen Decl. ¶ 3. When pressed by counsel for Mr. Windom, Committee staff promised to provide counsel greater specificity about the interview topics, but then communicated directly with the Department, omitting undersigned counsel from those communications. *See* Exhibit D. Counsel for Mr. Windom informed the Committee of their intention to seek guidance from the Department directly regarding what Mr. Windom could permissibly discuss at his voluntary interview. *See* Li Wai Suen Decl. ¶ 4.

On May 20, 2025, counsel for Mr. Windom requested guidance from the Department in anticipation of Mr. Windom voluntarily appearing before the Committee. *See* Exhibit C (May 20, 2025 email from P. Burton to E. Sampera). On May 29, the Department shared with counsel for Mr. Windom the list of intended interview topics the Committee had provided to the Department. *See* Exhibit D (May 29, 2025 email from E. Sampera to P. Burton). On June 4, the Department identified five separate topics about which Mr. Windom was authorized to testify regarding his employment at the Department. *See* Exhibit F (June 4, 2025 letter from B. Nieves to P. Burton). Importantly, the Department's June 4 letter directed Mr. Windom not "to reveal information the disclosure of which is prohibited by law or court, including classified information and *information subject to Federal Rule [of] Criminal Procedure 6(e)*." *Id.* at 2 (emphasis added). In other words, the Department confirmed the obvious: that Mr. Windom is required to comply with the law.

On June 12, Mr. Windom voluntarily appeared before the Committee for a transcribed interview, which lasted approximately five-and-a-half hours. Mr. Windom declined to respond to certain questions implicating his legal and ethical obligations, including grand jury secrecy pursuant to Rule 6(e).[2] *See, e.g.*, Exhibit G (Uncorrected Transcript of June 12, 2025 Windom Voluntary Interview ("Tr.")) at 19:18-23 (Mr. Windom's counsel stating that questions about an alleged proposal for course of investigation implicated Rule 6(e)); 35:1-6 (Mr. Windom stating that communications with the FBI regarding a grand jury subpoena implicated Rule 6(e)).[3]

---

[2] Committee staff informed us that a Department representative would be present outside the interview room to address any issues that arose during Mr. Windom's voluntary transcribed interview. *See* Li Wai Suen Decl. ¶¶ 7-9. However, no such Department representative appeared. *See* Exhibit G (Tr.) at 137:9-14.

[3] On multiple occasions at his voluntary interview, when Mr. Windom declined to respond to questions on the grounds of legal and/or ethical constraints, he referred the Committee, as an alternative, to publicly available sources, even specifically identifying documents that the Committee may wish to review and question him about. *See, e.g.*, Exhibit G (Tr.) at 68:16-18 (directing the Committee to "public access litigation . . . both in the Middle District of

5

In response, the Committee expressed a narrow view of Rule 6(e), stating at Mr. Windom's voluntary interview that Rule 6(e) did not apply to topics such as discussions of proposals for a specific course of investigation, as these discussions did not occur "before a grand jury." *See* Exhibit G (Tr.) at 19:15-20:2. One topic Committee staff attempted to explore, apparently premised on a Washington Post article, involved an alleged "proposal" by another Assistant U.S. Attorney regarding a potential course of investigation. *See id.* at 19:19-21. Counsel for Mr. Windom explained that Rule 6(e) extends beyond the literal confines of the grand jury room and covers more broadly concepts such as the course of the investigation. *Id.* at 20:3-4. Staff Counsel for the Committee's response was to re-ask the same question, declaring—incorrectly—that Rule 6(e) only shielded information Mr. Windom "learned from the grand jury." *Id.* at 20:11-20.

On July 21, 2025, Mr. Windom received a subpoena from the Committee, compelling his appearance for a deposition on September 30, 2025. In the cover letter accompanying the subpoena, the Committee stated its intention to re-ask Mr. Windom certain questions that he declined to answer at his voluntary interview, including declinations founded on Rule 6(e) concerns. *See* Exhibit H (July 21, 2025 Letter from J. Jordan to T. Windom) at 1 ("Therefore, due to your refusal to answer these questions during your voluntary transcribed interview, the Committee has decided to issue compulsory process to obtain your testimony about these matters.").[4] The Committee's letter also reiterated its narrow reading of Rule 6(e), calling it a

---

Pennsylvania and in the District of Columbia"); 114:4-6 (directing the Committee to the defendant's "motion for Rule 17(c) subpoenas" and the government's "responsive brief that included more information"). The Committee's majority staff elected not to ask Mr. Windom about the publicly available documents he referenced.

[4] Although not a direct subject of this application, the Committee's July 21 letter repeatedly mischaracterizes Mr. Windom's testimony at his transcribed interview. For example, the letter asserts that Mr. Windom "decline[d] to answer questions about" any "interactions with . . . Fulton County District Attorney employees." Exhibit H at 2-3. This is false. In response to a question about communications that the Special Counsel's Office had with the Fulton County District

"limited exception" and contending that no issue exists so long as Mr. Windom does not discuss "information [] learned from a grand jury." *Id.* at 3-4. The Committee also issued a press release expressing similar sentiments as the cover letter, stating that Mr. Windom relied "on an overbroad interpretation of Rule 6(e) of the Federal Rules of Criminal Procedure" that "does not create a legitimate basis to refuse to testify." *See* House Judiciary Committee, *Chairman Jordan Subpoenas Prosecutor from Former Special Counsel Jack Smith's Team for Deposition*, July 21, 2025, https://judiciary.house.gov/media/press-releases/chairman-jordan-subpoenas-prosecutor-former-special-counsel-jack-smiths-team) (attached as Exhibit I).

Relevant to this application, the Committee has declared its intention to revisit the following questions that implicate Rule 6(e) protected material:

(i)     Possible "interactions with the FBI to obtain billing records from the Willard Hotel"; and

(ii)    Mr. Windom's knowledge of an alleged February 2021 investigative proposal by another Assistant United States Attorney.[5]

Exhibit H at 3, 4.[6]

---

Attorney's Office, Mr. Windom stated that he did not "recall being part of any such communication" and further that he was "not aware" of anyone in the Special Counsel's Office having substantive communications with that office. *See* Exhibit G (Tr.) at 115:22-116:4. He did offer his belief that had such discussions occurred, he likely would have been prohibited from discussing them as this topic was outside the scope of testimony authorized by the Department. *Id.*

[5] The Committee's letter also references "materials obtained from and interactions [Mr. Windom] may have had with the partisan January 6th Select Committee." Exhibit H at 3. Mr. Windom declined to answer questions on this topic at his voluntary interview because it was outside the scope of the Department's authorization. *See* Exhibit G (Tr.) at 129:1-5. He also stated that Rule 6(e)'s requirements may be implicated, depending on the Committee's unknown future questions, even if the Department authorized him to discuss such information. *Id.* at 129:6-8. As discussed below in footnote 7, Mr. Windom's counsel has requested guidance from the Department multiple times since receiving the Committee's subpoena, but has not received any substantive response.

[6] For completeness, the Court also should be aware that the Committee's letter omits other instances where Mr. Windom declined to answer certain questions. For example, Mr. Windom declined to respond, based in part on Rule 6(e) concerns, when asked certain questions about the seizure pursuant to a warrant of Congressman Scott Perry's cell phone and allegations regarding

The cover letter also confirmed the Committee's intention to re-pose certain questions that Mr. Windom had declined to answer based on the Department having not authorized such testimony. Thus, following receipt of the July 21, 2025, subpoena and cover letter, Mr. Windom's counsel wrote the Department on August 5 seeking to resolve all outstanding issues well ahead of Mr. Windom's September 30 deposition. *See* Exhibit K (August 5, 2025 Letter from P. Burton to D. Camacho and E. Sampera). The Committee was copied and asked to provide details about any additional issues it wished to explore during the deposition. *See* Exhibit J (August 5, 2025 Letter from P. Burton to J. Jordan). Relevant here, Mr. Windom's counsel sought clarification from the Department regarding its position as to whether the Committee's proposed deposition topics implicate the restrictions on disclosure set forth in Rule 6(e), and whether the Department has obtained or intends to obtain a judicial ruling on this issue. Both the Department and the Committee were asked to respond by August 15, 2025. As of the date of this application, neither has substantively responded.[7]

---

the use of confidential human sources by the FBI on January 6th. *See*, *e.g.*, Exhibit G (Tr.) at 68:13-19; 124:15-19. It is unclear whether the Committee intends to re-ask questions regarding these or other topics at Mr. Windom's deposition. The warrant for the seizure of Mr. Perry's phone was issued in the Middle District of Pennsylvania, but was sought in the context of a grand jury investigation in this District; moreover, a subsequent warrant was sought in this District regarding the contents of the cell phone. Public access litigation in both districts led to the release of certain, but not all, information related to the warrants; in other words, some of the underlying information remains sealed by court order. *See, e.g., In re Application of Penn Live*, No. 22-mc-00756, ECF No. 105 (M.D. Pa. April 4, 2025) (order unsealing certain documents); *In the Matter of the Search and Forensic Copy of the Cell Phone of Representative Scott Perry*, No. 22-sc-02144, ECF No. 45 (D.D.C. Feb. 24, 2023) (order unsealing certain documents). This Court reviewed in detail (and before their release to the prosecution team) the contents of Congressman Perry's seized phone to assess his assertion of privilege under the Speech or Debate clause. *Memorandum Opinion*, *In the Matter of the Search of the Forensic Copy of the Cell Phone of Representative Scott Perry*, Case No. 22-SC-2144 (D.D.C. Dec. 19, 2023).

[7] On August 14, upon undersigned counsel's inquiry, the Department advised that it "is currently working on a response." Exhibit L (August 2025 email correspondence between P. Burton and Department) at 2. Since then, the Department has not responded to four additional email inquiries and one telephone voicemail undersigned counsel sent prior to filing this application. *Id.* at 1.

### III.    ARGUMENT AND PRAYER FOR RELIEF

Refusing to comply with a congressional subpoena may result in criminal prosecution for contempt of Congress.  *See* 2 U.S.C. §§ 192, 194.  The Committee appears to take the position that declining to answer on Rule 6(e) grounds would be tantamount to a refusal to testify.  *See* Exhibit H at 1 (stating the Committee has "decided to issue compulsory process to obtain [Mr. Windom's] testimony" due to his "refusal" to answer certain questions); *id.* at 4-5 (stating that Mr. Windom's "refusal to answer several questions in [his] transcribed interview impedes the Committee's oversight" and asserting that his "bases for declining to cooperate fully are not persuasive.").  Conversely, knowing violations of Rule 6(e) "may be punished as a contempt of court."  Fed. R. Crim. Proc. 6(e)(7).

Mr. Windom is therefore faced with a dilemma not of his own making.  Door #1 involves acceding to the Committee's narrow interpretation of Rule 6(e), answering its questions, and risking criminal prosecution for contempt of court.  Door #2 involves continuing to decline to answer the Committee's questions, thereby risking prosecution for contempt of Congress.[8] Despite Mr. Windom raising this urgent matter with both the Committee and the Department to attempt to resolve this impasse in good faith, neither have taken any meaningful action to settle the issues.  Mr. Windom is left with no choice but to select Door #3: seek a ruling from this Court on whether the topics on which the Committee seeks to compel Mr. Windom's testimony implicate the secrecy mandate of Rule 6(e).

---

[8] As Committee staff pointedly raised during Mr. Windom's voluntary interview, the Department has created a new component for the stated purpose of investigating the actions of the Special Counsel and its team.  *See* Exhibit G (Tr.) at 126:13-22 (referring to the "Weaponization Working Group that's currently being operated out of the Deputy Attorney General's Office").

The Court is well familiar with the Rule but we recite it here in relevant part for completeness of the record: Rule 6(e)(2)(B) states that persons, including "an attorney for the government," "must not disclose a matter occurring before the grand jury."  This Circuit interprets "matters occurring before the grand jury" broadly, to encompass a wide swath of information, including "the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, *the strategy or direction of the investigation*, the deliberations or questions of jurors, *and the like.*"  *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499-500 (D.C. Cir. 1998) (internal quotations omitted; emphasis added).  "Disclosure of which documents the grand jury considered reveals, at the very least, *the direction of the grand jury's investigation* and the names of persons involved, and thus falls within Rule 6(e)(2)."  *In re: Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986) (emphasis added).

Rule 6(e)(3) lists exceptions to this rule favoring secrecy, including a list of limited instances—not applicable here—in which a "court may authorize disclosure."  Courts in this Circuit "must 'hew strictly to the list of exceptions to grand jury secrecy' set out in Rule 6(e)(3), which … are 'exhaustive,' and 'must be narrowly construed.'"  *In re Capitol Breach Grand Jury Investigations within the Dist. Of Columbia*, 339 F.R.D. 1, 8 (D.D.C. 2021) (Howell, C.J.) (citing *McKeever v. Barr*, 920 F.3d 842, 845-47 (D.C. Cir. 2019))[9]; *see also Lopez v. DOJ*, 393 F.3d 1345, 1350 (D.C. Cir. 2005) (holding that grand jury subpoenas "and the dates on which they are issued *tend to reveal the direction of the relevant investigation*") (emphasis added).

---

[9] In that case, the Department sought advance permission from then-Chief Judge Howell to disclose voluminous grand jury materials to an outside litigation support vendor.  The court commended the Department for seeking such permission but ultimately rejected the request because no exception permitted disclosure.  *See* 339 F.R.D. at 9, n.7.

The Committee argues that Rule 6(e) does not apply to the questions it has asked, and seeks to re-ask, Mr. Windom. The Committee has not identified any Rule 6(e)(3) exception it believes covers this material. Instead, the Committee argues that Rule 6(e) itself is a "limited exception." *See* Exhibit H at 3. The Committee relies on a narrow reading of the phrase "matters occurring before the grand jury," applying that phrase to shield from disclosure only "*information* [a lawyer for the government] *learn[s] from a grand jury*." *Id.* at 3-4 (emphasis added).

The Committee's characterization of grand jury secrecy as a "limited exception" conflicts with the text of Rule 6(e) and judicial rulings in this Circuit affirming that Rule 6(e)(3) provides broad protection and that the "exhaustive" list of *exceptions* in Rule 6—not Rule 6(e) itself—"must be narrowly construed." *Capitol Breach Grand Jury Investigations*, 339 F.R.D. at 8. Further, the Committee's reading of the phrase "matters occurring before the grand jury" to prohibit disclosure of only information "learn[ed]" from the grand jury—whatever that means—is plainly inconsistent with Circuit precedent, which more broadly interprets "matters occurring before the grand jury" entitled to Rule 6 protection to include materials that reveal "the strategy or direction of the investigation." *Dow Jones & Co.*, 142 F.3d at 499-500.

In our view, the Committee seeks to re-question Mr. Windom regarding topics that are plainly "matters occurring before the grand jury" and which, in our estimation, do not meet any of the exceptions to Rule 6(e).[10] Purported interactions with the FBI about obtaining records from the Willard Hotel via a grand jury subpoena (records described as involving conduct by unindicted

---

[10] Counsel for Mr. Windom also is not aware of anything implicated by the Committee's potential deposition topics that should be unsealed as material from an "ancillary proceeding" that has been sufficiently publicly disclosed such that it has "lost its character as Rule 6(e) material." *Dow Jones*, 142 F.3d at 505. And, in any event, that is not a judgment for Mr. Windom to hazard. Further, the Committee or Department are free to file appropriate applications with this Court to unseal grand jury material.

individuals) reveal the direction of a grand jury investigation and therefore fall within Rule 6(e).

Likewise, discussing an alleged February 2021 investigative proposal by another prosecutor also

would reveal "the strategy or direction of the investigation," and therefore falls under Rule 6(e) as

well.  *Dow Jones & Co.*, 142 F.3d at 499-500; *see also In re: Sealed Case*, 801 F.2d 1379, 1381

(D.C. Cir. 1986) (same).[11]  Absent clear authority from the Court, we do not believe Mr. Windom

can provide certain responses to the Committee's inquiry on these identified topics based on non-

public documents or information he acquired during grand jury investigations.[12]

## IV.    CONCLUSION

The Committee has determined to compel Mr. Windom's testimony on these topics on pain

of contempt of Congress.  Individuals should not be forced to provide a congressional committee

a window into the inner workings of a grand jury process that it likely could not obtain through its

own direct request to this Court—but that is exactly where Mr. Windom, now a former Department

employee, finds himself.  The situation is further compounded by a Department that has departed

from longstanding policies forbidding line prosecutors from being subjected to congressional

inquiries such as this.  Having attempted but failed to resolve this dispute with the Committee, and

having attempted but failed to engage in fruitful discussion with the Department, Mr. Windom has

no meaningful option but to seek an order from this Court as to whether responses to these

---

[11] Discussion of non-public steps regarding the judicially authorized warrant to seize Congressman Scott Perry's cell phone, which was pursued in the course of a grand jury investigation prior to the establishment of the Special Counsel's Office, and allegations regarding the FBI's use of confidential human sources, may similarly reveal the inner workings of the grand jury investigation and are protected by Rule 6(e).  As noted above, we are uncertain whether the Committee intends to re-question Mr. Windom about these topics at his deposition.  If the Committee responds to this application and asserts that it intends to re-pose questions on these topics, Mr. Windom requests that the Court also determine whether responses to those questions would implicate Rule 6(e), so that all Rule 6(e) issues are resolved before any deposition.

[12] If the Court requires more information to determine whether Mr. Windom's answers to certain questions would implicate Rule 6(e), Mr. Windom is prepared to address the Court *ex parte*.

questions are permitted.  Accordingly, Mr. Windom respectfully requests that this Court issue an order determining whether the topics described in this memorandum and the Committee's cover letter are within the scope of Rule 6(e).

DATED:  September 3, 2025                    Respectfully submitted,

*/s/ Preston Burton*
Preston Burton (D.C. Bar No. 426378)
Rachel Li Wai Suen (D.C. Bar No. 500527)
Jackson Hagen (D.C. Bar No. 1671315)
Orrick, Herrington & Sutcliffe LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037-3202
Telephone: +1 202 349 8065
Facsimile:  +1 202 339 8500
pburton@orrick.com
rliwaisuen@orrick.com
jhagen@orrick.com

*Counsel for Thomas P. Windom*

# TABLE OF EXHIBITS

| Exhibit | Date | Type |
|---------|------|------|
| Exhibit A | January 25, 2025 | Notice of Removal from Federal Service |
| Exhibit B | April 7, 2025 | Letter from J. Jordan to T. Windom |
| Exhibit C | May 20, 2025 | Email from P. Burton to E. Sampera |
| Exhibit D | May 29, 2025 | Email from E. Sampera to P. Burton |
| Exhibit E | June 11 | Letter from P. Burton to J. Jordan |
| Exhibit F | June 4, 2025 | Letter from B. Nieves to T. Windom |
| Exhibit G | June 12, 2025 | Transcript of T. Windom Voluntary Interview |
| Exhibit H | July 21, 2025 | Letter from J. Jordan to T. Windom |
| Exhibit I | July 21, 2025 | House Judiciary Committee Press Release |
| Exhibit J | August 5, 2025 | Letter from P. Burton to Committee |
| Exhibit K | August 5, 2025 | Letter from P. Burton to DOJ |
| Exhibit L | August 5, 2025 - August 29, 2025 | Emails from P. Burton to E. Sampera and D. Camacho |

# EXHIBIT A



# Office of the Attorney General
## Washington, D. C. 20530

MEMORANDUM FOR THOMAS WINDOM

FROM:          THE ACTING ATTORNEY GENERAL

Subject:          Notice of Removal from Federal Service

This letter provides official notice that you are being removed from your position at the Department of Justice, and from the federal service, effective immediately.

As President Trump declared on his first day back in office, "[t]he American people have witnessed the previous administration engage in a systematic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies ... against those perceived political opponents in the form of investigations, prosecutions, civil enforcement actions, and other related actions." Nowhere was that effort more salient than in the unprecedented prosecutions the Department of Justice vigorously pursued against President Trump himself.

You played a significant role in prosecuting President Trump. The proper functioning of government critically depends on the trust superior officials place in their subordinates. Given your significant role in prosecuting the President, I do not believe that the leadership of the Department can trust you to assist in implementing the President's agenda faithfully.

As a result, pursuant to Article II of the Constitution and the laws of the United States, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately.

If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of the removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

# EXHIBIT B

ONE HUNDRED NINETEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

April 7, 2025

Mr. Thomas Windom
Former Senior Assistant Special Counsel
██████████████████

Dear Mr. Windom:

The Committee on the Judiciary is conducting oversight of the programs and operations of the Department of Justice. As part of our constitutional oversight responsibilities, we request your testimony regarding your role as a prosecutor on former Special Counsel Jack Smith's team. Your testimony is vital to our investigation into how the Biden-Harris Administration weaponized the Justice Department for political purposes and misused federal law-enforcement resources.

Under the Biden-Harris Administration, the Justice Department repeatedly demonstrated an alarming disregard for its constitutional responsibilities, instead allowing itself to be used as a political tool to target perceived political adversaries. Specifically, Special Counsel Smith and his team, including you, orchestrated partisan and politically motivated prosecutions of President Donald J. Trump and his co-defendants.[1] Among the disturbing tactics employed in the prosecution, your team sought to silence President Trump by restricting his public statements about the case,[2] conducted an unnecessary and controversial raid of his home,[3] attempted to improperly pressure defense counsel with the promise of political patronage,[4] and manipulated key evidence in the investigation.[5] These actions undermined the integrity of the Justice Department and violated the core responsibility of prosecutors to do justice.

---

[1] See Hunter Walker, et al., *Jack Smith's Deputy in Jan. 6 Case Is A 'Lawman Type' Who's Taken On Trumpworld Before*, TALKING POINTS MEMO (Sept. 13, 2023); Anna Bower & Roger Parloff, *Trump's D.C. Criminal Case Lurches Back to Life*, LAWFARE, (Sept. 6, 2024), https://www.lawfaremedia.org/article/trump-s-d.c.-criminal-case-lurches-back-to-life.

[2] Ryan J. Reilly and Daniel Barnes, *Special counsel asks for 'narrow' gag order for Trump in election interference case*, NBC NEWS (Sept. 15, 2023).

[3] Kaitlan Collins, *FBI executes search warrant at Trump's Mar-a-Lago in document investigation*, CNN (Aug. 9, 2022).

[4] See Letter from Jim Jordan, Chairman, H. Comm. on the Judiciary to Jack Smith, Special Counsel, U.S. Dep't of Justice (Sep. 7, 2023) (citing Ken Dilanian, *Lawyer for witness in Trump docs probe alleged prosecutorial misconduct*, NBC NEWS (Jun. 8, 2023)).

[5] Government's Response to Defendant Waltine Nauta's Motion to Extend Time, *U.S. v. Trump, et al.*, No. 23-80101-CR-CANNON(s) (S.D. Fla. May 3, 2024) (hereinafter "Government's Response"); *see* John Solomon, *Trump*

Mr. Thomas Windom
April 7, 2025
Page 2

       The Committee has a constitutional obligation to conduct oversight of the Department of Justice. Your testimony is crucial to understanding how these abuses of power occurred during the Biden-Harris Administration and to assist the Committee in developing appropriate legislative reforms. Please contact the Committee to schedule your transcribed interview as soon as possible, but no later than 5:00 p.m. on April 21, 2025. If you are represented by private counsel, please forward this letter to your attorney and ask him or her to contact Committee staff directly on your behalf.

       Pursuant to the Rules of the House of Representatives, the Committee on the Judiciary is authorized to conduct oversight of the Justice Department to inform potential legislative reforms.[6]

       Thank you for your prompt attention to this matter.

                Sincerely,

                Jim Jordan
                Chairman

cc:    The Honorable Jamie Raskin, Ranking Member

---

*Whodunnit: Prosecutors admit key evidence in document case has been tampered with*, JUST THE NEWS (May 3, 2024).
[6] Rules of the U.S. House of Representatives, R. X (2025).

# EXHIBIT C

**From:** Burton, Preston
**Sent:** Tuesday, May 20, 2025 3:29 PM
**To:** Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Subject:** RE: Thomas Windom Transcribed Interview

Ernie,

Thank you for your message.  We had reached out to DOJ a few weeks ago regarding the Committee's request to interview Mr. Windom and we would like to speak with you at your earliest convenience.

As we consider the Committee's request, we need guidance from the Department regarding the substantial Executive Branch confidentiality interests implicated by any potential interview.  Such guidance is particularly important in situations, as here, where the Committee seeks information on a broad set of topics from a career Department attorney and where those topics involve a grand jury investigation.  The Department has a long-standing policy of asserting its confidentiality interests in response to congressional requests as summarized in the Department's often-referenced Linder Letter.  Any guidance should be in writing and approved by attorneys at appropriate levels of seniority and authority within the Department.

Notwithstanding our need for written guidance before further considering the Committee's request, we are also concerned about potential, substantial conflicts impacting the Department's ability to provide such guidance.  Attorneys in senior roles in the Department served as the President's personal counsel in the very investigation about which the Committee seeks to question Mr. Windom.  The Department currently is adverse to Mr. Windom in a legal proceeding before the Merit Systems Protection Board stemming from the Department's unlawful termination of Mr. Windom's employment.  Prior to, or concurrent with, the Department providing the required written guidance, we request written confirmation from the Department's Office of Professional Responsibility that the Department is not conflicted from doing so, and that any attorneys who previously represented the President as his personal counsel were recused or abstained from considering the Committee's request, the decision whether to provide guidance, and what guidance to provide.

We look forward to discussing these and other related issues with you.  Please let us know your availability for a call or meeting.

Best,

Preston

---

**From:** Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Sent:** Monday, May 19, 2025 2:04 PM
**To:** Burton, Preston <pburton@orrick.com>
**Subject:** Thomas Windom Transcribed Interview

**[EXTERNAL]**

Good afternoon,

I am reaching out regarding the House Judiciary Committee's request to conduct a transcribed interview of your client, Thomas Windom.

I am working on scheduling this as soon as possible but first wanted to reach out to you to see if Mr. Windom needs anything from DOJ or has any questions before we proceed with setting a date on the calendar.

Best,
Ernie



**Ernie Sampera**
Office of Legislative Affairs, U.S. Department of Justice
Work Cell: 771-220-9745
Email: ernesto.sampera@usdoj.gov

# EXHIBIT D

**From:** Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Sent:** Thursday, May 29, 2025 7:37 PM
**To:** Burton, Preston <pburton@orrick.com>; Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** Re: Thomas Windom

**[EXTERNAL]**

Hi Preston,

Good to hear from you! Yes, I have received their intended scope and am currently working on drafting an authorization letter for your client. We will have that sent to you by next Thursday, per your request.

Here is the scope I was provided by the Judiciary Committee:

- Jack Smith's Team
    - Selection process
    - Prior interactions with Smith before he became Special Counsel
    - Interactions with Cooney, Bratt
    - Allegations of ethical lapses and OPR investigation
- January 6 investigation and case involving President Trump
    - Beginning of investigation prior to special counsel being named
    - Interactions with FBI, including ADIC Steven D'Antuono and ASAC Timothy Thibault
    - Interactions with JP Cooney
    - Temporary role at USAO-DC
    - Initiation of full investigation
    - Interactions with USPS-OIG
    - Interactions with NARA and Archives-OIG
    - Possible interactions with January 6Select Committee or other state/local prosecutors
    - Interviews conducted and subpoenas issued, including possible subpoenas to Willard Hotel
    - Contents of court filings in the case, specifically filings signed by Windom
- Any involvement with classified documents case involving President Trump
- Seizure of Rep. Perry's Cell Phone
    - Involvement in investigation
    - Roles and responsibilities
    - Scope of investigation

- o Reason for seizure at airport
- o Who imaged the phone and why that entity
- o Contents of court filings in the case, specifically filings signed by Windom

Let me know if you have any questions!


Thanks,
Ernie

Get Outlook for iOS

---

**From:** Burton, Preston <pburton@orrick.com>
**Sent:** Thursday, May 29, 2025 11:10 AM
**To:** Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>; Sampera, Ernesto (OLA)
<Ernesto.Sampera@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** [EXTERNAL] Thomas Windom

Good morning,
We spoke with Caroline Nabity on Tuesday and have agreed in principal to a June 12 interview date,
contingent on, among other things, the Committee providing you with their intended scope in sufficient detail to
permit the Department to provide us with meaningful guidance at least a week prior to that interview.   We
would appreciate knowing if you have received a description of the scope (and, if so, we would request a copy
of any such description) and whether we can expect to receive written guidance from the Department by next
Thursday.
Thanks,
Preston


**Preston Burton**
Partner
Orrick
Washington, DC  ▽
T 202-349-8065
pburton@orrick.com



---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you
received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of
the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT E

orrick

**Orrick, Herrington & Sutcliffe LLP**

2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

+1 202 339 8400

**orrick.com**

June 11, 2025

Chairman Jim Jordan
House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, DC 20515-6216

**Preston Burton**

**E** pburton@orrick.com
**D** +1 202 349 8065
**F** +1 202 339 8500

Re:    Thomas P. Windom Voluntary Transcribed Interview

Dear Chairman Jordan:

We represent Thomas P. Windom.  Until his unlawful termination in January 2025, Mr. Windom served with distinction as a career Department of Justice prosecutor for twelve years.

We are in receipt of the Committee's April letter requesting that Mr. Windom voluntarily appear for a transcribed interview.  We strongly disagree with the letter's characterization that Special Counsel Jack Smith, Mr. Windom, or any other attorneys assigned to the Special Counsel's Office pursued a "partisan and politically motivated prosecution of Donald J. Trump."  That statement is false and unfounded—as confirmed by the United States District Court when President Trump's counsel made similar allegations.  Rather, Mr. Windom faithfully executed his prosecutorial duties and responsibilities.  The Indictment and the Superseding Indictment charging President Trump with federal felonies related to the 2020 presidential election were the result of a thorough and impartial investigation guided by the facts and applicable law, and they were returned by the citizens who served on the grand juries convened by the United States District Court.

Notwithstanding the false premise underlying the Committee's request, we have engaged with Committee staff in good faith.  Mr. Windom intends to voluntarily appear tomorrow for the requested interview.

During our discussions with Committee staff, we requested that they provide specific topics, questions, and documents in advance of the voluntary interview.  We were instead provided with broad topic descriptions and advised that the Committee would be using only unspecified publicly available documents, including newspaper articles and Volume One of the January 7, 2025, Final Report of the Special Counsel.

We requested specificity not only to enable Mr. Windom a reasonable opportunity to prepare for his interview, but also to enable the Department of Justice to meaningfully consider its position with respect to privileged and confidential information implicated by the Committee's request.  To that end, we reached out to the Department for guidance, and it advised us that the Committee provided it with a broad list of

Chairman Jim Jordan
June 11, 2025
Page 2



potential topics, which the Department then shared with us.  *See* May 29, 2025, email to Preston Burton from Ernesto Sampera (listing the Committee's intended scope) (attached hereto as Exhibit A).

The Department thereafter provided us with written guidance that, as it acknowledges, breaks with decades of Department policy regarding congressional requests to interview career Department attorneys.[1] Specifically, the Department authorizes Mr. Windom to provide the Committee with information limited to five specific topics.  *See* June 4, 2025, letter to Thomas Windom, Esq., from Brian Nieves, U.S. Department of Justice, Office of the Deputy Attorney General (attached hereto as Exhibit B).  The Department did not, however, respond to our request for written confirmation that former members of President Trump's personal legal team, including the Deputy Attorney General and Principal Associate Deputy Attorney General, recused themselves from deciding whether to authorize Mr. Windom's testimony.  *See* May 20, 2025, email from Preston Burton to Ernesto Sampera (attached hereto as Exhibit C).  Its failure to provide any such confirmation is especially troubling since the Department official who authorized Mr. Windom's limited testimony is Deputy Chief of Staff in the Office of the Deputy Attorney General and, until a few months ago, was Deputy Chief Counsel for the Committee.[2]

Notwithstanding its abrogation of decades of policy, the Department's guidance letter confirms that Mr. Windom is legally barred from discussing matters covered by Federal Rule of Criminal Procedure 6(e), other laws, or court orders.  As such, Mr. Windom is unable to discuss matters occurring before the grand jury.  Nor is he able to discuss classified information, 26 U.S.C. § 6103 information, or information covered by protective orders and sealing orders issued during the relevant investigation and prosecution.  We are not aware of any effort by the Department or the Committee to seek relief from these laws, orders, and obligations regarding the Committee's inquiry.  We trust that the Committee, and especially its attorney staff, will eschew posing questions that may attempt to induce Mr. Windom to breach his professional and legal obligations with respect to the five limited topics that the Department approved, as doing so would implicate their own professional ethical duties.  *See, e.g.*, D.C. Bar Rule of Professional Conduct 8.4.

The Committee has also advised us of its intention to video record the transcribed interview.  Given previous and additional anticipated threats and harassment to members of the Special Counsel's Office and their families, we requested that the Committee not video record Mr. Windom's voluntary interview.

---

[1] Notably, the Department during the first Trump Administration invoked these longstanding privileges in response to similar congressional requests to probe the activities of another Special Counsel's Office. *Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files*, 43 Op. O.L.C. 1, 1-2 (2019) (Attorney General request for assertion of executive privilege over the Office of the Special Counsel's investigative files, including "law enforcement information, information about sensitive intelligence sources and methods, and grand-jury information that the Department is prohibited from disclosing by law").  And just two months ago, the Department sought to invoke these same confidentiality policies to attempt to prevent testimony by a former Department attorney.  *See* April 4, 2025 Letter from Kendra Wharton (Department of Justice, Associate Deputy Attorney General).

[2] The Department's response to the Committee's inquiry is clouded with potential for conflicts of interest. For example, the Department is adverse to Mr. Windom in ongoing litigation regarding his unlawful termination.

Chairman Jim Jordan
June 11, 2025
Page 3



The Committee declined our request, and we have little recourse.[3]  We requested that the Committee agree to provide us with reasonable advance notice of its intention to publish any video recording.  We did not receive a response, and we repeat that request now.  The Committee did agree to provide us the customary opportunity to review the interview transcript for accuracy and correction before it is finalized.  We will seek confirmation of that agreement and a response to our outstanding request on the record at the outset of the voluntary interview.

Finally, consistent with our request to the Department of Justice, to the extent that members of the Committee or their staff participated in any way in the various investigations or legal actions (be they civil, criminal, administrative, or congressional matters) concerning the attack on the United States Capitol on January 6, 2021, or in unlawfully contesting the outcome of the 2020 Presidential election, we request that those individuals recuse themselves from this process or at a minimum that they disclose any such roles and affiliations to us before Mr. Windom appears.

Sincerely,

Preston Burton

Rachel Li Wai Suen

Attachments:     May 29, 2025, email from E. Sampera to P. Burton
                 June 4, 2025, DOJ Guidance Letter to Thomas Windom
                 May 20, 2025, email from P. Burton to E. Sampera

cc:     The Hon. Jamie Raskin, Ranking Member (w/attachments)

---

[3] We also requested that Department counsel be present in the room along with the undersigned during the interview to address Department interests and to provide further guidance if necessary.  In doing so, we noted that we are personally aware from other matters before congressional committees that agency counsel have been permitted to be present simultaneously with personal counsel during voluntary transcribed interviews.  That request also was denied.

# EXHIBIT A

**Burton, Preston**

| | |
|---|---|
| **From:** | Sampera, Ernesto (OLA) ███████████████ |
| **Sent:** | Thursday, May 29, 2025 7:37 PM |
| **To:** | Burton, Preston; Camacho, Dario (OLA) |
| **Cc:** | Li Wai Suen, Rachel |
| **Subject:** | Re: Thomas Windom |

**[EXTERNAL]**

Hi Preston,

Good to hear from you! Yes, I have received their intended scope and am currently working on drafting an authorization letter for your client. We will have that sent to you by next Thursday, per your request.

Here is the scope I was provided by the Judiciary Committee:

- Jack Smith's Team
    - o  Selection process
    - o  Prior interactions with Smith before he became Special Counsel
    - o  Interactions with Cooney, Bratt
    - o  Allegations of ethical lapses and OPR investigation
- January 6 investigation and case involving President Trump
    - o  Beginning of investigation prior to special counsel being named
    - o  Interactions with FBI, including ADIC Steven D'Antuono and ASAC Timothy Thibault
    - o  Interactions with JP Cooney
    - o  Temporary role at USAO-DC
    - o  Initiation of full investigation
    - o  Interactions with USPS-OIG
    - o  Interactions with NARA and Archives-OIG
    - o  Possible interactions with January 6Select Committee or other state/local prosecutors
    - o  Interviews conducted and subpoenas issued, including possible subpoenas to Willard Hotel
    - o  Contents of court filings in the case, specifically filings signed by Windom
- Any involvement with classified documents case involving President Trump
- Seizure of Rep. Perry's Cell Phone
    - o  Involvement in investigation
    - o  Roles and responsibilities
    - o  Scope of investigation
    - o  Reason for seizure at airport
    - o  Who imaged the phone and why that entity
    - o  Contents of court filings in the case, specifically filings signed by Windom

Let me know if you have any questions!

Thanks,

Ernie

Get Outlook for iOS

---

**From:** Burton, Preston █████████████████████
**Sent:** Thursday, May 29, 2025 11:10 AM
**To:** Camacho, Dario (OLA) ███████████████ Sampera, Ernesto (OLA)

**Cc:** Li Wai Suen, Rachel █████████████████
**Subject:** [EXTERNAL] Thomas Windom

Good morning,

We spoke with Caroline Nabity on Tuesday and have agreed in principal to a June 12 interview date, contingent on, among other things, the Committee providing you with their intended scope in sufficient detail to permit the Department to provide us with meaningful guidance at least a week prior to that interview.   We would appreciate knowing if you have received a description of the scope (and, if so, we would request a copy of any such description) and whether we can expect to receive written guidance from the Department by next Thursday.

Thanks,

Preston

**Preston Burton**
Partner

Orrick
Washington, DC  ⊙
████████████████



orrick

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit http://www.orrick.com.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT B



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC  20530*

June 4, 2025

Thomas Windom, Esq.
Washington, DC

Dear Mr. Windom:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on the Judiciary (Committee) to provide a transcribed interview relating to your service in the Office of Special Counsel Jack Smith. In this interview, you are authorized to provide information that you learned while at the Department as described more fully below.

The Committee has identified specific topics of inquiry about which they have requested information from you. These topics are:

1.  The process by which you were selected to serve on the Special Counsel team and your prior interactions with Special Counsel Jack Smith;

2.  Your interactions with DOJ officials, including JP Cooney and Jay Bratt, and any matters related to allegations of ethical lapses or investigations by the Office of Professional Responsibility (OPR);

3.  Your knowledge of interviews conducted, subpoenas issued (including those related to the Willard Hotel), and the contents of court filings you personally signed in that case;

4.  Your involvement, if any, in the investigation concerning classified documents involving former President Donald J. Trump;

5.  Your role in the seizure of Representative Scott Perry's cell phone, including the basis for the seizure, the scope of the investigation, who conducted the imaging of the phone and why, and the contents of any related court filings you signed.

Department attorneys are obligated to protect non-public information that they learn in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the

Thomas Windom, Esq.
Page 2

Department has sought to balance the Executive Branch's confidentiality interests with Congress' legitimate need to gather information.[1]

In addition, Department attorneys must protect deliberations concerning investigations and prosecutions that were ongoing while they serve in the Department. The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations. If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."[2] Discussion of pending criminal cases and possible charges could also violate court rules and implicate rules of professional conduct governing extra-judicial statements.

Further, the Department has a longstanding policy of making only appropriate supervisory personnel – and not line attorneys or agents – available to respond to congressional oversight requests. This policy reflects the reality that Department decisions are made by its supervisory personnel, not line employees and, over the years, this policy has allowed Congress to "fulfill its oversight responsibilities without undermining the independence of line attorneys and agents."[3]

Nevertheless, the extraordinary events underlying this matter constitute exceptional circumstances warranting an accommodation to Congress in this particular case. Given these extraordinary circumstances, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, as limited in paragraphs 1–5 above. This accommodation is unique to the facts and circumstances of this particular matter.

Although you are authorized to provide information responsive to the topics outlined above, you are not authorized to reveal information the disclosure of which is prohibited by law or court, including classified information and information subject to Federal Rule Criminal Procedure 6(e).

---

[1] *See* Letter to Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, at 2 (Jan. 27, 2000) [hereinafter Linder Letter] ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

[2] Linder Letter at 5–6.

[3] Linder Letter at 6.

Thomas Windom, Esq.
Page 3

    If you have questions with respect to the direction detailed above, please contact the
Office of Legislative Affairs.

                                        Sincerely,

                                        Brian Nieves
                                        Office of the Deputy Attorney General

# EXHIBIT C

**Burton, Preston**

| | |
|---|---|
| **From:** | Burton, Preston |
| **Sent:** | Tuesday, May 20, 2025 3:29 PM |
| **To:** | Sampera, Ernesto (OLA) |
| **Subject:** | RE: Thomas Windom Transcribed Interview |

Ernie,

Thank you for your message. We had reached out to DOJ a few weeks ago regarding the Committee's request to interview Mr. Windom and we would like to speak with you at your earliest convenience.

As we consider the Committee's request, we need guidance from the Department regarding the substantial Executive Branch confidentiality interests implicated by any potential interview. Such guidance is particularly important in situations, as here, where the Committee seeks information on a broad set of topics from a career Department attorney and where those topics involve a grand jury investigation. The Department has a long-standing policy of asserting its confidentiality interests in response to congressional requests as summarized in the Department's often-referenced Linder Letter. Any guidance should be in writing and approved by attorneys at appropriate levels of seniority and authority within the Department.

Notwithstanding our need for written guidance before further considering the Committee's request, we are also concerned about potential, substantial conflicts impacting the Department's ability to provide such guidance. Attorneys in senior roles in the Department served as the President's personal counsel in the very investigation about which the Committee seeks to question Mr. Windom. The Department currently is adverse to Mr. Windom in a legal proceeding before the Merit Systems Protection Board stemming from the Department's unlawful termination of Mr. Windom's employment. Prior to, or concurrent with, the Department providing the required written guidance, we request written confirmation from the Department's Office of Professional Responsibility that the Department is not conflicted from doing so, and that any attorneys who previously represented the President as his personal counsel were recused or abstained from considering the Committee's request, the decision whether to provide guidance, and what guidance to provide.

We look forward to discussing these and other related issues with you. Please let us know your availability for a call or meeting.

Best,

Preston

---

**From:** Sampera, Ernesto (OLA)
**Sent:** Monday, May 19, 2025 2:04 PM
**To:** Burton, Preston
**Subject:** Thomas Windom Transcribed Interview

**[EXTERNAL]**

Good afternoon,

I am reaching out regarding the House Judiciary Committee's request to conduct a transcribed interview of your client, Thomas Windom.

I am working on scheduling this as soon as possible but first wanted to reach out to you to see if Mr. Windom needs anything from DOJ or has any questions before we proceed with setting a date on the calendar.


Best,
Ernie




**Ernie Sampera**
Office of Legislative Affairs, U.S. Department of Justice
Work Cell █████████████
Email: ███████████████████████

# EXHIBIT F



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC  20530*

June 4, 2025

Thomas Windom, Esq.
Washington, DC

Dear Mr. Windom:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on the Judiciary (Committee) to provide a transcribed interview relating to your service in the Office of Special Counsel Jack Smith. In this interview, you are authorized to provide information that you learned while at the Department as described more fully below.

The Committee has identified specific topics of inquiry about which they have requested information from you. These topics are:

1. The process by which you were selected to serve on the Special Counsel team and your prior interactions with Special Counsel Jack Smith;

2. Your interactions with DOJ officials, including JP Cooney and Jay Bratt, and any matters related to allegations of ethical lapses or investigations by the Office of Professional Responsibility (OPR);

3. Your knowledge of interviews conducted, subpoenas issued (including those related to the Willard Hotel), and the contents of court filings you personally signed in that case;

4. Your involvement, if any, in the investigation concerning classified documents involving former President Donald J. Trump;

5. Your role in the seizure of Representative Scott Perry's cell phone, including the basis for the seizure, the scope of the investigation, who conducted the imaging of the phone and why, and the contents of any related court filings you signed.

Department attorneys are obligated to protect non-public information that they learn in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the

Thomas Windom, Esq.
Page 2

Department has sought to balance the Executive Branch's confidentiality interests with Congress' legitimate need to gather information.[1]

In addition, Department attorneys must protect deliberations concerning investigations and prosecutions that were ongoing while they serve in the Department. The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations. If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."[2] Discussion of pending criminal cases and possible charges could also violate court rules and implicate rules of professional conduct governing extra-judicial statements.

Further, the Department has a longstanding policy of making only appropriate supervisory personnel – and not line attorneys or agents – available to respond to congressional oversight requests. This policy reflects the reality that Department decisions are made by its supervisory personnel, not line employees and, over the years, this policy has allowed Congress to "fulfill its oversight responsibilities without undermining the independence of line attorneys and agents."[3]

Nevertheless, the extraordinary events underlying this matter constitute exceptional circumstances warranting an accommodation to Congress in this particular case. Given these extraordinary circumstances, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, as limited in paragraphs 1–5 above. This accommodation is unique to the facts and circumstances of this particular matter.

Although you are authorized to provide information responsive to the topics outlined above, you are not authorized to reveal information the disclosure of which is prohibited by law or court, including classified information and information subject to Federal Rule Criminal Procedure 6(e).

---

[1] *See* Letter to Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, at 2 (Jan. 27, 2000) [hereinafter Linder Letter] ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

[2] Linder Letter at 5–6.

[3] Linder Letter at 6.

Thomas Windom, Esq.
Page 3


      If you have questions with respect to the direction detailed above, please contact the Office of Legislative Affairs.

                      Sincerely,


                      Brian Nieves
                      Office of the Deputy Attorney General

# EXHIBIT G

1

2

3

4

5    COMMITTEE ON THE JUDICIARY,

6    U.S. HOUSE OF REPRESENTATIVES,

7    WASHINGTON, D.C.

8

9

10

11

12

13    INTERVIEW OF:  THOMAS WINDOM

14

15

16

17

18                      Thursday, June 12, 2025

19

20                       Washington, D.C.

21

22

1   The interview in the above matter was held in room 2237, Rayburn House Office Building,

2 commencing at 10:03 a.m.

3   Present:  Representative Jordan.

1    Appearances:

2

3

4    For the COMMITTEE ON THE JUDICIARY:

5

6    ███████████ GENERAL COUNSEL

7    ███████████ DIGITAL DIRECTOR

8    ███████████ CHIEF COUNSEL FOR OVERSIGHT

9    ███████████ COUNSEL

10   ███████████ PROFESSIONAL STAFF MEMBER

11   ███████████ COUNSEL

12   ███████████ MINORITY OVERSIGHT COUNSEL

13   ███████████ MINORITY CHIEF OVERSIGHT COUNSEL

14   ███████████ MINORITY GENERAL COUNSEL

15   ███████████ MINORITY CHIEF COUNSEL AND SENIOR ADVISOR

16   ███████████ MINORITY INTERN

17   ███████████ MINORITY PROFESSIONAL STAFF MEMBER

18   AND LEGISLATIVE AIDE

19

20

21

22

23

1    For THOMAS WINDOM:

2

3    PRESTON BURTON

4    RACHEL LI WAI SUEN

5    Orrick, Herrington & Sutcliffe LLP

1      ██████████    Good morning.  This is a transcribed interview of Mr. Thomas Windom, former

2      senior assistant special counsel on Special Counsel Jack Smith's team.  Chairman Jordan has

3      requested this interview as part of the committee's oversight of the Office of Special Counsel Jack

4      Smith and the inexplicable seizure of a constitutionally elected Member of Congess' cell phone.

5           Would the witness please state your name for the record?

6           Mr. Windom.  Thomas Windom.

7      ██████████    We encourage witnesses who appear before the committee to freely consult

8      with counsel if they choose, and it is my understanding that you're appearing today with personal

9      counsel.  Is that correct?

10          Mr. Windom.  That is correct.

11     ██████████    Could counsel please state your name for the record?

12          Mr. Burton.  Sure.  Preston Burton, and my colleague, Rachel Li Wai Suen.

13     ██████████    On behalf of the committee, I want to thank you for appearing here today to

14     answer our questions.  We appreciate your willingness to appear voluntarily.

15          My name is ██████████, and I am with Chairman Jordan's staff.  I'll now have everyone

16     else from the committee introduce themselves as well.  I'm joined by my colleague ██████████.

17     ██████████, if you want to go ahead.

18     ██████████ ██████████ with Ranking Member Raskin's staff.

19     ██████████ ██████████ with Ranking Member Raskin's staff.

20     ██████████ ██████████ Ranking Member Raskin's staff.

21     ██████████ ██████████ Ranking Member Raskin's staff.

22     ██████████ ██████████ Chairman Jordan's staff.

23     ██████████ ██████████ Chairman Jordan's staff.

1             ██████ ██████, Chairman Jordan's staff.

2             ██████ ██████ Chairman Jordan's staff.

3             ██████ I'd like to now go over the ground rules and guidelines that we will follow during

4 today's interview.

5             Our questioning will proceed in rounds. The majority will ask questions first for 1 hour, and

6 then the minority will have an opportunity to ask questions for an equal period of time if they

7 choose. We will alternate back and forth until there are no more questions and the interview is over.

8 Typically, we take a short break at the end of each hour, but if you would like to take a break apart

9 from that, please just let us know.

10             As you can see, there is an official court reporter taking down everything we say to make a

11 written record, so we ask that you give verbal responses to all questions. Do you understand that?

12             Mr. Windom. Yes.

13             ██████ So the court reporter can take down a clear record, we'll do our best to limit the

14 number of people directing questions at you during any given hour to just people on the staff whose

15 turn it is. Typically, it's just two individuals from each staff. Please try and speak clearly so the court

16 reporter can understand and the folks down at the end of the table can hear you.

17             It is important that we don't talk over one another or interrupt each other if we can help it,

18 and that goes for everybody present at today's interview.

19             We want you to answer our questions in the most complete and truthful manner as possible,

20 so we will take our time. If you have any questions or if you do not understand one of our questions,

21 please let us know. Our questions will cover a wide range of topics, so if you need clarification at any

22 point, just say so.

1       If you honestly don't know the answer to a question or do not remember, it is best not to

2   guess. Please give us your best recollection, and it is okay to tell us if you learned information from

3   someone else. Just indicate how you came to know that information. If there are things you don't

4   know or can't remember, just say so and please inform us who, to the best of your knowledge, might

5   be able to provide a more complete answer to the question.

6       You should also understand that by law you are required to answer questions from Congress

7   truthfully. Do you understand this?

8       Mr. Windom. I do.

9       █████████ And this also applies to questions posed by congressional staff in an interview.

10  Do you understand this?

11      Mr. Windom. I do.

12      █████████ Witnesses that knowingly provide false testimony could be subject to criminal

13  prosecution for making false statements under 18 U.S.C. Section 1001. Do you understand this?

14      Mr. Windom. Yes.

15      █████████ Is there any reason you are unable to provide truthful testimony today?

16      Mr. Windom. No.

17      █████████ Finally, I'd like to make note the content of what we discuss here today is

18  confidential. We ask that you not speak about what we discuss in this interview to any outside

19  individuals to preserve the integrity of our investigation.

20      For the same reason, the marked exhibits that we will use today will remain with the court

21  reporters to go into the official transcript, and any copies of those exhibits will be collected at the

22  end of the transcribed interview.

1    That's the end of my remarks. Is there anything that my colleagues from the minority would

2    like to add?

3    ███████ We want to thank the witness for taking time out of your schedule to join us

4    today.

5    I also do want to note for the record that this interview is being video-recorded, and we

6    wanted to request on the record for that video when it is final.

7    ███████ We give you the video when it comes in.

8    ███████ We actually don't get it when it comes in. We get it before you use it, and I

9    appreciate that. But it's when it's available --

10    ███████ No. We give it to you when -- like, the video needs to be mastered, right. They

11    need to take out the portions that are off the record. And then we send it to you.

12    ███████ I don't believe that we received any of the videos from this Congress.

13    ███████ I've sent several to ███████

14    ███████ So, anyway, just to be clear, as soon as the video is ready, we have a professional

15    videographer goes through, and as soon as it's -- they take out the parts that are off the record, we

16    send it over to you.

17    Mr. Burton. If you don't videotape at all, it would make all this more efficient.

18    ███████ Well, guess when the videotaping started? I mean, the January 6th Committee

19    started the videotaping. And so, you know, our members have an interest in doing that, and that's

20    why we are where we are.

21    Mr. Burton. Well, we are not members of the January 6th Committee, so --

22    ███████ On that note, I don't believe that we received the bulk of the videos from last

23    Congress, so we can discuss that later, but put that on the record.

1              ██████      Mr. Burton, I understand you have some remarks you'd like to make.

2         Mr. Burton.  I do.  Thank you, ██████

3         Before we begin, we understand from our communication with you that we will have the

4    opportunity to review the transcript before it's finalized, and we have requested that we be provided

5    with reasonable advance notice before any of the video recording, which we object to, is made

6    public.

7         I also -- I sent a letter to the chair last -- yesterday afternoon through you, and I respectfully

8    request that that letter and the attachments I sent to the chair yesterday be made part of the record

9    for this voluntary transcribed interview.

10        I have copies if that would help, if you're maintaining the copies as the majority.  I can also

11   share a copy with Democratic staff.

12        Just two points I'd like to emphasize from that letter.  Notwithstanding the Department of

13   Justice's position on privilege and unanswered questions about its leadership's conflict of interest

14   with respect to Mr. Windom and actually with respect to the entire subject matter of the

15   committee's inquiry, in addition to limiting its approval for Mr. Windom to address the five specific

16   topics set forth in its June 4th letter, the Department acknowledged that Mr. Windom may not

17   violate Rule 6(e), court orders, or other laws with respect to his testimony today.

18        With those important restrictions and limitations in mind, along with the others

19   more -- addressed more fully in our letter to the chair, Mr. Windom will respond to the committee's

20   questions to the best of his recollection and understanding.

21              ██████      Thank you.  We can mark the letter from you as exhibit No. 1.

22        Mr. Burton.  Thank you.

23                              [Windom Exhibit No. 1

1          was marked for identification.]

2          ████████  The clock now reads 10:09 a.m.  We'll start the first hour of questioning.

3                                    EXAMINATION

4          BY ██████:

5          Q    Mr. Windom, what positions did you hold at the Department of Justice during your

6     tenure there?

7          A    I started in February of 2013 as an assistant United States attorney in the United States

8     Attorney's Office for the District of Maryland.  I held that title throughout the entirety of my time in

9     the Justice Department, which concluded in January of this year, 2025.

10          In addition to the standard title of assistant United States attorney, I became a supervisor in

11    the Southern Division.  That's the Greenbelt office of the United States Attorney's Office for the

12    District of Maryland.

13          Around early 2018, that's when I became -- I believe the sequence was an acting deputy chief

14    and then the deputy chief.  I became the chief of that office around April of 2020, and then

15    concluded my term -- or my time as chief of the Greenbelt office around November of 2021.  That's

16    when I began a series of details.

17          Q    And what can you tell us about those details?

18          A    The first detail was to the United States Attorney's Office for the District of Columbia.

19          Q    And when did that detail begin?

20          A    Approximately the beginning of November, kind of middle of November maybe, of

21    2021.

22          Q    And were you asked to detail or did you seek out the opportunity?

23          A    I was asked to go on a detail.

1    Q    And who asked you to go on the detail?

2    A    The initial person that spoke to me about a potential opportunity was an individual

3    named Rush Atkinson in the Office of the Deputy Attorney General.

4    Q    Did you have any more conversations with anyone about the role before you accepted

5    the detail?

6    A    I did.

7    Q    And who did you speak with about the detail?

8    A    I assume you're speaking not about like family and things like that, but --

9    Q    That is correct, just at the Justice Department.

10    A    The other individuals that I remember speaking to, in one of the conversations there

11    was a person by the name of Chris Kavanaugh.  I don't remember him having a speaking role.

12    And let me maybe frame this for you as well.  The time period that we're talking about would

13    have been fall or so of 2021, fall, late fall, something like that.  At the time, much of the Department

14    was teleworking.  And so when I say meeting or a conversation, I don't recall any of these being in

15    person.  These, to my best recollection, were either by telephone or by videoconference.

16    Q    Okay.  And so you spoke with Mr. Atkinson, Mr. Kavanaugh.  Did you speak with anyone

17    else at the Department about the detail before you accepted it?

18    A    Yes.  The person who I spoke to at some point during the process who was from the

19    United States Attorney's Office for the District of Columbia was John Crabb, who my understanding

20    was the chief of the Criminal Division there.

21    Q    Were those the only conversations you had with Justice Department officials prior to

22    your detail beginning?

1      A     I think that those are the only three people in terms of Justice Department officials that

2     would have been knowledgeable about the potential opportunity.  I'm certain I spoke to colleagues

3     of mine in my office or other friends who were at Justice to, you know, consider whether or not going

4     on detail was something I would like to do.

5      Q     And what was the purpose of the detail in November 2021?

6      A     The initial conversation or conversations, it appeared to me that there was a -- there

7     had been investigative information that was developed during the course of ongoing criminal

8     investigations in the United States Attorney's Office for the District of Columbia, and some of those

9     investigative threads had not been fully explored.

10          It was my understanding that there was an opportunity to go on detail to review some of

11     these threads to explore whether additional avenues of investigation existed and ultimately to

12     determine whether I believed any of them merited investigation and then to make recommendations

13     as to what should or should not be investigated further.

14      Q     And what was the focus of the investigation?

15      A     The -- I think that at that time I wouldn't say that there was a focus.  And I just want to

16     cabin this, I guess, to the inception of the conversations.  And then the -- when I began on detail, I

17     spent -- I arrived in the U.S. Attorney's Office for the District of Columbia and began reviewing

18     information.

19      Q     Was the focus of the investigation on the events that occurred on January 6, 2021, or

20     was it the 2020 election?  Is that accurate, that the focus of the investigation was on the 2020

21     election?  Take it separately.

22      A     Okay.  I think that what -- as I understood it, was that there were investigative

23     information -- there was investigative information that had been developed during the course of the

1    investigations into either the on-the-ground rioters who breached the Capitol Building and assaulted

2    law enforcement officers, and then also what later became the conspiracy cases, as shorthand, which

3    may involve people, I'm thinking like Oath Keepers, Proud Boys, things like that, where they may not

4    have actually in some instances entered the Capitol.

5          So those are the sorts of investigations where I began looking at the investigative files.

6        Q    And you said that you began a series of details in the fall of 2021. So we have the one

7    that began in November 2021. What was the next detail?

8        A    The next detail was to the Special Counsel's Office.

9        Q    And when did you begin that detail?

10       A    The special counsel was appointed I believe on November 18th of 2022. I began the

11   detail to that office shortly after his appointment.

12       Q    And did you ask to be detailed to Special Counsel's Office or did someone ask you?

13       A    Special counsel asked me.

14       Q    Special Counsel Jack Smith?

15       A    Yes.

16       Q    Did you speak with anyone else about that opportunity before accepting it, at the

17   Justice Department?

18       A    I did.

19       Q    Who did you speak with?

20       A    I did not speak to -- well, I spoke to Mr. Cooney, J.P. Cooney, who was in the United

21   States Attorney's Office for the District of Columbia. I spoke to him about it. He had, my

22   understanding, previously worked with Mr. Smith.

23       Q    Did you speak with anyone else about the opportunity before accepting it?

1      A    I did.

2      Q    Who else did you speak with?

3      A    I did not speak to any other DOJ officials about it.

4      Q    Just Mr. Cooney and Mr. Smith were the only ones you spoke with?

5      A    In terms of DOJ officials, yes.

6      Q    That is correct.

7      A    I spoke to other individuals from -- that I otherwise knew from -- you know, personally

8  or professionally, who I thought may or may not have had at some point contact or knowledge of Mr.

9  Smith, but not people that would necessarily know what the specific detail would entail.

10     Q    Okay. I want to go back to your first detail. I just wanted to make sure we had a clear

11  record. Just those two details or did you have another detail before January 2025?

12     A    I did not have another detail before. I believe those were the two details. If I remember

13  correctly, the special counsel detail, the paperwork for it may have been for like 1 year or some

14  period of time, and so there would be additional paperwork, I assume, for like another year or

15  another whatever period of time.

16     So those are the two offices, but there may have been additional terms of details. And by

17  terms, I mean time periods.

18     Q    When you began your detail at the U.S. Attorney's Office for D.C. in November 2021,

19  who was the U.S. attorney at the time?

20     A    Either right when I started or shortly thereafter, Matt Graves was -- or became the U.S.

21  attorney.

22     Q    And had you ever worked with Mr. Graves before?

23     A    No.

1       Q    When you arrived at the U.S. Attorney's Office for D.C. in November 2021, was that your

2    first time being involved in any investigation surrounding the events of January 6th?

3       A    No.

4       Q    Had you worked on investigations in your previous role at the U.S. Attorney's Office in

5    Maryland?

6       A    I had. I was the supervisor, as I indicated, of the Southern Division. And the way

7    that -- just in terms of staff, there were opportunities and requirements of reviewing information and

8    investigations that other individuals worked on.

9       Q    And you mentioned previously that there had been investigative information that was

10    developed as part of an ongoing criminal investigation when you arrived at D.C.

11    What was the nature of that investigation?

12       A    My understanding -- and if I indicated in the singular, I meant plural. I was speaking of

13    the -- what I understood to be hundreds, if not more, of individual investigations into the Federal

14    felonies that were committed at and in the Capitol on January 6th of 2021.

15       Q    And you noted that you were brought on to explore threads that had not been fully

16    explored. Can you kind of describe for us what those threads were that you were going to focus on

17    during your detail?

18       A    I can give you a general sense of it. When I arrived, I began talking to prosecutors in the

19    U.S. Attorney's Office for the District of Columbia to determine kind of what their files look like, what

20    information existed, if they believed that there were information that had been developed during the

21    course of their investigations that may not be specifically relevant to their investigative subject but

22    that may otherwise have been worth looking into.

1    I looked at a number of investigative files from many ongoing grand jury investigations,

2    criminal investigations, and determined that ultimately, in my view, there were a few, at least a few

3    pieces of information that merited further investigation.

4        Q    And what were those pieces of information that merited further investigation?

5        Mr. Burton.  I think we need to be careful about Rule 6(e) and getting specific on these issues

6    because that is, you know, one of the restrictions on Mr. Windom.

7        So I don't know, when you're asking specific information about a course or topic of

8    investigation, that he can answer that question.

9            BY ▮▮▮▮▮▮▮:

10       Q    Okay.  What were the topics that merited further investigation?

11       A    I think that the best I can do, consistent with the strictures of Rule 6, is to say that they

12   involved events at and around the Capitol on January 6th of 2021.

13       Q    And when you say events that occurred at or near the Capitol on or around January 6th,

14   are you talking about the speech that President Trump gave at the Ellipse?

15       A    I think that what I said before can hold on that one, that I reviewed a significant amount

16   of information from ongoing criminal investigations, grand jury investigations.  And beyond that, I

17   don't think that I'm permitted by law to discuss the details of that with you.

18       Q    Because the special counsel's report that Special Counsel Smith published at the end of

19   his investigation in January 2025 noted pieces of evidence and information surrounding the speech at

20   the Ellipse and how that played into the indictment of the President.  Were you involved in that

21   investigation, in that specific piece of the investigation?

22       A    If you'd like to show me the parts of the special counsel's report, I'm happy to take a

23   look at those and answer very specifically for you.

1    Q    Did you ever investigate the speech at the Ellipse?

2    A    I think that, as you indicated and as the special counsel report says and I believe the

3    indictment that was handed down by a grand jury on August 1st of 2023, all discuss information

4    about the defendant's speech at the Ellipse.

5    ███████.  By defendant, you're talking about the President?

6    Mr. Windom.  Mr. Trump, yes, President Trump.

7    BY ████████:

8    Q    And when did you first begin looking into the actions of President Trump in regards to

9    January 6th?

10    A    I don't know that I -- there's a specific timeframe that I could give to you.  I think that in

11    the investigations that preceded me that involved the rioters on the ground primarily, a large volume

12    of information had been developed.

13    By virtue of that, there was a significant amount of information on any number of individuals,

14    including publicly available information.  Obviously, there were, I would venture, hundreds of people.

15    So among those hundreds of people, Mr. Trump was one of them at some point.  I can't give you the

16    specific timeframe of that.

17    Q    When did you begin investigating the other coconspirators that were listed in the special

18    counsel's report?

19    A    So I want to be clear, I guess, on what you mean by investigating.  The way that I

20    understand it, at least, as I reviewed and as other people reviewed information, you find information

21    about any number of individuals at various times throughout the course of reviewing existing case

22    files or grand jury information.

1    So I don't know that there is a specific point in time where this person appeared in a

2    document versus that person appeared in a document. I couldn't give that to you.

3    Q    And when you came into the U.S. Attorney's Office in D.C. in the fall of November or

4    November 2021, did you work closely with others who were already at the D.C. office?

5    A    I -- let me -- before answering your question, let me just make clear, my best

6    recollection is that it was around November of 2021. If it was early December, for example. I just

7    want to be clear on that, that it's somewhere in that time period.

8    So the question was did I work closely with other people who were already there in the

9    office? The answer to that is yes.

10    Q    Did you have the opportunity to work with J.P. Cooney?

11    A    Eventually.

12    Q    When did you start working with Mr. Cooney?

13    A    Mr. Cooney -- I mentioned a moment ago that when I arrived on my detail to that office

14    that I spoke to various prosecutors who had been there and who may be knowledgeable of existing

15    information and existing files.

16    Mr. Cooney was one of those individuals who I spoke to at the beginning. I wouldn't say that I

17    began working with him until much later.

18    Q    When do you think you began working with him?

19    A    It was around the summer of 2022.

20    Q    So was he doing a separate investigation while you were working on exploring these

21    threads that needed to be pulled?

1       A    Mr. Cooney, my recollection, was a supervisor. And the name of his section I believe has

2    changed over time, but it was either fraud or fraud and public corruption or public corruption and

3    fraud, something like that.

4        So he was a supervisor in that section doing whatever other cases that I was not involved in

5    until around the summer of 2022.

6       Q    And before you started working with him in the summer of 2022, did you ever obtain an

7    understanding of his investigations related to January 6th, what he was working on?

8       A    I don't know at that time if he was working on -- I don't know one way or the other if he

9    was working on investigations related to January 6th. As I said, he was a supervisor. I suppose that

10    maybe people in his section or he were working on those types of cases in addition to other cases.

11       I'm generally aware that he was involved in some cases involving what I was loosely terming

12    earlier as on-the-ground rioters or the conspiracy cases. I don't -- I don't know if that work

13    overlapped with the time when I was there, but I was not -- to the extent that he was involved in

14    that, I don't recall myself being involved in that.

15       Q    Did you ever become aware that in early 2021, around February, Mr. Cooney had taken

16    a proposal to investigate ties in President Trump's orbit in his advisers related to January 6th?

17       Mr. Burton. Could you repeat that? I'm sorry.

18       ████████. Of course.

19       Did you ever become aware that in February 2021, Mr. Cooney had taken a proposal to his

20    supervisors wanting to investigate President Trump and individuals within his orbit regarding the

21    lead-up to and the events of January 6th? Did you ever become aware of that?

22       Mr. Burton. I think asking about a proposal for a course of investigation would be Rule 6(e)

23    type information.

1          ████████    How so?  That's not before a grand jury.  That's asking about a proposal that

2     went to his leadership.  That's not before a grand jury.

3          Mr. Burton.  That's not what Rule 6 is limited to.  It's not literally what is -- happens in the

4     grand jury room.  It's the course of an investigation, a course of action.

5          And I don't know that he -- well, I don't know the answer to the question, but I think if you're

6     asking about a proposal for a course of an investigation, the only investigation is going to be a grand

7     jury investigation.  And I don't think, in his circumstance and as broadly as the courts interpret that

8     concept, we are going to be able to answer that question under the restrictions that that rule

9     imposes on him.

10          ████████    Okay.  Let me rephrase the question.

11          Without revealing information you learned from the grand jury, did you ever become

12     aware that Mr. --

13          Mr. Burton.  You don't learn information from the grand jury, ████████

14          ████████    Excuse me.  Please let me ask my question.  Please let me ask my question, and

15     then you can decide whether or not you're going to allow your client to answer.

16          BY ████████

17     Q     Without revealing information you learned from a grand jury, did you ever become

18     aware in February 2021 that Mr. Cooney was having discussions with his leadership regarding looking

19     into President Trump and his advisers and their ties to what occurred before January 6th and on

20     January 6th?  Did you ever become aware of that?

21     A     I think I might be able to give you some information that will get us to the next question

22     or topic on this --

23     Q     Okay.

1          A       -- consistent with my obligations under Rule 6 and any other obligations I have,

2    including my understanding is this is not one of the specific topics that the Department of Justice has

3    authorized me to discuss.

4          What I can say is I am aware of public reporting from some time -- I don't have knowledge as

5    to when a newspaper article or a report or even the source of it came out -- that at some point in

6    time prior to my detail in the United States Attorney's Office, I -- somebody or some group of

7    people -- and I believe that Mr. Cooney was identified in whatever newspaper article I saw -- had

8    sought a series of investigative steps.

9          I couldn't tell you sitting here today what even steps that article may have mentioned, but I

10   hope that that is sufficient, that whatever your next series of questions is, we can get to those.

11         Q       Do you have any independent knowledge outside of that newspaper article regarding

12   those -- that conversation that Mr. Cooney had?

13         A       So on this one?

14         Q       That is correct.

15         A       I -- what I can say is I'm aware of the newspaper article.  Beyond that, I am not

16   authorized by the Department of Justice to discuss anything about that with you if I did know it or if I

17   did not know it.

18         And if I were so authorized, my understanding based on counsel here, is that I would be

19   prohibited from discussing that with you, based on, at a minimum, Rule 6 of the Federal Rules of

20   Criminal Procedure.

21         Q       And looking at other individuals you may have worked with at the D.C. U.S. Attorney's

22   Office, we'll start at the top, did you work closely with Mr. Graves during the beginning of your detail

23   in fall of 2021?

1    A    I -- that would be my characterization of it.  Perhaps would make sense, instead of

2    saying, you know, closely with somebody, to give you a sense of numerosity of contacts.

3         I regularly interacted with Mr. Graves, attended meetings with Mr. Graves.  How you want to

4    categorize that or characterize that, I -- I guess I leave to you.

5    Q    Would he be your supervisor?  Would you say he was your supervisor at the time of the

6    detail?

7    A    He was not my direct supervisor.  He, I think, by law, was everybody's supervisor in that

8    office.

9    Q    And who was your direct supervisor, would you say?

10   A    Mr. Crabb.  John Crabb, the criminal chief.

11   Q    And how closely did you interact with Mr. Crabb?  Did you have several meetings with

12   him every week, talk to him on a daily basis?

13   A    I don't know that I can say daily.  We had frequent contact.  I -- Mr. Crabb was, as I said,

14   my direct supervisor.

15   Q    And what was --

16   A    I'm sorry.  I just want to be very clear here.  In terms of a timeframe that we're talking

17   about, you're talking about when I began at the office or you're talking about kind of the duration of

18   my time there?

19   Q    We can start with when you began at the office, and then we can discuss the duration.

20   So if you want to start with that.

21   A    Sure.  So what I said from Mr. Graves and from Mr. Crabb, I was referencing kind of

22   the -- when I began there and then kind of the initial time on detail in that office.

1        Q     And what was Mr. Crabb's role in the investigative threads that you were looking at?

2    Was he looking at the same threads or did he have a different prong that he was working on, if you

3    will?

4        A     Mr. Crabb was the chief of the Criminal Division of what I understand to be the largest

5    United States Attorney's Office in the country, with hundreds of assistant United States attorneys.

6         I regularly was in contact with him regarding information that I reviewed.  That was certainly

7    not the only responsibility that he had in that office.

8        Q     So his was more of a supervisory role, if you will?

9        A     Correct.

10       Q     And were there others that you worked that would have been at the same level as you

11   that worked on similar investigative threads or different prongs of the larger investigation that

12   involved January 6th?

13       A     There were other individuals, other prosecutors with whom I worked.

14       Q     And who would be at the same level as you?  Can you give us those names?

15       A     The -- I can give you kind of a sense of it, but I can't give you names.  The --

16       Q     Because you don't remember or -- the names?

17       A     I'm not authorized by the Department to identify individual line prosecutors.

18       Q     Okay.  Go ahead.  So give us a sense of who -- how many did you work with?  Let's go

19   with that.

20       A     It evolved over time.  I -- there were -- you know, I started off, and then shortly

21   thereafter, another individual joined the efforts that I was beginning to look at.  I -- I'd say --

1     Q    So individual one, if you will, prosecutor number one, we'll call that individual

2    prosecutor number one, they were working on the same threads that you were working on. Is that

3    correct?

4    A    They -- that individual was working with me.

5    Q    Okay.

6                       But you're not giving us the name?

7    Mr. Burton.  No.  The letter says interactions with DOJ officials.  We don't understand DOJ

8    officials to be ordinary line assistants.  You can get that information from the Department of Justice if

9    they wish to furnish it.

10                       Or we can get a new authorization letter and bring you back.

11               BY

12    Q    Okay.  You said it evolved over time, so did more prosecutors join the effort?

13    A    More prosecutors began working with me over time.  I think that a couple more.  And

14    so, as I said, I think that I started early-mid November of '21.  So shortly after I started, one other

15    individual was assigned to kind of look at similar things, worked with me on that.

16    Q    What do you mean by similar things?

17    A    Do the same thing I was doing, basically.

18    Q    Work on the same investigative threads or different investigative threads?

19    A    So I don't think that we're to the point of there even being investigative threads.  The

20    time period that I'm talking about, I'm reviewing files, examining existing information from ongoing

21    grand jury investigations or criminal investigations, and speaking to prosecutors.  So that's the time

22    period that I'm talking about.

1      Q      Okay. So if we -- we already have prosecutor number one. So prosecutor number two

2    you said joined. Did they -- were they reviewing -- you said similar things, so were they reviewing

3    different investigative files than you were?

4      A      Sorry. I want to make sure I know what you're talking about when you say prosecutor

5    number two. Are you talking about the second person that began working with me or another

6    individual?

7      Q      So you had identified someone that we termed prosecutor number one that was

8    working with you. Then you said two more individuals joined.

9      A      That sounds right.

10      Q      So this one individual, prosecutor two, since you won't give us names. So prosecutor

11    two was working on similar things is what you said. And I asked you to define similar things, and you

12    said looking at investigative files.

13      So were they looking at the same investigative files as you or different investigative files?

14      A      There was a large volume of information to review. I suspect that they probably looked

15    at some of the same stuff, and I suspect that they probably looked at some different stuff. I couldn't

16    specifically tell you now, going on, you know, 3 and change years, 3 and a half years, what they

17    looked at or did not look at on any given day.

18      And I do want to be clear. It is not that I am resisting giving you the names. It's that I have

19    been given a very specific authorization of what I can and cannot provide to you. And my

20    understanding of the authorization letter from the Department of Justice is that I cannot provide that

21    information to you, consistent with my obligations.

1      Q    So the other individual that joined, so we have two other people now other than you,

2 and you said there were prosecutor one that you were working with and two more joined. We've

3 discussed one.

4      So the other one, prosecutor three, what was their role?

5      A    The same as the other individuals. I'm not going to use your nomenclature, but the

6 other individuals with whom I worked.

7      Q    Okay. And then were there just three other prosecutors besides you working on the

8 January 6th-related investigations or did others join?

9      A    I'm, again, not going to use your characterization of the January 6th-related

10 characterization investigations. I've explained to you what I was doing in that time period. I -- other

11 people -- other prosecutors were assigned over time, other additional prosecutors.

12      Q    How many other prosecutors were assigned to work on the same investigative files that

13 you were reviewing at that time?

14      A    So I think that at some point I -- just to give timing, at some point, a recommendation

15 was made to the U.S. attorney that there were certain pieces of information that we collectively had

16 reviewed that merited further investigation.

17      So I recall that at least one of those prosecutors was working on these issues at the time that

18 those recommendations were made. And then thereafter, other prosecutors were not just kind of

19 reviewing investigative files and talking to prosecutors but also working on the investigative efforts

20 that the United States attorney approved.

21      Q    And so in the fall of 2021, how many other prosecutors were you working with?

22      A    The fall of '21?

23      Q    Uh-huh.

1      A      Myself.  The one other individual who started shortly thereafter.  And my recollection is

2    that there were approximately two people, and I don't recall if that was December of '21,

3    January-February of '22.  Somewhere in that time period.

4      Q      Okay.  So then when did the team start to evolve and become bigger?

5      A      Let's see.  I think an additional person, an additional prosecutor began assisting at least

6    in around March-April-May 2022 time period.

7      Q      And that was it?

8      A      No.  As I said, the additional prosecutors joined over time.

9      Q      Okay.  And at its largest, how many prosecutors were working on the same effort that

10    you were working on?

11      A      You're talking about while in D.C. as opposed to in the Special Counsel's Office?

12      Q      That's correct, while in D.C.

13      A      So around the summer of 2022, it became apparent that additional prosecutors were

14    necessary to explore all of the information and investigations that had been approved by the United

15    States attorney.

16            Numberswise, I -- if we were around a handful of people at that time, I want to say

17    somewhere around 7 to 12 additional people joined.  And I want to be clear, I guess.  Seven to 12

18    additional prosecutors were asked to join during, rough timeframe, the summer of 2022.

19      Q      And you had mentioned the U.S. Attorney's Office had approved various investigations.

20    When did the U.S. attorney -- I'm assuming Mr. Graves was the U.S. Attorney at that time.  Is that

21    correct?

22      A      Mr. Graves was the United States Attorney.

23      Q      So when did Mr. Graves start approving investigations?

1  A My recollection is that the first recommendations on more specific investigations were

2 made to Mr. Graves in December of 2021.

3  Q Okay.

4  A Maybe like mid-December.  And then my recollection is that Mr. Graves approved

5 certain investigative efforts ballpark Christmastime.  So probably a little bit before Christmas, I would

6 think, of 2021.

7  Q Did he approve additional investigations over time, or was it just the recommendations

8 were made in December of 2021 and then he approved certain investigative efforts around

9 Christmastime?  Is that the only approval that occurred?

10  A I recall at least one more investigative effort that Mr. Graves approved.

11  Q And when did that approval occur?

12  A Approximately January-February of 2022.

13  Q And when you say approved certain investigative effort, can you give us a sense of what

14 that investigative effort was?

15  A Not other than what I've already provided to you.

16  Q Was it he was going to allow you to investigate further, do witness interviews, you

17 know, send out subpoenas?  Was that the type of investigative efforts he was allowing you to do?

18  A So I think that what I described before was reviewing files, reviewing existing

19 information, talking to prosecutors that had worked on other cases.  What I'm thinking of in terms of

20 the additional lines of investigation that Mr. Graves approved would involve additional investigative

21 steps beyond those that were already existing.

22  So there were, broadly speaking, and I don't remember, you know, what -- you know, what

23 specific steps for which, you know, specific stream, but it likely included reviewing other documents

1    specific to the investigative streams, perhaps obtaining records that were not in existing holdings

2    regarding those efforts.

3         Ultimately -- you mentioned speaking to witnesses in one way or another.  I think broadly

4    what I can say is that eventually at some point in time that did occur.

5         Q      And when did you start speaking with witnesses?

6         A      I -- I don't know if I can give you a specific timeframe.  I'm certain that by, you know,

7    January, February, March, kind of early 2022, there were at least discussions with counsel.  I don't

8    have a sense for when conversations with specific individuals began.

9         Q      And since you were reviewing existing investigative files once you started your detail

10   and then Christmas 2021, there were -- or excuse me, December 2021, there were recommendations

11   and then ultimately approval was around Christmastime.  Was the goal of the new investigative

12   efforts to gain new information?

13        A      That was certainly part of the investigative streams that were approved by Mr. Graves.

14   There were a series of steps, next steps, those sorts of things, investigative steps, and I'm sure that

15   some of those probably included obtaining new information, as I indicated.

16        Q      And the recommendations from December 2021, who made those recommendations?

17        A      The best I recall, I made them, in conjunction with at least one of the other prosecutors

18   that I was working with.  It may have been that it was just the two of us assigned at that time.

19        Q      And who did you make those recommendations to?

20        A      I made them to Mr. Graves.  I don't know if I emailed them to him or if I, you know,

21   provided them to Mr. Crabb.  I -- my recollection is that I received notification of Mr. Graves'

22   approval through Mr. Crabb.  So I guess it's likely that I first transmitted the -- the recommendations

23   to Mr. Crabb.

1    Q    So the recommendation would have been, you said, likely maybe email, but there was

2    no formal, you didn't go present your recommendations to Mr. Graves. Is that accurate?

3    A    I recall a Word document. And so I said email a minute ago. I'm just assuming that that

4    was emailed to Mr. Crabb. I don't recall a specific meeting with Mr. Graves where, you know, here is

5    a Word document, let's go over this line by line.

6    My recollection, however, is that prior to that time, I had had conversations with both

7    Mr. Crabb and Mr. Graves about different things that we were finding as we were looking through

8    the investigative files.

9    Q    And at this point in time, were you still teleworking in the fall of 2021?

10    A    I think that I was in -- when I went on detail to D.C. and also when I was the chief in

11    Greenbelt, I largely was in person. I recall the -- when I mentioned the teleworking before, I just

12    recall being in my office in Greenbelt on a, like, whether Zoom or some other call.

13    So my general practice at that time was to -- was to be in the office whether or not it was -- it

14    was required. But in the time period specifically that you mentioned when I started in D.C., I believe

15    that I was in the office certainly most days, you know, perhaps every day.

16    Q    And were the other prosecutors working on this effort, were they also in office with you

17    or did they telework?

18    A    I think there's another option here. The other individuals who I mentioned before were

19    not, to my knowledge, at that time on detail or working at the U.S. Attorney's Office for the District of

20    Columbia. So they may come in, you know, as needed, or they may come in just to work there. But

21    my recollection is that, at the beginning, the individuals that I -- certainly the first individual that I

22    mentioned was assigned to an office at Main Justice.

23    Q    Okay. And Mr. Graves and Mr. Crabb, were they in the office as well or --

1       A    I think that they were in probably every day.

2       Q    Okay. When did you start working with the Washington Field Office of the FBI on your

3   investigative efforts?

4       A    I -- relatively early on. The -- well, let me give you a sense of it. The investigations that I

5   described earlier that were ongoing were already existing when I arrived. Most, if not all, of those

6   were FBI investigations or at least involved investigations that FBI agents were working on.

7       So the -- a lot of the information, my understanding, may have come or, you know, whether it

8   was housed at the FBI or housed at D.C., involved the FBI in some way. So I think relatively early on I

9   began interacting with the FBI in terms of reviewing information.

10      Q    And who did you interact with mostly at the Washington Field Office?

11      A    Those would be line agents.

12      Q    Did you ever work with the Assistant Director in Charge, Steven D'Antuono?

13      A    I think that the most I can say here, consistent with the Department's authorization, is

14   that I know who Mr. D'Antuono is. Specific interactions that I may or may not have had with the FBI

15   or other investigating agencies, the Department has not authorized me to discuss with you.

16      Q    Did you ever interact with Assistant Special Agent in Charge Tim Thibault?

17      A    Similar answer. I think that the most that I can say is that I know who Mr. Thibault is,

18   but beyond that, my understanding of the authorization letter that the Department has provided is

19   that I have not been authorized to discuss any interactions, any specific interactions that I may or

20   may not have had with the FBI or other law enforcement agencies.

21      Q    Beyond Mr. D'Antuono and Mr. Thibault, did you interact with any other individuals at

22   the FBI?

23      A    Yes.

1    Q    And were those individuals lower than Mr. D'Antuono and Mr. Thibault in the hierarchy?

2    A    My understanding of Mr. D'Antuono's position is that he was the assistant director in

3    charge of the entire field office. Given that, my understanding is that everybody who worked in that

4    office was lower than him.

5    Q    And so did you interact with anyone else at Mr. Thibault's level, which would be the

6    assistant special agent in charge, one of the assistant special agents in charge?

7    A    Kind of the same answer I gave before. Generally, I interacted with people at the FBI in

8    various levels. If you want to give me specific names, I can answer similarly as I did for Mr. Thibault

9    or Mr. D'Antuono as to whether I know who they are. And then beyond that, I would be prohibited

10    from discussing specific interactions by virtue of the Department's lack of authorization.

11    Q    Did you interact with individuals on ASAC Thibault's team?

12    A    My understanding of the role of an assistant special agent in charge is that there are

13    many squads underneath them. If -- I'm trying to think of how I can --

14    Q    Did you work with squad CR15?

15    A    Yeah, I can -- I can be responsive now that I think that you're specific. I think it's -- I

16    think it's -- I think that it is a matter of record, but my counsel can correct me if I'm wrong here. I

17    think that it's a matter of record that I worked for -- excuse me. I worked with agents who were

18    assigned to a public corruption-focused squad at WFO.

19    I don't know if the specific designator or however the FBI terms it is a matter of public record

20    or otherwise would be included in the authorization, but perhaps that gets you what you're looking

21    for.

22    Q    Did you work with any other squads other than CR15?

23    A    I -- can you give me a point in time, just to be clear?

1        Q       Let's start with the fall of 2021.  Did you work with any other squads other than CR15?

2        A       I think that I -- in the fall of 2021, I worked with -- and that's my phrasing of it -- that I

3    described before that some of the information that I was looking at in that time period was from FBI

4    investigations.

5                I believe that -- you mentioned CR15.  I believe that the squads or squad that was working

6    more on the on-the-ground rioter cases or the conspiracy cases was not CR15.

7        Q       What can you tell us about conversations you had regarding subpoenaing the Willard

8    Hotel?

9                Mr. <u>Burton.</u>  A subpoena would be, by definition, a grand jury subpoena.  So that conflicts

10   with Rule 6(e).

11               BY██████████:

12       Q       Did you ever have discussions with Mr. D'Antuono regarding seeking information from

13   the Willard Hotel?

14       A       I think that that falls into two different prohibitions.  What I said before is that I'm -- I

15   know who Mr. D'Antuono is.  And when you asked me that, whether I interacted with him or

16   whatever the specific question was before, I pointed you to the Department having not authorized

17   me to --

18       Q       But Mr. D'Antuono --

19       A       Excuse me, ma'am.

20       Q       -- is a Department official, so --

21       A       I am not done with my answer.

22       Q       Go ahead.

1          A     So for that reason, I would not be able to talk about specific interactions with

2     Mr. D'Antuono.  Beyond that, the question that you most immediately posed seems to me, to the

3     extent that it occurred or did not occur, my understanding would fall, as my counsel indicated, within

4     Rule 6 obligations, which would further prevent me from discussing that with you.

5          Mr. Burton.  In addition, your request to the Department specifically named those two

6     agents.  Their guidance letter to us does not.

7          ███████  It says discussions with Department officials, correct?

8          Mr. Burton.  FBI agents are not Department of Justice officials, as I understand the term.

9          ███████  That's ridiculous.  FBI is a part of the Department of Justice.

10         Mr. Burton.  I understand that, but I don't know that it --

11         ███████  Okay.

12         Mr. Burton.  -- it is a Department of Justice official.  But anyway --

13         ███████  If that's the position you're going to take, this is --

14         Mr. Burton.  Could I please finish, ███████?

15         Regardless of whether this is an official or not, any interaction with him -- I'm aware of the

16    newspaper article that prompts this line of inquiry, which is supposedly about a subpoena to the

17    Willard, as you just said, ███████

18         Any subpoena issued would be, by definition, a grand jury subpoena and, therefore, that topic

19    is off limits by the terms of Rule 6(e) and as indicated on page 2 of the June 4, 2025, letter providing

20    guidance.

21              BY ███████

22         Q     Did you ever become aware of what has been reportedly called a war room at the

23    Willard Hotel?

1      A    I think that probably the best I can give you on this is I am aware of public reporting that

2    I think probably used that phrase. I don't know what the source of that was or what the timeframe

3    of that article.

4        If it is -- setting that information aside, if there are another source of information from which I

5    learned that, if that existed, my understanding is that that would be part of the Rule 6 grand jury

6    investigation, and I would not be able to discuss another source of that information with you.

7      Q    Are you aware of reporting that in November 2021, you had conversations with

8    Mr. D'Antuono where he told you he did not -- you did not have enough evidence to subpoena the

9    Willard Hotel? Are you aware of that reporting?

10      A    I'm aware of the reporting.

11      Q    When did you begin working or obtaining information from the United States Postal

12    Service Inspector General?

13      A    I'm sorry, can you repeat the question?

14      Q    When did you begin working with the United States Postal Service Inspector General?

15      A    For similar reasons that I said before, the Department of Justice authorization letter has

16    not allowed me to speak about specific investigative agencies with whom we worked.

17        I think that the FBI is different because that's a matter of public record otherwise. But

18    beyond -- with respect specifically to the Postal Inspection Service, if they were or were not part of

19    the investigation at some point, my understanding is that the Department's letter does not permit

20    me to discuss that with you.

1    [11:02 a.m.]

2            BY █████████:

3        Q    There has been public reporting that you worked with the Postal Service Inspector

4    General. Are you aware of that reporting?

5        A    I'm not sure if I recall that specific reporting. Do you have an article that you can show

6    me on that?

7        Q    Yeah, we can enter the article.

8        This is the Washington Post article from June 19th, 2023, titled "FBI resisted opening probe

9    into Trump's role in Jan. 6 for more than a year." This will be exhibit No. 2.

10                        [Windom Exhibit No. 2

11                        was marked for identification.]

12        Mr. Windom. Is this the same one that I -- has the thing that you mentioned a minute ago?

13            BY █████████:

14        Q    That is correct. The Willard.

15        A    Okay. Do you mind pointing me to the --

16        Q    Yeah, I'll get it. So if we count -- 1, 2, 3, 4, 5, 6, 7, 8 -- page 9, there's a big, bold thing

17    that says, "I'm not serving subpoenas on the friggin' Willard."

18        A    I'm sorry. Are you pointing me to the --

19        Q    Yes, to page 6.

20        A    -- Willard part or the postal inspection part?

21        Q    The postal inspection part comes right after that.

22        A    One, 2, 3, 4, 5 --

23        Q    And there's a big, bold heading that says, "I'm not serving subpoenas on the Willard."

1        A       Got it.  So the paragraph that you want to point me to?

2        Q       So there is -- if you look underneath the heading, there's a paragraph -- one, two, three,

3    four, five, six -- the eighth paragraph, just to describe what we were talking about, it said, "At a

4    meeting in November 2021, Windom asked D'Antuono to assist in a grand jury investigation, which

5    would include subpoenaing the Willard hotel."

6        The next paragraph down says, "D'Antuono was skeptical.  The investigative track sounded

7    eerily similar to the Cooney proposal that had been shot down in February, he later confided to

8    colleagues."

9        The next paragraph:  "'I'm not serving subpoenas on the friggin' Willard,' D'Antuono told

10   Windom, according to a person familiar with their discussions.  'You don't have enough to issue

11   subpoenas.'"

12       The next paragraph says, "Windom seemed surprised at the flat rejection."

13       And then the next paragraph is where the Postal Service comes in.  It says, "In the next

14   several weeks, Windom would turn to consider the fake electors and discreetly inquire if another

15   agency might help:  the U.S. Postal Service inspector."

16       A       And just for clarity for the court reporter, the exhibit that you have handed me is

17   differently paginated than the one that you have.  So whatever page numbers were stated may be

18   different than the official incident.

19       Q       Uh-huh.

20       A       I think that what I can say to your original question is, to the extent that I was not

21   previously aware of this public reporting, I now am aware of this public reporting.

22       Q       And --

23       A       I -- sorry.

1          Q     No, you go ahead, sir.

2          A     On the -- I -- and now that I have this in front of me, on the prior question that you

3    asked about -- and I don't remember the specific question, but generally about Mr. D'Antuono and

4    his statement, I -- again, I can't -- within what the Department has authorized, I can't give specifics.

5          I think, to the extent that it's helpful, I can generally say that I do not recall an episode like

6    this occurring.

7          Q     Uh-huh.

8          A     And given the relative responsibilities of prosecutors versus agents, it is somewhat

9    surprising to me that such a thing would have occurred.

10          Q     And then if you go to -- it's three pages ahead of the Willard.

11          A     When you say --

12          Q     Turn back three pages.

13          A     -- "ahead," forward or backward?

14          Mr. Burton.  It's backwards.

15          ███████.  Uh-huh.  I'm looking at the heading that says, "A prosecutor missteps with talks

16    of seditious conspiracy."

17          Mr. Burton.  I'm sorry, ███████.  I'm trying to keep up with you, but --

18          ███████.  Right here.

19          Mr. Windom.  It's the third one.

20          Mr. Burton.  I've got it.

21          ███████.  Yep.

22          Mr. Windom.  It's the third one back.

23          ███████.  Yep.  And I want the paragraph directly above that heading.

1          Mr. <u>Windom.</u> Okay. I got it.

2                    BY ███████████:

3          Q       That paragraph says, "Officials at the National Archives had discovered similarities in

4     fraudulent slates of electors for Trump that his Republican allies had submitted to Congress and the

5     Archives.  The National Archives inspector general's office asked the Justice Department's election

6     crimes branch to consider investigating the seemingly coordinated effort to swing states.  Citing its

7     prosecutors' discretion, the department told the Archives it would not pursue the topic, according to

8     two people with knowledge of the decision."

9          Were you aware of this reporting prior to today?

10         A       I think that the best that I can do is say that, since I was aware of the initial episode that

11    you referenced from this article, it's likely that I read this article or at least skimmed it at some point.

12    Assuming that is correct, I would have been aware of this paragraph, I assume.

13              ████████     Did the reporter call you for comment?

14         Mr. <u>Windom.</u>  Carol Leonnig and Aaron Davis, June 20th of 2023.  I don't have any recollection

15    of speaking to those people about this article or knowing of its existence prior to.

16              ████████     So they didn't call you for comment?

17         Mr. <u>Windom.</u>  Not that I'm aware of.

18                    BY ███████████:

19         Q     Did you work with the Archives Inspector General?

20         A       I think that I -- that is a matter of public record.  And so, regardless of the Department's

21    authorization, which doesn't specifically mention the Archives, I believe that there have been filings

22    in the case regarding discovery where the Archives was referenced as having been one of the

23    agencies with whom we worked.

1      Q    And when did you begin working with the Archives?

2      A    I -- on that one, I'm not sure I can give specifics within the authorization.  I think that the

3   best I can do is say that it was while I was on the detail to the U.S. Attorney's Office to the District of

4   Columbia.

5      Q    Uh-huh.

6      A    So prior to the time in the Special Counsel's Office.

7      Q    Okay.  So you worked with the Archives prior to your role on Special Counsel Jack

8   Smith's team, which would have started in November 2022.  Is that correct?

9      A    The answer to the first part of your question is yes.

10         The second part of your question as to when I started with Mr. Smith, I don't actually know if

11  that was the end of November or the beginning of December, but that time period, at least, of 2022.

12                    BY █████████:

13     Q    Did you have any communication with Washington Post reporters during your time

14  in -- the times we're discussing now?

15     A    During this time period, no.  But --

16     Q    At the Special Counsel's Office, did you talk to Washington Post reporters?

17     A    No.

18     Q    Okay.  Have you ever talked to any Washington Post reporter?

19     A    Yes.

20     Q    Okay.  But not related to any of these investigations?

21     A    I'm not sure if it's helpful, but, within the last month or two, a Washington Post reporter

22  showed up at my house, and I sent them on their way.

23     Q    Okay.  Did you have any emails from Washington Post reporters about --

1      A    I -- and maybe it's helpful to give you, kind of, the larger picture.  As a rule, I didn't speak

2  to reporters about cases, not just in the Special Counsel's Office or in D.C. but historically.  Each office

3  along the way has had a press person.

4      Q    Uh-huh.

5      A    To the extent that questions were asked of me as an unsolicited incoming, at least in

6  Maryland, I would pass that along to the press person in the Special Counsel's Office.  That's my best

7  recollection.

8      There are -- and I can't quantify it -- any number of times that I have received text messages,

9  emails, social media, you know, friend requests or whatever the different platform is --

10      Q    Uh-huh.

11      A    -- asking me either questions or to comment, and I universally have not engaged, not

12  responded.  That's at least my recollection today.

13      Q    Okay.

14      ████████.  We'll go off the record.  We're at the end of our first hour.

15      [Recess.]

16      ████████.  We'll go back on the record.

17      And I apologize, I didn't get a chance to introduce myself at the beginning of the first round.

18  My name is ████████, and I am with Mr. Raskin's staff on the House Judiciary Committee.

19      Thank you very much for coming in, Mr. Windom.

20      And before I turn things over to my colleague ████████, I just have a couple housekeeping

21  matters I want to put on the record.

22      First, at the beginning of the last hour, there was an exchange about the videotaped

23  interviews.  And I just want to put on the record, we have received recordings of two transcribed

1    interviews.  We have not received the others.  And I take my colleague's assurances to heart that

2    those will be provided when they are ready.

3    ███████.  You received all the videos that are completed.  The videographers have to go

4    through their process to cut out the periods that were off the record, and they do other things, which

5    I'm not entirely sure what it is, but it takes them some time.

6    ███████  Understood.  And thank you for those assurances.

7    I also wanted to address some of the frustration that came to light in my colleague's

8    questions in the last round about the narrow scope of the Department of Justice's authorization

9    letter, which hems in the testimony that Mr. Windom is authorized to provide to the committee

10    today.

11    And I want to tell my colleagues that we share this frustration and would welcome the

12    opportunity to work with them to insist upon the Department of Justice to live up to this

13    administration's claim that it is the most transparent in history.

14    In particular, we have found that the Department of Justice has shown a particular

15    unwillingness to share information that touches upon evidence of criminal wrongdoing by the

16    President.

17    And this is particularly troublesome in the Department of Justice's -- the current Department

18    of Justice's continued refusal to release Volume 2 of Special Counsel Smith's report, which we

19    understand lays out evidence of how Donald Trump, while a private citizen, retained hundreds of

20    classified documents at his Mar-a-Lago clubhouse and then deliberately defied grand jury subpoenas,

21    obstructed law enforcement, hid evidence, and lied about his continuing retention of these records.

22    The Department's refusal to release Volume 2 of Special Counsel Smith's report, in sharp

23    departure from the Department of Justice's historical practice, including during the last

1    administration, of publicly releasing these special counsel reports, prepared at taxpayer expense, is

2    troubling, particularly as it appears to be part of a pattern by this administration of using the

3    Department of Justice to cover up evidence of criminal wrongdoing by President Trump.

4         And so I would -- I share my colleagues' frustration and would like to express once again that

5    we are standing by, willing to work with them to conduct oversight of the Department of Justice and

6    press this Department of Justice to live up to its claims and this administration's claims of

7    transparency.

8         I'm going to hand it to you.

9         ███████. Thank you.

10        Mr. Windom, thank you again for joining us today.

11        At the top of our hour, I want to go ahead and introduce a couple documents. We're not

12   going to turn to them right away, but I'd like you to have them in front of you.

13        The first one, which I believe is exhibit 3, we'd like to introduce Volume 1 of Special Counsel

14   Smith's report.

15                        [Windom Exhibit No. 3

16                        was marked for identification.]

17        ███████. And because of the length of the report, we only have limited copies. If anybody

18   wants an additional copy, we can certainly get one for them.

19        Mr. Windom. Thank you.

20        ███████. And then as exhibit 4 we'd like to introduce the superseding indictment in United

21   States of America v. Donald J. Trump. That's case No. 1:23-cr-257-TSC in United States District Court

22   for the District of Columbia.

23                        [Windom Exhibit No. 4

1          was marked for identification.]

2     Mr. <u>Windom.</u>  Thank you.

3                              EXAMINATION

4          BY ▮▮▮▮▮▮▮

5     Q     Mr. Windom, a couple of followup questions from the prior hour.

6     Regarding the Willard Hotel subpoena question, not talking to that particular subpoenas,

7     whether they were served or not served, in general, what's the process for obtaining a subpoena?

8     A     The process for obtaining a subpoena -- and I think that it's fair to say that this was not

9     just my time in the Special Counsel's Office but in my 12 years in the Department.

10    A determination is made, at a minimum by the prosecutor, at times in consultation with

11    agents, as to investigative steps that should be undertaken in whatever the investigation is.  One of

12    those potential investigative steps is to serve a grand jury subpoena.

13    Prosecutors have the ability to issue those on their own without first going and requesting

14    that from the grand jury.  There is a template.  And, typically, that can be served any number of ways.

15    That can be served by the prosecutor, by staff in the prosecutor's office, by fax machine, by email,

16    hand delivery.  Agents also can serve subpoenas.  They can be delivered by mail.  There are any

17    number of options to actually serve the subpoena.

18    In terms of obtaining the subpoena, it largely is determining that that is an investigative step

19    that may provide useful information and then, process-wise, getting that to the subpoena recipient.

20    Q     And with respect to the process, what I understand you to have just said is that it is not

21    necessarily necessary to even involve an agent to serve a subpoena; that can be done directly by a

22    prosecutor.  Is that correct?

23    A     That's my understanding.

1  Q Or by a prosecutor's staff?

2  A By staff.  Or by fax machine.

3  Q Thank you.

4  I want to take a couple steps back.  You said in the earlier hour that you started at DOJ in

5 2014.  Is that correct?

6  A I think it as February 11th of 2013 --

7  Q 2013.

8  A -- was my first day.

9  Q What was your educational background?

10  A I went to college at Harvard.  Graduated in 2000.  I went to law school at the University

11 of Virginia School of Law.  Graduated in 2005.

12  Q Did you do clerkships after you graduated from law school?

13  A I did.

14  Q Who did you clerk for?

15  A I clerked for a judge on the Fifth Circuit.

16  Q Are you able to provide the name of the judge?

17  A Sure.  Edith Brown Clement.

18  Q Who appointed Judge Clement?

19  A I think she was appointed twice.  She was first on the district court, appointed by, I

20 believe, President George Bush, the first President Bush.  And then my recollection is that she was in

21 the first class of appellate court nominees by George W. Bush.  So two different Presidents.

22  Q Okay.  And both George Bush and George W. Bush were both Republican Presidents.  Is

23 that correct?

1      A    That's my understanding.

2      Q    What work did you do prior to joining the Department of Justice?

3      A    Prior to -- so, after my clerkship, which ended around August or Labor Day of 2006,

4  shortly thereafter I started at a law firm in Washington, D.C.

5      Q    Are you able to provide the name of that law firm?

6      A    Sure.  It's Williams & Connolly.

7      Q    And were you an associate at Williams & Connolly?

8      A    I was.

9      Q    How long were you at Williams & Connolly?

10     A    I was there for just over 6 years.

11     Q    And so was your next step to go to DOJ, or were there any intervening --

12     A    It was.  I think I ended my time at Williams & Connolly in January of 2013 and began at

13  the Department in February of 2013.

14     Q    And you indicated that you joined the U.S. Attorney's Office in Maryland, correct?

15     A    Correct.

16     Q    And until you were detailed to the District of Columbia, your entire career at DOJ was at

17  the district of Maryland, correct?

18     A    Yes.

19     Q    What type of work did you do there?

20     A    The Southern Division in Maryland is housed in Greenbelt.  That's where the office is.  It

21  covers, geographically, five counties that are sort of most contiguous or adjacent to D.C.,

22  Montgomery County being the largest at, you know, a million or so folks, Prince George's County, you

23  know, being the second-largest at about a million or so folks, and then three other counties.

1    The Southern Division did not have sections.  It was a generalist office.  And I'm contrasting it

2    to the Baltimore office, for example; the Northern Division had different sections.  So I could, as a line

3    prosecutor in Greenbelt, do any type of case, really, maybe with some exceptions, but that was my

4    understanding.  And I basically did all kinds of cases in my time there.

5        Q    If you had to put a number on it, can you estimate the number of cases that you worked

6    on?  Just cases, not trials.

7        A    Yeah, let me cabin that to just the ones that I specifically worked on myself.  Because, as

8    the supervisor in the office, there would be hundreds and hundreds of other ones of which I was

9    aware and made supervisory decisions on but did not, you know, file papers in or conduct

10    investigative steps myself.

11        I would say, at a minimum, hundreds that I specifically worked on myself.  I recall

12    probably close to 100 different dispositions and over 100 sentencing proceedings.

13        Q    And can you estimate the number of trials that you worked on?

14        A    Twelve.  Twelve that I prosecuted to verdict.

15        Q    Did you win any awards during your time with the Maryland office?

16        A    I did.

17        Q    Can you describe those awards for us?

18        A    Let's see.  Without getting the titles of them correct, I know that I was given awards for

19    prosecution of violent crime, prosecutions of fraud, prosecutions that involved significant issues.

20        I was, I guess, out -- it was while I was there, but they weren't office awards -- I was given an

21    award of National Security Prosecutor of the Year by the Baltimore Field Office of the FBI, and one

22    year I received an award from the FBI Director.

23        Q    Okay.

1          Moving on, Chairman Jordan wrote to you on April 7th, 2025.  Are you familiar with that

2    letter?

3          A     I'm generally familiar with it.

4          Q     We can introduce it if you'd like to see it.

5          A     If there's a specific question you have, that might be helpful.

6          Q     And this will be exhibit 5.

7          A     Thank you.

8                                    [Windom Exhibit No. 5

9                                    was marked for identification.]

10                        BY ▮▮▮▮▮▮▮▮▮

11         Q     And I'm going to ask you about a line in the second paragraph on the first page, but take

12    as long as you want to --

13         A     I'm fine, if you just want to point me to where.

14         Q     The second paragraph on that first page, the second full sentence reads, "Specifically,

15    Special Counsel Smith and his team, including you, orchestrated partisan and politically motivated

16    prosecutions of President Donald J. Trump and his co-defendants."

17         Do you see where it says that?

18         A     I do.

19         Q     What's your response to that allegation?

20         A     I don't agree with it.

21         Q     Can you explain why?

1          A      I am unaware of any foundation for that statement to have been made. At all times in

2     the office, my intention and my goal and what I actually did was to follow the facts and to follow the

3     law wherever they may lead.

4          I guess I'm somewhat surprised to see this here because, during the course of the litigation in

5     the District of Columbia, the defendant and his counsel made this same claim or something similar on

6     a number of occasions. They had the opportunity to litigate that fully in the district court. They did

7     so. And after that litigation, the district court found no evidence of selective or vindictive

8     prosecution, which is what this would refer to.

9          Q      Thank you.

10         Is it fair to say that you agree with what Special Counsel Smith said in his report, that this was

11    a righteous prosecution predicated on sufficient facts and evidence to justify bringing the charges

12    that were brought?

13         A      I generally agree with Mr. Smith's report. I agree that, certainly, there were sufficient

14    facts to prove the defendant's guilt beyond a reasonable doubt had we proceeded to trial.

15         Q      And I want to turn to those charges now. And, as I do that, we'll be referring to both the

16    superseding indictment and then the description of the charges that is in the Smith report beginning

17    at page 33.

18         Mr. Windom, Count One of the indictment charges President Trump -- or charged President

19    Trump with violating 18 U.S.C., section 371, which is the conspiracy to defraud the United States,

20    correct?

21         A      Yes.

1      Q      And ordinary people who are not lawyers are probably familiar with crimes like theft

2   and murder, and conspiracy to defraud the United States is something that is not necessarily part of

3   common parlance.

4          I'm wondering if you can tell us in layman's terms what this charge alleges.

5      A      Sure.  So I think the best thing to do would be to refer to the special counsel's report for

6   completeness on this issue.  The section on Count One begins on page 34.

7          Big picture, you know, there's a number of different elements that a prosecutor would have

8   to prove, that a grand jury would have to find, and did find.

9          But, here, that would be the defendant conspired with other individuals -- and there are

10  unidentified numbered co-conspirators, I believe, in this superseding indictment -- to defraud the

11  United States.  In this case, according to the evidence and according to the special counsel report,

12  that was through a series of steps that included deceitful or dishonest means.

13     Q      And the term "defraud," in the charge "defraud the United States," "defraud" doesn't

14  just mean cheating the government out of money or property, correct?

15     A      That is my understanding.

16     Q      What does "defraud" mean in this context?

17     A      So, here, it also refers to schemes to interfere with or obstruct a lawful government

18  function.

19         The lawful government function that served as one of the bases for Count One is described

20  more fully in the special counsel report.  Kind of, at core, that function -- and then this kind of bleeds

21  over into Counts Two and Three regarding the obstruction -- involved the process of selecting and

22  certifying the President of the United States.

1   Q And that was the process of selecting and certifying the President of the United States

2 on January 6, 2021, correct?

3   A I believe that the time period of the conspiracy predated that. I believe it may have

4 started around November 13th. But the certification that I think serves as the culmination of those

5 processes occurred in 2021 on January 6th.

6   Q Thank you.

7   The special counsel's report details the four elements of this crime, and I want to walk

8 through those one by one.

9   The first element is that the defendant entered into an agreement to commit the act at issue.

10 What does that mean in this context? What was the agreement?

11   A The agreement was an agreement with others to defraud the United States, to obstruct

12 a lawful government function, which, here, as I said before, was the process of selecting and

13 certifying the President of the United States.

14   Q And the statute or the, I guess, case law on the statute requires prosecutors to show

15 that the defendant -- in this case, Mr. Trump -- acted by deceitful or dishonest means, correct?

16   A That's my understanding.

17   Q Did prosecutors find that Mr. Trump acted by deceitful or dishonest means?

18   A We did.

19   Q And can you explain what those means were or how you understood that they were

20 dishonest?

21   A Sure. I think that the special counsel report -- and I don't want to read it word for word,

22 so I will summarize -- goes into fairly explicit detail on this. And I'll kind of go through the

23 paragraphs, I guess.

1   Other than that, there are -- my understanding is, this was intended as a kind of summary of

2 the major categories of information that we developed as part of the investigation, or that the

3 Special Counsel's Office developed, and so other documents, other filings, things like that, may

4 include still other pieces of information.

5   According to the special counsel report, the core of the defendant's obstructive scheme was a

6 false narrative of outcome-determinative voter fraud.  That was kind of -- the deceit was kind of a

7 through-line for all of the conduct.

8   These were statements and conduct that was not just false but also, importantly, I think, that

9 the defendant knew was false.  He knew that the information was false, according to the evidence

10 that was gathered and according to the special counsel's report, for any number of reasons.

11   The first one that's outlined here is that the false claims that the defendant was making were

12 repeatedly debunked to him by a variety of people -- Federal officials, State officials, courts, judges,

13 people who would have actually been knowledgeable of the facts on the ground, in best position to

14 ascertain the truth.

15   Campaign personnel that Mr. Trump hired, whose sole role as being campaign personnel was

16 to get Mr. Trump elected, in some instances told him that the false claims he was making were, in

17 fact, false.  There are some specific examples of this in the report that I can refer you to.

18   I mentioned courts before.  There were a number of lawsuits that put Mr. Trump on notice

19 that his claims were false.  There were -- this is something that is noted in the special counsel report.

20 Sometimes in cases, it's not just the actions that a defendant takes but actions the defendant doesn't

21 take.  Here, the evidence that the special counsel developed showed that the defendant avoided

22 consulting some informed sources, such as State election officials, in the very States that the

23 defendant was saying fraud occurred.

1       Another piece of information that was developed in the special counsel's report is that, on a

2    number of occasions, the false claims that the defendant and his conspirators made changed,

3    oftentimes from day to day.  There are some examples, I think at least two, in the report.

4       But, for example, in Arizona, one day, the allegation was that 36,000 non-citizens voted in the

5    State.  Five days later, it was, quote, "beyond credulity" that a few hundred thousand didn't vote.

6    Three weeks after that, "The bare minimum was 40- or 50,000.  The reality is about 250,000."  These

7    are quotes.  Days after that, the assertion was 32,000.  And, ultimately, the conspirators landed back

8    where they started, at 36,000.

9       What this showed, according to the special counsel report, was not just an objective falsity

10    but what, based on this evidence, appears to be making numbers up from whole cloth, such that they

11    were unfounded to begin with.

12       Q       In addition to the evidence you just described, Mr. Trump also said even before the

13    election took place that he planned to pursue false claims -- or fraud claims.  Excuse me.  Is that

14    correct?

15       A       There is evidence that was developed by the special counsel and outlined in the special

16    counsel report that the defendant had made claims prior to the election that he would, you know,

17    declare fraud of some kind.  And the ones that I'm thinking of right now are outlined at page 38 and

18    39.

19       Q       And why is the fact that Mr. Trump said even before the election took place that he

20    planned to pursue fraud claims, why was that an element that helped to show that he had

21    knowledge that what he was doing was deceitful?

1    A    In general, it's helpful to show intent if a defendant makes a claim about something he

2    is going to do and why he is going to do it before it is done.  And the evidence here that was

3    developed and outlined in the special counsel report, in my view, does just that.

4    Q    And the special counsel report also details statements that Mr. Trump made, such as, "It

5    doesn't matter if you won or lost the election, you still have to fight like hell."  When President-elect

6    Biden appeared on television in November, Mr. Trump said to a staffer, "Can you believe I lost to this

7    F'ing guy?"  And then he called Vice President Pence "too honest" for declining to join the conspiracy.

8        Can you explain the importance of those particular statements in showing that Mr. Trump

9    was acting in a deceitful manner?

10    A    Without really going beyond what is written in the special counsel report, the

11    defendant's intent in spreading the knowing falsehoods is evidenced by exactly these statements.

12        When, you know, the Vice President to the United States, whom the defendant had chosen as

13    his running mate, declined to join the conspiracy, the defendant said that the Vice President was "too

14    honest."  That was a piece of evidence that the special counsel thought important enough to put in

15    his report.

16    ██████████████████

17    Q    So, just to put it in layman's terms, kind of having listened to your testimony, it seems

18    that, in essence, Count One, the evidence in there is about showing that the President entered into

19    an agreement with others to overturn the results of the 2020 Presidential elections by illegal means.

20    A    That is a --

21    Q    In sum and substance.

22    A    That is kind of a shorthand way to say it, I guess.  I would want to be precise if you're

23    talking about a specific count.  And the special counsel report kind of lays out the elements that, as

1    prosecutors, we would have to prove to a petit jury beyond a reasonable doubt and the evidence, at

2    least the major categories of evidence, that the special counsel believed met that burden.

3        Q    And in furtherance of that conspiracy of that agreement, President Trump repeatedly

4    said that the elections were stolen, but your evidence showed that that was a lie and that he knew

5    that that was a lie.

6        Is that, in sum and substance, the evidence you were describing earlier?

7        A    I think that, generally speaking, that that is correct. I think that, as with any trial, you

8    have to have the hard evidence to back up the overall statement. And my understanding is that the

9    special counsel's report details the major categories that substantiate the view that the defendant

10   undertook deceitful or dishonest means, at least according to the language of the elements of Count

11   One, and made false statements that he knew were false.

12       Q    And, just to be clear, the lying is an action that President Trump himself undertook in

13   order to advance this conspiracy. But the other participants in the conspiracy, themselves, took on

14   other steps in order to advance this conspiracy. Is that right?

15       A    There was evidence that's detailed in the special counsel report that false claims were

16   made not just by the defendant but also by co-conspirators. There was other evidence that, beyond

17   words, actual conduct was taken by the defendant and by the conspirators.

18       Q    Are there any other examples of some of the acts taken by other conspirators that you

19   can describe for us?

20       A    There are. I think that Co-Conspirator 1 is identified here as somebody who made some

21   of the false claims with respect to numbers of non-citizens voting in Arizona.

22       I think that the first 30 or so pages of the special counsel report -- well, my understanding of

23   the structure here is, the first 30 or so pages are the facts, or a core of the facts, the major categories

1    of facts, that were developed during the investigation and that those are referenced sometimes in

2    shorthand or in shorter versions when discussing the counts.

3                    BY █████████:

4        Q        Moving on to Counts Two and Three, which is obstruction and conspiracy to

5    obstruct -- and this is page 45 of Volume 1 of the report.

6                    Generally speaking, what does the obstruction statute prohibit, not in respect to this case but

7    speaking broadly?  In layman's terms, what does obstruction say -- or the statute say?

8        A        Sure.  Title 18, United States Code, section 1512 has any number of subparts.  There are

9    other statutes that cover obstruction as well.

10                   The one that was charged in Count Two and relatedly in Count Three involved, for Count Two,

11   conspiracy to obstruct an official proceeding and, for Count Three, it's the substantive act of

12   obstruction as opposed to just a conspiracy to obstruct.

13       Q        And "official proceeding" in this case was the proceeding before Congress, correct?

14       A        Yes.  The official proceeding here was the certification of -- well, there's a definitional

15   statute which identifies an official proceeding as, quote, "a proceeding before the Congress."

16       Q        And in this case that was the January 6 certification, correct?

17       A        That is correct.

18       Q        There are four elements of the crime of obstruction, correct?

19       A        For the substantive obstruction?

20       Q        Uh-huh.

21       A        Let me move over to that page of the report.

22                   For the conspiracy, it's just two elements, but for substantive obstruction, it is four.

1       Q       The first element is that the defendant -- in this case, President Trump -- obstructed,

2   influenced, or impeded an official proceeding or attempted to do so, correct?

3       A       Yes.

4       Q       And as we just said, here, that official proceeding was the certification of the vote on

5   January 6, 2021.

6       A       Right.  That was a proceeding before the Congress.

7       Q       Okay.

8               And the second element is that, in the course of doing so -- in other words, in the course of

9   obstructing, committing the obstructive act -- the defendant committed or attempted to commit an

10  act that impaired the integrity or rendered unavailable records, documents, objects, or other things

11  for use in the official proceeding, correct?

12      A       Correct.

13      Q       And what were the specific bad acts here?

14      A       A lot of the evidence of deceit and willfulness for Count One are -- they translate to

15  showing deceit and willfulness and intent for each of the counts.  And so the kind of core of those

16  facts are outlined in what we talked about before and then otherwise expanded on in the first 30

17  or so pages of the report.

18      Q       So it's things like Donald Trump falsely claiming that vote counts in Arizona were off

19  when he knew that was false, correct?

20      A       That is an example of it.  I think that, here, specific to the obstruction counts for Counts

21  Two and Three, there's more of a discussion about the creation of false documents, which in this case

22  would be the fraudulent elector certificates that the conspirators arranged to transit to the United

23  States Congress.

1     Q     Can you describe the fraudulent elector scheme briefly for the record?

2     A     Generally speaking, sure. And if I misstate anything, it's all laid out in detail in the

3     report.

4         In seven States that the defendant lost -- in which the defendant lost the popular vote, there

5     was an effort for people who would have been electors for him had he won -- to get those people

6     together or, should they be unwilling, to replace those people with other people who would serve as

7     fraudulent electors, to sign pieces of paper that stated that they were -- and I'm not going to get the

8     wording right, but -- essentially the, you know, duly-qualified electors for that State.

9         In two of the seven States, there was some qualifying language. And, again, the specifics are

10    in the report, I think. But, basically, two of those seven States, the people who agreed to sign those

11    pieces of paper said something to the effect of, "We are the duly-authorized electors if a court later

12    finds that we are." In five of the States, my recollection is there was no such qualifying language.

13        That scheme to put together those fraudulent certificates, fraudulent pieces of paper, was

14    arranged by a number of conspirators, with the knowledge of the defendant, as is outlined in the

15    special counsel report.

16        And then those individuals attempted to mimic as closely as they could the actual procedures

17    that, had they been legitimate electors, they would have had to comply with -- things like mailing the

18    pieces of paper by -- I forget if it's certified mail or registered mail -- showing up and signing the

19    pieces of paper at a specific location in a particular State, things like that.

20        And then those certificates, at least some of them, made their way to Congress, with the

21    intent that they be used contrary to or to supplant the legitimate elector certificate from those

22    States.

1    Q    And did the special counsel make findings or uncover evidence to suggest how the

2    defendant and the co-conspirators intended to have those certificates accepted at Congress?

3    A    I don't know that I would use the word "findings." My understanding of the report is

4    that it's intended to set forth what occurred during the pendency of the office and the results of -- or

5    at least the major categories of the results of the investigation.

6         Setting that, kind of, characterization aside, the report has a large number of details about

7    how the mechanics of the fraudulent elector scheme worked in practice.

8    Q    And, sitting here today, can you summarize that for the record, what the evidence

9    showed?

10    A    Sure. Beyond what I said before, and just looking at, you know, pages 11 through 16 of

11    the special counsel report, it kind of -- it basically tracks what I said before. There are some

12    additional components about how the co-conspirators, when they were trying to get fraudulent

13    electors to agree to sign these pieces of paper, how the co-conspirators lied, in some instances, to

14    the people who would sign the certificates and said that the certificates would only be used in the

15    event that ongoing litigation was resolved in the defendant's favor. There was a deception aspect to

16    it, kind of internal deception. The conspirators, again, deceived some of the fraudulent electors.

17         I think that there was also evidence of phone calls and of other communications that are

18    outlined in the special counsel report. To the extent it's not obvious, the footnotes -- and, just for

19    clarity, because I, you know, am being consistent here with what we are permitted to

20    discuss -- regardless of the Department's authorization letter, there are matters of public record.

21    When the first folks that were sitting in that chair asked me questions that were a matter of public

22    record, I was able to answer those things. For your questions, I'm doing the same thing.

1   These footnotes identify -- well, the whole report of Volume 1 is a matter of public record.

2 But the footnotes identify in large part ECF numbers, which are electronic case filing docket entries,

3 that are publicly available.  And then the ones that start with "SCO," S-C-O, dash, and then a number,

4 those are Bates numbers to show the source of an existing document that may or may not otherwise

5 be on the public record.

6   Q Thank you for that.

7   With respect to the fraudulent elector scheme, the report details efforts to work with the

8 Republican National Committee, doesn't it?

9   A There are some instances that are discussed of that in the report.

10   Q Can you describe those efforts?

11   A Yes.  Let me find the page here.

12   Mr. Burton.  I just want him to stick to the report.

13   ███████.  Understood.

14    BY █████████:

15   Q And this is, I think, page 12, and it goes on after that.

16   A That's right.

17   The special counsel's investigation uncovered evidence of a phone call between the

18 defendant and Co-Conspirator 2 on one hand and the chairwoman of the Republican National

19 Committee on the other end of the phone.

20   And, during that call, the chairwoman was told that it was important for the RNC to help

21 organize the defendant's elector nominees in the seven States that I mentioned before, or the fact of

22 those seven States.

1    The Co-Conspirator 2 told a lie to the chairwoman of the Republican Party intended,

2    according to the evidence, to induce that person's cooperation -- excuse me -- to induce the

3    cooperation of the fraudulent electors, that those electors' votes would be used only if ongoing

4    litigation in that particular State proved successful for Mr. Trump.

5        And then, from that point, Mr. Trump communicated with some of the other co-conspirators

6    about the plan.  And those conspirators, in turn, worked with the more logistically focused

7    conspirators.

8        Q      Right.  So, in other words, Mr. Trump and his co-conspirators attempted to enlist the

9    official Republican -- the arm of the Republican National Committee that deals with campaign work,

10   right?  They tried to get them to use their power, their work with the States, to develop these false

11   electors?

12       A      So I'm not sure if I can go so far as to agree with what you just described.  I think that

13   the most I can say is that evidence showed that the defendant and the conspirators attempted to

14   have the chairwoman of the Republican National Committee assist in organizing the fraudulent

15   elector nominees.

16           BY ██████████:

17       Q      Just to make sure that this is clear for the record, on election day -- for example, let's

18   take the example of the State of Pennsylvania -- the voters of the State of Pennsylvania go and cast

19   their ballots, those ballots are counted, and one of the Presidential candidates wins that State, right?

20   And so, in 2020, the 2020 election, President Biden won the State of Pennsylvania.

21       After that election, 20 electors gather in a room to officially cast the vote for Pennsylvania's

22   20 electoral votes.

23       Is that -- that's how the process works?

1  A  Without agreeing with each of the specifics of what you said about perhaps the number

2 and, you know, whatever the process was at that time, as a general matter, the candidate that wins

3 the popular vote in Pennsylvania is entitled to, in my understanding, the votes of the electors in total

4 from that State.  And there's a process that is outlined by the Constitution and Federal statute as to

5 how they vote and how those votes are ultimately counted.

6  Q  And so the ballots of those 20 electors are then sent to Congress, which is what is

7 counted on January 6th by Congress to officially ascertain the results of the election.  Do I have that

8 correct?

9  A  My understanding of the process is that, yes, the legitimate electors sign whatever

10 certificates that are, I understand, sealed and they bear the seal or signature of the executive of the

11 States and that those are mailed to Congress to be counted at the certification proceeding.

12  Q  So am I correct in understanding, as part of this conspiracy, it assembled people who are

13 not the duly-empowered electors of a number of States to fill out a form that fraudulently

14 represented that Donald Trump had won the electoral votes for that State and attempted to send

15 that document to the Congress of the United States?

16  A  That, in summary, is what the special counsel's report says.  I think that, beyond that, at

17 least in a number of those States, they did in fact send -- if not in all of those States -- they did in fact

18 send, as opposed to just attempting to send, the fraudulent documents to the United States

19 Congress.

20  Q  So, in sum and substance, the conspiracy created false ballots, electoral voter

21 certification ballots, to send to the Congress of the United States for the January 6th certification?

22  A  The evidence shows that the conspiracy involved the creation of false documents.

23    BY █████████

1        Q       We will move on to the "Conspiracy Against Rights" statute. And this is discussed

2    beginning on page 49 of the Smith report.

3             The fourth count of the indictment charged Mr. Trump with violating the "Conspiracy Against

4    Rights" statute. And I don't know that this is a statute that's commonly understood by every

5    American. Can you explain briefly what the statute says?

6        A       Sure.

7             The charge here essentially was that the defendant entered a conspiracy to injure, oppress,

8    threaten, or intimidate one or more persons in the exercise of or enjoyment of a right or privilege

9    secured by the Constitution.

10             Here, the right that was guaranteed by the Constitution was the right to vote and the right to

11    have one's vote counted. So, in sum and substance, it was a conspiracy to injure that fundamental

12    right to vote.

13        Q       And the individuals injured by this alleged crime would've been the voters in the States

14    where President Trump was trying to overturn the vote, correct? Or trying to overturn the vote

15    count, I should say.

16        A       I want to be specific on what the special counsel report says. I think that there were a

17    number of potential victims of the crime, whether that's, you know, how that's viewed as the people

18    in the five States where there was no qualifying language, the people in the seven States where there

19    was qualifying language -- the additional two States where there was qualifying language, or all of the

20    voters in the United States who otherwise voted for a candidate other than the defendant.

21        Q       So, essentially, the victim would be all the voters who voted for President Biden?

22        A       Perhaps in layman's parlance. I don't know -- and just to be very clear, there are

23    statutory definitions of victims that may or may not come into play. But that is what is alleged as

1    part of the conspiracy against rights, is that, here, the defendant and the conspirators acted in

2    concert together to injure the right of at least one individual to vote and to have one's vote counted.

3         Q    Mr. Windom, there have been -- some have said that Mr. Trump's actions were speech

4    protected by the First Amendment.  In fact, the superseding indictment -- I think it is paragraph 3 of

5    the indictment -- recognizes that Trump, quote, "had a right, like every American, to speak publicly

6    about the election," meaning the 2020 election, "and even to claim falsely that there had been

7    outcome-determinative fraud during the election and that he won."

8         But your office claimed and a court ultimately found that Mr. Trump's actions were not

9    protected by the First Amendment, correct?

10        A    There is a paragraph in the superseding indictment which is at least similar to what you

11   just described, and I think that it is uncontested that the First Amendment permits certain forms of

12   speech.

13        And there is case law and there is litigation here that the First Amendment is not absolute; it

14   has some limits.  And at least one of the limits that the courts have held for a substantial period of

15   time is that the First Amendment does not protect speech that is rendered during the course of

16   criminal conduct that is deceitful, that is fraudulent, and things of that nature.

17        This is my shorthand.  This is more specifically discussed in the report and in other litigation

18   filings.

1    [12:14 p.m.]

2

3              BY █████████:

4        Q    So, in other words, the fact that Mr. Trump had -- and we all have -- the First

5    Amendment right to say whatever we want about any given election, in this particular case, Mr.

6    Trump's actions were not protected by the First Amendment because he took it one step further,

7    correct?

8        A    In this case, the evidence that we intended to use at trial was permissible to use, was

9    otherwise not forbidden for use by the First Amendment, and the principal reason for that is that, as

10    outlined in the report, it showed deceit and fraud.

11       Q    Thank you.

12              █████████. We can go off the record.  Thank you.

13       [Recess.]

14              █████████. We'll go back on the record.  The time is now 12:23.  We'll start our next hour of

15    questioning.

16              █████████. Mr. Windom, during the first hour with us, you refused to provide names of DOJ

17    officials.  You're relying on your DOJ authorization letter.  However, I would point out that the DOJ

18    authorization letter authorizes you to provide unrestricted testimony to the committees irrespective

19    of potential privilege, and this accommodation is unique to the facts and circumstances of this

20    particular matter.

21              So the parts of the letter that you're referencing that relate to, you know, Department policy

22    about not identifying line attorneys is -- is defeated by the fact that it said, "Nevertheless, the

23    extraordinary events underlying this matter constitute exceptional circumstances, warranting an

1    accommodation of Congress in this particular case.  Given these extraordinary circumstances, the

2    Department authorizes you to provide unrestricted testimony to the committee."

3         So I'll just -- I'll just identify this before ██████ --

4         Mr. Burton.  And, ██████, notably, the part you omitted in your reading was "as limited in

5    paragraphs 1 through 5 above."

6         Your ask to the Department of Justice -- and I have great respect for the staff of this

7    committee -- did not request listing personnel.  Our reading in the context where Mr. Windom is in

8    adverse litigation with this Department, in the context of this Department, the limiting -- and being

9    quite specific, and recognizing other limitations -- I assume they know how to write a letter as well.

10        We're going to interpret "DOJ officials" in the most appropriate narrow fashion, as stated in

11   this letter.

12        Your -- ██████ request originally to the Depar- -- to the Department, for example, listed

13   certain FBI agents.  Those people are not listed in this letter.

14        So I appreciate your pointing that language.  There, it says "as limited."  So we're going to

15   interpret that as appropriate.  We do not believe ordinary line assistants qualify as DOJ officials.

16        ██████.  That's just preposterous, but ██████ will proceed with the questions.

17             BY ██████:

18        Q    During your investigation, did you ever become aware that the Inspector General at the

19   Justice Department was conducting a related investigation into Acting Assistant Attorney General

20   Jeffrey Clark?

21        A    And just to set the timeframe, can you -- let me know if you want me to describe things

22   before -- when I was in D.C. or when I was in the special counsel's office or just generally?

23        Q    Let's start with when you were in D.C.

1      A      Okay.  The -- I think that what I can say to that is, is yes, I was aware that there was

2      a -- and you mentioned -- you mentioned OIG.  I was aware that there was like a Senate or House

3      committee that did some interviews or depositions or something like that, related to -- to Mr. Clark.

4      The Office of the Inspector General, I think to the extent that I was aware of that, if it existed, I'm not

5      sure.  And I'm happy to take counsel here, if that's included in the Department's authorization.

6      Q      Did the Inspector General's investigation ever merge with the larger investigation that

7      you were conducting at D.C. or within the special counsel's office?

8      A      Without going into the specifics of what investigation was what or what was looking at

9      what, I think it's public information that the Office of the Inspector General for the Department of

10     Justice was one of the agencies with which we worked.

11     Q      And when did the appetite come about for obtaining contents of Congressman Scott

12     Perry's cell phone?

13     A      Can -- you're using the word "appetite."  Can you give me some definition there?

14     Q      The desire.  When did you identify Congressman Perry as possibly having relevant

15     evidence to your inquiry?

16     A      I'm not sure of the exact timing that discussion began regarding information that may

17     establish criminal conduct that was to be found on Congressman Perry's personal cell phone.

18            There is a -- and you may have it, I'm sure, in one of those boxes.  There's a redacted affidavit

19     from, I think, the Middle District of Pennsylvania that goes into substantial detail on kind of the -- the

20     evidence that supported the judge's probable cause finding.  There's probably some dates in there.

21     Q      But you just don't independently remember right now when you began identifying

22     Congressman Perry as possibly having relevant evidence to your inquiry?

1       A    Best I can probably do is a timeframe.  I think that the warrant in the Middle District of

2   Pennsylvania was August of 2022.  If you want to show me the affidavit, I'm happy to kind of go

3   through and see if there's an indication of when we started developing the evidence that's outlined

4   in the affidavit.  It's got to be sometime before August of 2022 and, you know, after the time that my

5   detail started.

6       Q    How did the contents of Mr. Perry's phone tie into the broader investigation?

7       A    I think that, as I outlined in the special counsel report, there was information that

8   ultimately was recovered from Congressman Perry's personal cell phone that, prior to the Supreme

9   Court's decision in the summer of 2024, we had intended to use at a trial of the defendant, Mr.

10   Trump, and that, as noted in the report, that evidence would have been admissible in trials of any

11   other individuals, setting aside the Supreme Court's decision.

12       Q    And what was that evidence?

13       A    For the same reasons that we've discussed before, you're talking about, I guess, a few

14   different prohibitions that do not let me talk about that.  The first is, though I recognize that the

15   Department's authorization talks about certain aspects of the seizure of Congressman Perry's cell

16   phone, there are certainly Rule 6 issues here.  Beyond that, there are -- I'm aware of a variety of

17   public access litigation I think both in the Middle District of Pennsylvania and in the District of

18   Columbia.  Those are the two places where Federal judges found probable cause to search

19   Congressman Perry's phone.

20       My recollection is that, as a result of that litigation, the different district court judges did not

21   permit the release of certain information; hence, what I described before, the redacted affidavit.  I

22   think that there's other redacted documents.  So kind of an overlapping series of statutes and court

1    rules and rules of criminal procedure, setting aside the authorization, that prohibit me from

2    discussing that in detail, other than what's in the special counsel report.

3        Q    Whose idea was it to seek a warrant to obtain Congressman Perry's cell phone?

4        A    I don't know who first -- it could have been me, it could have been somebody else, who

5    first proposed getting a warrant. I think that --

6            ████████. That could have been your idea?

7        Mr. Windom. What I said before, ████████. I don't know whose idea it was at its inception.

8        Perhaps most relevant for y'all, the approval for moving forward with such a warrant -- I

9    described kind of the supervisory structure in the District of Columbia before -- would have been Mr.

10   Crabb and Mr. Graves.

11       My recollection is that for major -- well, certainly for strategic decisions and certainly for

12   major investigative steps, that Mr. Graves was, at a minimum, consulted if not, you know, directly

13   approved.

14           ████████. Did you articulate to your supervisors why you thought this was such a good

15   idea?

16       Mr. Windom. I'm not sure if -- well, setting aside whatever's permitted in the authorization, I

17   don't know that I can recall specific contents of conversations now that would have occurred around

18   3 years ago. I recall generally that, you know, I was involved in the, you know, the decision to

19   propose a search warrant to -- that that was approved by Mr. Crabb and by the U.S. attorney.

20       I think that -- and you may have a better recall than I do -- but I think that the special counsel

21   report talks about in -- at least in this instance, this is a situation where the Public Integrity Section at

22   Main Justice would also have to be consulted, according to their rules.

23       So I hope that that's responsive to your question.

1          BY ███████:

2      Q      Why execute the warrant while he was on travel?

3      A      I saw reference to that in an article, maybe, or in your -- your topics.  Maybe it's helpful

4   to give you a sense of how the process actually works for obtaining and then executing a search

5   warrant.

6          So in this case, my recollection is that there's the redacted affidavit and the

7   redacted -- probably the warrant sheets itself, which call for both a warrant to search the person of

8   Congressman Perry for his cell phone and then what I think is called a location warrant, to ping the

9   phone location to basically see where it is.

10         When -- my recollection is that when the agents -- when the agent swore out the affidavit in

11   the Middle District of Pennsylvania, that's where, my understanding, Congressman Perry lived at the

12   time.  That's where his residence was.  And that was the right venue under Rule 41 to seek that -- to

13   seek that warrant, which is where he was physically located.

14         After that, once the court in the Middle District of Pennsylvania found probable cause to

15   believe that there would be evidence of I think it was four separate Federal felonies on Congressman

16   Perry's personal cell phone, there is a defined period of time -- I believe it's 14 days -- it can change.

17   It's written on the face of the warrant.  And during that time, the agents -- I'm giving you a typical

18   circumstance -- the agents come up with an operational plan to execute a search warrant.

19         I don't recall the specific details or the timing on this one.  I know that there was at least one

20   other prosecutor that I worked with at my same level that was working on, you know, obtaining the

21   search warrant and working with the agents to effectuate it.

1      My recollection is that at the time that the warrant was signed by the judge, that the belief

2   was that Congressman Perry was in the district, and I think that that was borne out by later

3   information.

4      My recollection is that the agents then came up with an operational plan, as is common, to

5   execute the warrant. I don't remember the specific details after that. I'm assuming that since we

6   had -- there was, as part of this, the ping warrant on the phone that they were able to determine his

7   location and then -- you know, whether it was the first place they thought he would be or wherever

8   he ended up being. And my recollection is that they executed the warrants on the date that they had

9   planned to do so regardless of, you know, what the location was or who he was with. Those are

10   circumstances that are operational in nature that are outside the day-to-day control of, you know,

11   even if -- certainly, I think, in my mind, outside of the control of the agents, but outside the control of

12   the prosecutors as well.

13      Q      So you were never told, prior to the execution of the search warrant, that the agents

14   were now going to have to go and find Mr. Perry at his vacation home?

15      A      Probably the best I can do is to tell you what likely occurred. I don't recall the specifics

16   of it in that time period now going on 3 years ago.

17      What probably would occur in a operational situation, if the agents -- which again, I don't

18   recall -- had to travel from, let's say, Harrisburg -- you know, the Harrisburg area, I think, is in the

19   Middle District of Pennsylvania -- to a different district where the Congressman was, they likely

20   would have reached out to a prosecutor -- I can't say that that was me -- just to notify that, hey, you

21   know, the subject of the execution of the search warrant wasn't at location 1; we have to -- you

22   know, we have to go to location 2.

1       I'm surmising here based on the fact of the ping warrant. I don't specifically recall any of that.

2   And again, it may have -- to the extent that it did happen, that may have been a conversation with

3   one of the other prosecutors.

4       Q      And what can you tell us about the discussions leading up to the execution of the

5   warrant? Did you have any discussions with other prosecutors regarding seeking a warrant for Mr.

6   Perry's cell phone?

7       Mr. Burton.      ▮▮▮▮▮▮, do you mean other than the ones he's discussed already, or you just

8   want to reiterate that?

9       ▮▮▮▮▮▮. Well, he said that they may have spoken to another prosecutor, so I'm trying to

10  figure out how many other prosecutors were working on obtaining Mr. Perry's cell phone.

11      Mr. Windom. Again, and please correct me here, but my recollection is that that was August

12  of 2022?

13          BY ▮▮▮▮▮

14  Q      Mm-hmm.

15  A      Okay. I think I previously described the staffing over time in the D.C. U.S. Attorney's

16  Office that would have been around the time that I began working with Mr. Cooney and that other

17  prosecutors were added to the investigative efforts.

18      My recollection is that there was one other person -- one other prosecutor who I worked with

19  specifically on, you know, obtaining this warrant.

20  Q      Mm-hmm.

21  A      There likely were others that were less involved in kind of the day-to-day -- you know,

22  you got to do the paperwork for it, you got to arrange the -- with the court to swear something

23  out -- for the agent to swear something out.

1       There likely were other prosecutors that we worked with that were at least aware of it.

2    Certainly, as I said before, Mr. Crabb and Mr. Graves would have been the ones that authorized it.

3    And then ultimately it was up to the Federal judge to authorize it, which happened here in at least

4    two instances.

5       Q       And you mentioned Mr. Cooney. Did you have conversations with Mr. Cooney about

6    seizing Congressman Perry's cell phone?

7       A       I don't recall any. During that time period, I'm sure I would have just because he would

8    have been working with me at that point. So I would be surprised if that didn't occur. I'm sure it

9    occurred. I don't recall any specific conversation.

10      Q       Did you have conversations with this other prosecutor you have mentioned regarding

11   seizing Mr. Perry's cell phone?

12      A       Regarding obtaining judicial authority to seize the cell phone? Yes.

13      Q       Okay. And did you ever discuss with this other prosecutor whether or not you should

14   seek consent before going to a warrant?

15      A       Going back 3 years, I'm not sure if I specifically recall that. I think what may be helpful is

16   that, any time investigative steps are -- at least in my experience, any time that investigative steps

17   are discussed, they will include a range of options.

18      So to the extent that consent was an option here, perhaps that was discussed. I don't have a

19   specific recollection of that.

20      Q       So you can't remember whether or not you discussed reaching out to a Member of

21   Congress regarding obtaining a cell phone prior to going to a warrant?

22      A       I don't have a specific recollection of that. I suspect that that either was discussed or

23   was, if not discussed, then considered by the United States attorney who would have approved us

1    moving forward to reach out to chambers to arrange for the agent to swear out the affidavit that had

2    ample probable cause to find that evidence of criminal conduct existed on Congressman Perry's cell

3    phone.

4        Q    So why didn't you seek consent in this instance?

5        A    I'm not -- again, like I -- as I said before, I don't recall one way or the other discussions.  I

6    think that there are a number of possible investigative steps.  Here, there was a warrant.

7        I think that what's important, as y'all are looking at this for your legislative inquiry, is that a

8    judge in Pennsylvania issued the warrant on a finding of probable cause.  Agents executed it and

9    obtained the cell phone and imaged it.  And what that means is they essentially took a copy and they

10    put it in a box.  They did not then review the contents of the phone.

11        Then the next step of that was a separate search warrant in the District of Columbia.  As part

12    of that search warrant, there is addendum C, I think it is.  And again, this is all public information.

13    That has a protocol.  And the protocol exists because of the D.C. circuit's ruling in Rayburn House

14    Office Building.  I'm not sure if we're in Rayburn, but it is -- that's the name of the case.  And the

15    protocol essentially dictates that, at that point, the Congressman and his counsel come immediately

16    into play with the court as an arbiter of what the government can and cannot get.

17        The addendum C, the protocol, my recollection, began a process whereby Congressman Perry

18    was given access to a copy of the image that had been taken.  And Congressman Perry had the ability

19    in the first instance to designate what he believed to be privileged under the Speech or Debate

20    Clause to the Constitution.  That's before anybody from the government looks at -- looks at this,

21    looks at any of this.

22        Congressman Perry made certain determinations.  My recollection is that there were

23    some -- there was some information on the phone over which he did not claim any privilege.  And

1    then there were parts of it, and I'm going to ballpark some numbers here, but let's just say 2,000

2    items over which he claimed a privilege.

3        Thereafter, it started a series of cascading court decisions from the district court in D.C. to

4    three judges on the D.C. circuit to a separate district court in the District of Columbia.  All five of

5    those judges, my recollection, specifically found that Congressman Perry had an overbroad view of

6    what the Speech or Debate Clause allowed him to protect.

7        And eventually -- and again, guesstimate numbers here, but of the 2,000 or so records over

8    which Congressman Perry claimed a privilege, ballpark, 1,600 of them ultimately were released to the

9    government.

10        So to the extent that there's some thought that perhaps Congressman Perry should have

11    been asked for consent at the inception rather than proceeding to a search warrant, what the

12    process ultimately ended up with was a judicially arbitered system whereby Congressman Perry had

13    the ability to invoke every privilege that he wanted with respect to Speech or Debate.  The courts

14    ruled on all of that.  But the core of the evidence was preserved from the inception so that whatever

15    the court later decided would be the final word and not simply the word of -- or the view of the law

16    of Congressman Perry.

17        Q    But I think, you know, we can all agree that cell phones nowadays have a lot of

18    information about a person on it.  Is that correct?  Would you agree with that?

19        A    To the basic view that cell phones have lots of information, as a general matter, yes, I

20    can agree with that.

21        Q    And you were seeking very specific information from his cell phone, correct?

22        A    I want to be very clear on your use of the word "you."  Here, the United States attorney

23    and, as I indicated before, likely the Public Integrity Section, approved moving forward with this.  An

1    agent, a Federal law enforcement agent signed an affidavit that two different judges found had

2    probable cause to believe had evidence of criminal conduct on Mr. Perry's -- Congressman Perry's cell

3    phone.

4            There are specific things within the warrant that the government, as with every warrant, are

5    permitted to look for and to find.  Here, it was somewhat the flip because the Congressman himself

6    was able to determine in the first instance what he thought might be privileged or not.  And then that

7    is -- we proceeded down the path of litigating the portions that he believed might be covered by the

8    speech or debate privilege.

9        Q    I understand that.  And you had said that the Justice Department obtained a -- what you

10    called a copy of his whole cell phone.  Is that correct?

11        A    An image, yes.  In common parlance, I would say copy, but I'm sure there are people

12    more scientifically inclined to -- who know better as to the terminology.  I think it is called an image in

13    the filings.

14        Q    So the complete copy would include any photos he had on his phone.  Is that correct?

15        A    My understanding is that the image is a replica of the contents of the phone.

16        Q    But you weren't looking for, like, photos of him and his young daughters.  Is that

17    correct?        .

18        A    You can look specifically at the redacted affidavit for specificity on what the agent

19    believed there would be probable cause to find and what the two Federal judges found there would

20    be probable cause to find.  I'm happy to go through -- typically, there's an attachment B which lists

21    the categories of information that a government agent can search.

22            Again, here, it is different because we're in a situation where a Congressman was given,

23    pursuant to the speech or debate privilege and the binding D.C. circuit precedent, the ability in the

1  first instance to look at anything and to determine a privilege designation before any government FBI

2  agent, government prosecutor looked at any contents of the phone.

3         Q      But, you know, the thing that we're trying to get at here is seizing the phone of a sitting

4  Member of Congress is a pretty big deal.  And so when you receive a full copy, the Justice

5  Department takes a full copy of a sitting Member of Congress' cell phone.  You now have all of the

6  contents on his phone.  And I understand that he went through and looked at privilege.  But why not

7  just ask him to turn over the information you were seeking?

8         Mr. Burton.  Just to be clear, when you're using "you," you're meaning the Department of

9  Justice, not Mr. Windom personally?

10        ███████████  Yes.  Correct.

11        Mr. Windom.  Yeah.  I mean, beyond what I've said, I'm not sure that I could detail every

12  consideration.  As I said before, the United States Attorney for the District of Columbia was the one

13  that ultimately approved this.  At least that's my recollection.  At a minimum, it would have been his

14  criminal chief, Mr. Crabb.  But I am fairly certain it's Mr. Graves in consultation with the Public

15  Integrity Section.

16        With respect to -- you know, "consent," I think, is the word that you were using.  What I think

17  was borne out by the considerable litigation that occurred after the seizure is that Mr.

18  Perry -- Congressman Perry had a different view of what the law was than what it actually was.

19        After that litigation, we obtained more information than he believed the government was

20  entitled to but, as I said, five different judges found otherwise.

21        ███████████.  Would you have remembered if you would have discussed seeking consent from

22  a Member of Congress?

1    Mr. Windom. Yeah. I mean, I see what you're doing with trying to ask the same question in a

2    different way. As I've said before, I don't recall here today if I was part of a discussion on that. In

3    general, different investigative techniques are discussed over the course of investigations: warrant,

4    subpoena, consent. The ultimate decision-maker here would have been the leadership of the United

5    States Attorney's Office.

6    ███████████ And what was your involvement with obtaining the warrant?

7    Mr. Windom. I guess I'll start with the one in the Middle District of Pennsylvania, the first

8    one. My recollection is that it was a -- a role that I had taken many times before with warrants.

9    Preparing the paperwork, reviewing the draft that ultimately is signed by the agent. Editing the draft,

10    I'm sure, occurred.

11    As I said before, there was at least one other prosecutor who worked on this with me, so we

12    likely, you know, both held those responsibilities.

13    BY ███████████:

14    Q    You're not giving us the name of that prosecutor?

15    A    That person is a line prosecutor, and so --

16    Q    You are too.

17    A    Yes.

18    Q    Okay.

19    A    Or I was.

20    Q    Right. But during times relevant.

21    A    Correct.

22    I'm sorry. I lost my train of thought. Where was I?

23    ███████████. We were discussing your role in obtaining the warrant.

1          Mr. Windom.  Sure.  So the Middle District of Pennsylvania -- I'm sure I was involved in editing

2    the affidavit, at least organizing the preparation of the paperwork by legal assistants.  Likely, either I

3    or the other prosecutor that I'm thinking of had contact with the U.S. Attorney's Office for the Middle

4    District of Pennsylvania.

5          Just the way, in my experience, logistically it works is when seeking a warrant in a district

6    where you are not the prosecutor, you call the home office because they know the procedures there

7    for, like, what judge is on duty that week or, you know, the proper formatting or font of the

8    paperwork.

9          So likely, that occurred.  Spoke to somebody there.  Likely, that person, whoever it was,

10   contacted chambers for the Federal judge and arranged a time to swear out -- for the agent to swear

11   out the warrant.  I'm sure I was involved in all of that in some manner, whether that was actually

12   effectuating it or discussing it with the other person and discussing it with supervisors.

13         Those are more the logistics of it.  This was August of '22.  The affidavit has a significant

14   amount of information that supported the probable cause.  So I'm sure I reviewed that, edited it, had

15   discussions with the affiant about it prior to swearing it out.

16         And then I remember being part of a similar process in D.C. for the second warrant

17   where -- something similar except it was our -- it was the jurisdiction in which we were located, so we

18   didn't have to call, you know, a AUSA in Pennsylvania.  We would have arranged with chambers

19   to -- for the affiant to swear out the second warrant, which included the addendum C protocol that I

20   had previously recounted.

21         ██████.  While you're going through this process, getting ready to seek a warrant and then

22   getting a warrant for Congressman Perry's cell phone, what kinds of discussions were you having with

23   other prosecutors regarding the Speech or Debate Clause?

1    Mr. <u>Windom.</u>  You know, setting aside conversations that I may have had with folks on the

2    line, I am certain that it was discussed, whether or what application there was or the speech -- of the

3    Speech or Debate Clause prior to seeking and obtaining the warrant in the Middle District of

4    Pennsylvania.  My recollection is it is because of the Speech or Debate Clause that we sought -- that

5    the government at that time sought authorization only to seize and to image the device as opposed

6    to, you know, looking through the information.

7        My recollection is that the phone was returned to Congressman Perry within a matter of

8    hours on whatever day it was seized and the image was made.  So I'm certain that there was

9    discussion of the Speech or Debate Clause, mindfulness of it.

10        Generally speaking, the folks with whom I worked were career, seasoned prosecutors who

11    otherwise had been familiar with at least the contours of the clause in other circumstances.  And

12    then, as I indicated before, the litigation in the District of Columbia and the second search warrant

13    specifically included search protocols which, as I understand it, were required by the Rayburn House

14    Office Building case.

15            BY█████████:

16    Q    How did they get into his phone?

17    A    The mechanics of it?

18    Q    Yeah.

19    A    I can tell you generally what I know about how that stuff works, but I couldn't tell you in

20    this instance which program --

21    Q    Did he provide a password or --

22    A    I'm sorry?

23    Q    Do you know if he provided a password?

1          A      I don't believe that he did, but I don't recall.

2          Q      Okay. So how do you get into the phone without a password?

3          A      If you have a copy of the affidavit, I think that there's a few different options that are

4    listed. One of them is -- and I don't want to misspeak, so I will speak generally, I guess.

5          Usually, my understanding in my experience in cases of seizures of cell phones, there's a -- as

6    part of the attachment, it permits facial recognition; so basically the agent holding up the phone to

7    the person's face. There may be other things that are listed --

8          Q      Is that what happened in this case?

9          A      If I can finish my answer, please, sir.

10         As I said before, I don't know what specifically happened in this case. I believe that that was

11    part of the addendum, the protocol for execution of the warrant in the Middle District of

12    Pennsylvania.

13         Separate from that, if it wasn't or if it didn't occur -- which, as I said, I don't recall -- there are

14    people who have technical expertise and who have access to law enforcement versions of devices

15    and software to get into phones that are locked. I don't recall sitting here now even if the phone was

16    locked.

17         Q      Did you participate in any discussions where you talked about how you're interfering

18    with the Congressman's duties by taking his phone from him?

19         A      Did I participate in discussions --

20         Q      Did you even consider that?

21         Mr. Burton. When he was on vacation.

22         ████████. What's that? Yeah. Congressmen work even when they're on vacation, believe it

23    or not.

1          Mr. <u>Windom.</u> I think that the most I can say there, consistent with my obligations, is that

2    there was a procedure in place. It was -- every legal obligation, my understanding, was fulfilled. It

3    was approved by a Federal judge in Pennsylvania. The warrant was executed in the manner and the

4    time in which we were authorized to do so.

5          And as I said before, the Congressman was deprived of his phone for, as I understand it,

6    according to the litigation, a matter of hours and, according to y'all, while he was on vacation.

7          BY ██████████:

8    Q    But as you sit here today, you don't remember raising the fact that you're interfering

9    with his duties while taking the phone. You don't remember any conversations where you flagged

10   that as a consideration here.

11   A    I'm not going to agree with that characterization. I think that --

12   Q    But you don't remember it. Well, tell me what you do remember about you raising that

13   topic.

14   A    Let me take your questions in turn.

15         As I said before, I don't agree with the characterization that you've just made. I have

16   indicated to you that we're going on 3 years now since discussions occurred regarding the seizure of

17   Congressman Perry's cell phone.

18         My recollection is that, as I said before, any decision as to move forward would have been

19   made by the United States attorney, would have been approved or consulted with the Public

20   Integrity Section.

21         To the extent that there were any arguments that Congressman Perry made or could have

22   made with respect to his congressional duties, there was a substantial amount of litigation regarding

23   that, and I would --

1          Q      Before you took the phone?  I'm asking you, before you took the phone.

2          A      In terms of the timing of that?  All I can say is that, you know, going on 3 years now, I

3    don't recall the specifics.  I don't believe that I would be able to talk about, even if I did, specific

4    conversations with other line prosecutors.  I'm certain that appropriate consideration was given, as is

5    my experience at least, to all substantial issues.  And in this case, the United States attorney made a

6    decision, and one and, you know, then other Federal judges agreed with respect to the probable

7    cause finding.

8          Q      But you do under- -- do you acknowledge that when you take the phone from him, he's

9    unable to conduct business with his top advisers and with other Members of Congress?

10         Mr. Burton.  I don't think there's any factual basis that supports that.  You're assuming he's

11   using his phone to do those things.  You're assuming a lot.  He's stated that he doesn't recall --

12         ███████.  Well, when you take Mr. Perry's phone, he's not able to have communications

13   with his colleagues and Congress.

14         Mr. Burton.  I don't know that to be true.

15         ███████.  Okay.  He's unable to make telephone calls.

16         Mr. Burton.  With that phone.

17         ███████.  With that phone, correct.  Do you know if he used a different phone?

18         Mr. Burton.  It's your questions, ███████ --

19         ███████.  So you're interfering with his duties as a, you know, Representative.  He

20   represents 750,000 people.

21         Mr. Burton.  He has -- he's --

22         ███████.  So the question --

23         Mr. Burton.  -- he's answered the question.

1    Mr. <u>Windom.</u>  Where was the question?

2              BY ███████ :

3    Q    You didn't -- you don't recall any discussions about the fact that you're interfering with

4    his duties while the phone is away from him.  He can't call other Members of Congress.  He can't call

5    his chief of staff.  He can't call his wife, if his wife was at the -- at the store.

6    A    Beyond what I said before, I think that I would just reiterate that I don't agree with the

7    characterization of your question.  I do not believe that, as my counsel just stated, there would be a

8    factual basis to support the question.  We're talking about --

9    Q    But you're interfering with his duties while his phone's gone.

10   A    I'm going to continue with the answer to your first question.  We're talking about a

11   period of time of, as I understand it, a number of hour --

12   Q    Many hours, yeah.

13   Mr. <u>Burton.</u>  Do you want to -- were you there?  I mean, he's telling you what his

14   understanding was.

15              ███████ .  Okay.

16              BY ███████ :

17   Q    Many hours, correct?

18   A    I'll continue with my answer, if that's okay.

19   Q    Okay.

20   A    My understanding is that Mr. Perry did not have his personal cell phone for whatever

21   the number of hours was, and that during that time period, obviously he was unable to use his

22   personal cell phone.  I do not have information, sitting here today, going on 3 years, as to what other

23   devices he may or may not have had, if he had, for example, laptops, iPads, computers.  I'm staring at

1    two different cell phones that ████████ has in front of her here, others on the table -- other

2    communication devices that Mr. Perry would have been entitled to.

3          I also don't recall -- though, again, this is just my recollection. I don't recall the litigation in

4    this matter, of which much was publicly unsealed, discussing that. If you have that information and

5    would like to point it to me, I'm happy to review it. But that's -- you're making a characterization that

6    I simply don't recall being part of the litigation.

7          Q    Right. But my question was, before you took the phone, did you raise concerns that,

8    hey, if you take the Congressman's phone, you're interfering with his duties? He represents 750,000

9    people from Pennsylvania. This is something serious that we need to talk about here at the Justice

10    Department before we proceed.

11          A    Beyond the answer I've already given the first five or seven times you asked this

12    question, I don't have anything to add. The United States attorney approved moving forward with

13    this. It was in consultation at least with the Public Integrity Section, is my understanding. And agents

14    executed a search warrant that was authorized by a Federal judge in Pennsylvania.

15          Q    Okay. And you said yourself and then another line prosecutor, who you've refused to

16    identify, and then your immediate supervisor, the head of Criminal Division, and Matthew Graves

17    were the four DOJ people?

18          Mr. Burton.  Yeah. I would object to him refusing. He's not authorized to provide that

19    information.

20          ████████.  In your reading of the letter.

21          The letter, as I mentioned, says you're authorized to provide unrestricted testimony to the

22    committee irrespective of potential privilege, as limited by the paragraphs 1 through 5. This is clearly

23    within number 5.

1              We're talking about -- I'm asking questions about the basis for the seizure of stealing

2     Mr. Perry's phone. So, anyway.

3              Mr. <u>Windom.</u>  I'm not sure what the pending question is.

4                   BY █████████

5        Q    I'm asking if you remember anything, and you said you don't, which is really remarkable

6     that you don't remember anything about discussion that the DOJ officials, you know, talked about

7     interfering with Mr. Perry's duties as a Congressman.

8        A    I understand that you are saying certain words and making certain characterizations of

9     what did and did not occur. I have provided to you today on multiple occasions over the last 15

10    minutes in response to the same question --

11       Q    Okay.

12       A    -- my recollection of what occurred --

13       Q    Very little. So I'll return to █████████

14       A    I'm going --

15       Q    Unless Mr. Jordan has some --

16       A    I would appreciate being able to, as ██████████ said earlier, finish my answer without

17    you speaking over me. May I do that?

18       Q    Okay. I thought you just said that you've told me everything.

19       A    As I said before, and as I was attempting to continue, I provided you my recollection,

20    now going on 3 years, of what occurred. I've identified the individuals who approved moving forward

21    with the search warrant. I've identified that at least two Federal judges found probable cause to

22    execute the warrant; that the warrant was, in fact, executed; and the manner in which Congressman

1    Perry's rights under the Speech or Debate Clause were manifestly attended to by virtue of the

2    protocols entered by the district court in the District of Columbia.

3        Q    Right. But my question was about interfering with his duties by depriving him of his

4    phone.

5        Mr. Burton. And that's a interesting characterization.

6        He's told you the facts. You can interpret the facts how you wish. I'm sure you will. He's told

7    you he doesn't recall a discussion that you are -- keep going back to. And you've expressed your view

8    that you find that however you find it.

9        Can we move on to something --

10        Chairman Jordan. Did you know the Inspector General's Office would scan the phone before

11    you took the phone?

12        Mr. Windom. I'm sorry, Congressman?

13        Chairman Jordan. Did you know the Inspector General's Office would scan the phone before

14    you took the phone?

15        Mr. Windom. My recollection is that I -- there were -- the FBI and then the Department of

16    Justice Office of Inspector General were the two law enforcement agencies that are identified in the

17    search warrant attachment.

18        I don't recall right now which of those two agencies imaged the phone. Certainly one of them

19    did, and that was the purpose of the first warrant in the Middle District of Pennsylvania.

20        Chairman Jordan. What's customary? The FBI doing it or the Inspector General doing it?

21        Mr. Windom. I can't speak to a customary situation. I think what is customary in this case is

22    that there were at least two Federal law enforcement agencies that were working with us on the

23    investigation, and my recollection is that in some instances during the course of the investigation,

1    which spanned the time prior to the special counsel, sometimes the one law enforcement agency

2    would image a phone or review a phone in some way.  Sometimes another law enforcement agency

3    would.  Generally speaking, my understanding is those are typically done based on staffing and

4    availability.

5         Chairman Jordan.  Did you have a preference in previous investigations who would scan the

6    phone?

7         Mr. Windom.  I've had -- sorry.  Go ahead.

8         Chairman Jordan.  I'm just asking, did you have a preference?

9         Mr. Windom.  In previous investigations, I've worked with a number of different law

10   enforcement agencies, including --

11        Chairman Jordan.  You said two law enforcement agencies.  What two were you referring to,

12   just to be clear?

13        Mr. Windom.  In this one --

14        Chairman Jordan.  FBI and IG?

15        Mr. Windom.  This specific search warrant authorized the movement of the phone, my

16   recollection -- and this is attachment D -- by the FBI or to the DOJ OIG's laboratory in the Northern

17   District of Virginia.

18        Chairman Jordan.  Okay.  It's our understanding that the Inspector General's Office scanned

19   the phone.  Is that your understanding?

20        Mr. Windom.  Sitting here today, I don't recall.  It was certainly one of those two.  I know that

21   the Office of the Inspector General did participate in forensic review, forensic extraction of certain

22   devices as part of the investigation.  It would not surprise me if they were the one that did this here,

23   but it could have been the FBI as well.

1          Chairman <u>Jordan.</u> Okay.

2          ███████████  So you didn't take it back to Virginia to do it?

3          Mr. <u>Windom.</u> I did not do anything. The government, according to the search warrant

4    affidavit, I recall, transported the phone back. At some point, it was in the District of Columbia

5    because that is where we received the second Federal judge's authorization to search. And just by

6    purposes of the venue provisions of Rule 41, it would have had to have been in the district in order

7    for the judge in the District of Columbia to issue that warrant.

8          ███████████  So you take the phone in New Jersey and then you take it at least to Washington,

9    D.C., and then, presumably, back to Jersey?

10         Mr. <u>Windom.</u> No. My understanding is that since it was a matter of hours, just logistically,

11   that that would have taken place somewhere proximate to wherever the phone was seized. When

12   I -- and perhaps I was inarticulate before. When we obtained the search warrant in D.C., my

13   understanding, the image of the device was in D.C.

14         There are, likely, redacted publicly available documents which discuss in detail this

15   information. I'm giving you my recollection of what occurred during those few weeks.

16         ███████████. And I know you've discussed the litigation that ensued following the seizure of

17   Congressman Perry's cell phone. And the Court of Appeals for D.C. in September of 2023 found,

18   among other things, that his conversations with his colleagues about the 2020 election certification

19   vote and vote on proposed election reform legislation were quintessential legislative acts entitled to

20   the privilege. And what I would like to know is whether or not you had conversations, prior to

21   executing the warrant, with your fellow prosecutors regarding whether or not these conversations

22   would be privileged.

1          Mr. <u>Windom.</u> I think that what I can provide you is that, as I said before, we had

2    conversations, I'm certain, regarding the Speech or Debate Clause and what the contours of the

3    clause were. And that is why we took the extremely protective measures that we did in terms of a

4    warrant first to image the device and then a second warrant in D.C. whereby, for Congressman

5    Jordan's edification since he -- I don't think, sir, that you were here when I was saying this part

6    earlier, and I apologize if you were.

7          There was a addendum C, my recollection is, a protocol whereby essentially the district court

8    judge was the arbiter of what was and was not privileged. But in the first instance, Congressman

9    Perry had the ability to assert any privilege he wanted with respect to the Speech or Debate Clause

10   and then to litigate that fully up through and including the D.C. circuit and then back to the district

11   court on remand before the government saw any of these --

12          BY                :

13   Q     How long did it take, all the litigation?

14   A     Timewise, I think that the warrant was August of 2022. I don't have a strong

15   recollection here, but I think maybe there was a decision either in the circuit or by the district court

16   December of '23. I think this is publicly available. So --

17   Q     So you're --

18   A     -- 16 months, something like that.

19   Q     So why not just ask Mr. Perry's lawyer for the emails you want? Like, if there's emails

20   between him and Jeff Clark, or whatever you're searching for, why don't you just ask him for it?

21   Emails with Jeff Clark aren't, you know, obviously -- you know, that's different from communications

22   he would have with members of his staff or Members of Congress. So you don't know whether he

23   would have just given them to you because you didn't ask.

1          A       So you're stating your view of the Speech or Debate Clause. I think what I went through

2    earlier was a fairly explicit and detailed version of what Congressman Perry believed was -- was the

3    protection of the Speech or Debate Clause.

4          Q       It's a little different, though, once you take the phone.

5          A       I'm going to continue with my answer, and then you can ask another question.

6          Congressman Perry had the opportunity to invoke whatever privilege he wanted. The

7    ballpark numbers that I gave before, he invoked a privilege over, ballpark, 2,000 items. And the

8    district court on remand -- so that would be the third court to look at it -- released something like

9    16- or 1,700 items.

10         To the extent that one can draw any conclusions about what Congressman Perry would have

11    done had he been asked consent, I commend you to review what he actually did once litigation

12    occurred. Beyond that, I have no information.

13         Q       They didn't -- they didn't ask?

14    ██████████       On page 100 of special counsel's report, which --

15    Chairman <u>Jordan.</u> Can we go off the record for just one second?

16    ██████████       Oh. Sorry. Go off the record.

17    [Discussion off the record.]

18    ██████████. We'll go back on the record.

19             BY ████████:

20         Q       Page 100 of special counsel report -- it's exhibit 3. And I can read the passage for you

21    that I'm interested in. Let you flip to page 100 before I start.

22         A       Thank you.

23    Go.

1        Q     It says, "In addition" -- this is at the top.  "In addition, the office consulted with PIN

2  regarding investigative steps that involved gathering evidence connected to congressional staff."

3        Was the congressional staff in question related to Congressman Perry?

4        A     I can't speak to that in terms of specifics.  All I can say is what is written here in the

5  report.

6        Q     Were you involved with discussions with PIN regarding evidence connected to

7  congressional staff?

8        Mr. <u>Burton.</u>  Do you mean him personally or the office?

9        ▇▇▇▇▇▇.  Him personally.

10        Mr. <u>Windom.</u>  The timing of -- so this says, "The office consulted with PIN."  It does not use

11  the phrase, you know, the time of -- period of time spanning the -- prior to the appointment of

12  special counsel.

13        My recollection is that the primary point of contact in the Special Counsel's Office with the

14  Public Integrity Section was another person.  I certainly had communications with the Public Integrity

15  Section about a number of different items, which are kind of categorized -- many of which are

16  categorized here.

17        I don't remember if I was the one that was on a phone call or an email with the Public

18  Integrity Section regarding staff.  I am aware, at least in part, of what this refers to.  And I was aware

19  that the Public Integrity Section, whatever was required by the Justice Manual in terms of the verb

20  "consultation" or "approval," whatever it was, was adhered to in this case.

21        ▇▇▇▇▇▇.  What does this refer to?

22        Mr. <u>Windom.</u>  This refers to the office consulting with the Public Integrity Section regarding

23  investigative steps involving gathering evidence connected to congressional staff.

1          ████████. In what congressional staff were you seeking evidence?

2          Mr. Burton. I don't believe he can answer that under Rule 6(e).

3                    BY ████████:

4          Q     Was it connected to Congressman Perry?

5          A     I can't identify information about that.

6          Q     So there could have been a broader effort to sweep in evidence from other

7    congressional staff?

8          A     A few things, I guess.

9                First, I am not going to agree with the characterization of your question, the words that

10   you've used. All I can say is that in response to the question, what does this mean, this sentence

11   here, I am -- my understanding is that I am prohibited by Rule 6 of the Federal Rules of Criminal

12   Procedure, and perhaps other standing orders of the court, setting aside whether the Department's

13   letter even authorizes me to discuss that, from discussing this with you.

14         Q     Okay. So you're not going to discuss whether or not you were going after other

15   congressional staff information?

16         A     For this -- and I appreciate you reiterating the question in a different way. Again, I'm not

17   going to agree with the characterization of what you have just said. The only thing that I am able to

18   say, consistent with my obligations under the Department's authorization letter and Rule 6 of the

19   Federal Rules of Criminal Procedure, and perhaps other standing orders of the court, is that I cannot

20   identify the congressional staff that are referred to on page 100 of the special counsel report.

21         Q     What was your involvement in drafting the special counsel's report?

22         A     I was involved in the drafting and editing process.

23         Q     Did you -- can you tell us if you drafted specific portions of it?

1          A    Unlikely.  If you'd like, we can go page by page.  I can tell you the process that was

2     undertaken in the office.

3          Q    We can go through the process, if you'd like.  Go ahead.

4          A    It's your question, so I'm happy to answer it if you'd like to ask it.

5          Q    Did you help draft the results of the investigation section?  That was number 1, referring

6     to the table of contents here.

7          A    I'm certain that I had input into that section, whether it was initial draft or editing.

8          Q    Do you believe you had input into all of the major sections of volume 1?

9          A    I had the ability to recommend edits to the entirety of the report.

10         Q    Okay.

11         A    There were -- going back to kind of the process, there were, obviously, drafts along the

12    way as there are with respect to any document.  I was involved in drafting some of the sections.  I

13    had the ability to recommend edits.  Whether or not they were accepted, I had the ability to

14    recommend them, as did any number of other people in the office.

15         The fundamental thing to understand, though, is that this is the report of the special counsel

16    and that the final word on what is included and is not included in volume 1 of the report was up to

17    the special counsel.

18         Q    And when did you personally start working on the report?

19         A    Timeframe that I started maybe drafting some parts or editing would have been, I think,

20    best recollection, November of 2024.

1    [1:20 p.m.]

2            BY ▇▇▇▇▇▇ :

3        Q    And if you'd -- just sticking with the report, since we have it out, on page 2, it talks about

4    a series of alleged criminal efforts.  And so I just kind of wanted to go through and ask which efforts

5    you were involved with investigating.  And this can be back while you were at D.C. or it can be at the

6    Special Counsel's Office, whichever time period you prefer.

7            But one of them was to allegedly induce State officials to ignore true vote counts.  Were you

8    involved in that portion of the investigation?

9            Mr. Burton.  Wait.  I'm sorry.  Where?

10           ▇▇▇▇▇▇  Page 2 of the report, the very last few words on that page before the footnote, it

11    says, "This included" -- and that's where I'm starting to read -- "attempts to induce State officials to

12    ignore true vote counts."

13           BY ▇▇▇▇▇▇ :

14       Q    Were you involved in this portion of the investigation?

15       A    I was involved in the portion of the investigation that involved uncovering evidence of

16    the defendant's attempts and the conspirators' attempts to induce State officials to ignore true vote

17    counts.

18           And, then, without wasting the time to read the rest of it -- I'm happy to if you would like to.

19       Q    Uh-huh.

20       A    The rest of that sounds -- I think that I was involved in some way in each of those lines of

21    investigation.

1  Q Okay. And did those lines of investigation begin when you were first detailed to the U.S.

2 Attorney's Office in D.C., or did they just start where -- your involvement just begin when you became

3 a part of Smith's team?

4  A My recollection, without, you know, full recall here, going back 3 years and change, is

5 that at least some investigation with respect to each of these different components, I guess the five

6 component of the conspiracies, was in existence prior to -- and I worked on in some capacity --

7  Q Uh-huh.

8  A -- prior to the appointment of the special counsel.

9  Q And when you were accepting the detail over to D.C. in November 2021, did you have

10 an understanding that this would be the type of alleged criminal effort that you'd be investigating?

11  A I think I described before the conversations that I had with the individuals, and I do not

12 recall these specific things being part of that discussion.

13  I think that what I talked about before -- and the record will be clear on this from my prior

14 answer -- is that I began reviewing a number of investigative files from ongoing criminal grand jury

15 investigations, spoke with prosecutors, and recommended certain lines of investigation to the United

16 States attorney, who then approved them.

17  █████████  We can go off the record.

18  [Recess.]

1    [2:05 p.m.]

2    ██████ It is 2:05.  We can go back on the record.

3    BY ██████:

4    Q    Mr. Windom, just a couple of questions about the Scott Perry cell phone issue.  And I

5    know we went through this in some substantial amount of detail, we'll say, in the last hour.  I just

6    want to get a clean record.  So I'm going to be asking you some of the same things again.  I'm not

7    trying to torture you, I promise.

8         In the prior hour, you were asked about a seizure of Representative Perry's cell phone.  And I

9    think, at one point, the line was used by majority counsel that accused prosecutors of stealing

10   Mr. Perry's phone.  Do you remember that?

11   A    I don't remember the use of that word, but I'm not sure all the different questions.

12   Q    Do you consider the seizure of his cell phone to be stealing the phone?

13   A    No.  I think as I explained in some detail, the process whereby the government obtained

14   Congressman Perry's phone included approval authority by a senior member of the U.S. Attorney's

15   Office in the District of Columbia, the Public Integrity Section consultation.

16        And then, ultimately, after the agent signed a comprehensive affidavit describing probable

17   cause to believe that evidence related to four Federal felonies would be found on Congressman

18   Perry's phone, a neutral, detached magistrate, by law, under Rule 41, under the case law, is to review

19   that.  Here, that's exactly what happened.

20        After that, a second Federal district judge, in this case, in the District of Columbia, also went

21   through the same process -- reviewed an affidavit, found probable cause, signed a search warrant.

22   So there's two Federal judges who found probable cause.

1          And, acting on the orders of the court regarding seizing an electronic device, searching the

2     different locations that are described in the affidavit, the agents executed the warrant in accord with

3     the law.

4          Q     You keep referencing the Public Integrity Section.  Is that the Public Integrity Section at

5     the U.S. Attorney's Office in the District of Columbia or the Public Integrity Section at DOJ Main

6     Justice?

7          A     The one at Main Justice within the Criminal Division.

8          Q     Okay.

9          And I want to introduce as exhibit 6 section 9-85.000 from the Department of Justice Justice

10    Manual.

11                              [Windom Exhibit No. 6

12                              was marked for identification.]

13              BY ███████████:

14         Q     Are you familiar with the Justice Manual?

15         A     I am generally familiar with the Justice Manual, yes.

16         Q     The Justice Manual lays out procedures that prosecutors are required to follow prior to

17    or when they bring cases, correct?

18         A     Among other things, yes.

19         Q     Can you turn to section 9-85.110?  It's on page 2 as printed.

20         A     Yes.

21         Q     Section 9-85.110 is "Investigations Involving Members of Congress," correct?

22         A     Yes.

1      Q      To the best of your knowledge, did the seizure of Representative Perry's phone follow

2      all of the procedures outlined in this section?

3             You can take a minute to review.

4      A      My recollection is that -- and this would've been in the U.S. Attorney's Office for the

5      District of Columbia -- that the requirements of the Justice Manual were adhered to.

6             Just for clarity, reading every word here, I'm not sure if this was the operative version in

7      August of 2022.  Generally speaking, it sounds consistent to me with what was required at that time.

8             My recollection is that the Public Integrity Section would have been consulted, whether or not

9      it was me who did the consulting.  The process for doing so typically includes formalizing that

10     consultation or approval in a message from Public Integrity to the prosecutor who has requested the

11     consultation.

12     Q      And, specifically, the fourth page of this is printed.  About halfway down, it says, "The

13     application for a warrant for records, information, or property belonging to a Congressional office,

14     Member of Congress, or Congressional staffer or for a location or device in which legislative materials

15     are likely to be found requires approval by PIN."

16            Do you see where it says that?

17     A      I do see that.

18     Q      That requirement was adhered to in this situation, correct?

19     A      Assuming it was approval as opposed to consultation back in August of '22, the answer

20     to that is yes.

21     Q      Thank you.

22     A      Whatever was required back then pursuant to the Justice Manual, my recollection, was

23     adhered to.

1    Q    And you've said a number of times today that prosecutors had probable cause to

2    believe that there were evidence of four felonies on Mr. Perry's phone, correct?

3    A    That's my recollection from the affidavit.

4    Q    Are you able to tell us today what those four felonies were?

5    A    Do you happen to have a copy of the redacted affidavit?

6    Q    We do.  We can introduce that as exhibit 7.

7                            [Windom Exhibit No. 7

8                            was marked for identification.]

9            BY ████████:

10    Q    And this is the affidavit that accompanied the August 2nd, 2022, application for a

11    warrant, which I believe was the first application.

12    A    So the question that you posed was, what were the four felonies?

13    Q    Uh-huh.

14    A    Okay.  Thank you for providing the document, because this does comport with my

15    recollection.

16        On page 3, paragraph 7, it lists four -- the four felonies.  And that's what the affiant believed

17    that there was probable cause for.

18        And then on the very first page of the document that you handed me, there's a section in the

19    middle that says, "The search is related to a violation of," and then it identifies the four -- the same

20    four statutes, signed by the United States magistrate judge.

21        The four that I recalled, which this does support:  substantive obstruction, under Title 18,

22    United States Code, section 1512(c); conspiracy to obstruct, under Title 18, United States Code,

1    section 1512(k); false statements, under Title 18, United States Code, section 1001; and conspiracy to

2    defraud the United States, under Title 18, United States Code, section 371.

3        Q    Thank you.

4        Now, the courts apply particular safeguards to materials from Members -- seized from

5    Members of Congress -- or -- excuse me. Let me rephrase that.

6        There are particular safeguards that apply to materials seized from Members of Congress,

7    correct?

8        A    Speaking as a general matter, yes. It depends which circuit that you're in, as for the

9    level of protection. But they all stem from the Speech or Debate Clause of the United States

10    Constitution.

11        Q    And, in this particular case, Mr. Perry was given an opportunity to review and assert

12    privilege over the contents of his phone, correct?

13        A    Correct. The protocol in the District of Columbia was that Congressman Perry, in the

14    first instance, would be able to assert the privilege. He did so in a manner that the courts found to

15    be overbroad.

16        That was litigated. And, ultimately, after that litigation, the government obtained information

17    from the device -- again, to your question, though, after Congressman Perry in the first instance had

18    the ability to assert his privilege.

19        Q    I just want to make a note for the record that what we just introduced as exhibit 7, the

20    application for a warrant by telephone or other reliable electronic means, is available publicly online

21    through the Reporters Committee for the Freedom of the Press.

22        Mr. Windom, you just referred to a court ruling. I want to introduce as exhibit 8 the

23    memorandum opinion from Judge Boasberg dated December 19th, 2023.

1          [Windom Exhibit No. 8

2          was marked for identification.]

3          BY █████████

4     Q     Is this the relevant ruling on Mr. Perry's privilege claims that you were referring to?

5     A     This -- hang on one second.

6          This is certainly one of them.  The others that I was referring to would've predated this.

7          There was an initial one by then-Chief Judge Howell, I recall, where she found overbreadth to

8     Congressman Perry's invocation of the privilege.

9          Then it went to the D.C. Circuit, where I believe that it was a unanimous panel that found

10    something similar.

11         Was remanded to a new chief judge.  Chief Judge Boasberg had become chief judge in the

12    interim, and that's the position to whom these things go.  And then this is Chief Judge Boasberg's

13    memorandum opinion.

14         I'm not sure if I said this earlier, but I think that the docket will reflect that Congressman Perry

15    did not appeal this ruling.

16    Q     Thank you.  And this memorandum opinion is the final disposition of the ruling on

17    privilege claims, right?

18    A     That's my recollection, since the Congressman elected not to appeal.

19    Q     Okay.

20         So, at the bottom of the first paragraph on the very first page, the memorandum opinion

21    reads, "Having now analyzed each of the 2,055 documents still at issue, the Court will order Perry to

22    disclose 1,659 of them, but not the 396 others," correct?

23    A     I believe that you've read that correctly.

1       Q       So the final ruling was that the vast majority of the documents -- or materials on

2    Mr. Perry's phone that prosecutors sought were not privileged, correct?

3       A       That is true.  But just to be even more specific, these were just the documents over -- or

4    the items that Congressman Perry asserted a privilege.  There was a separate volume of material, my

5    recollection is, over which Congressman Perry agreed that there was no privilege, and those also

6    were produced to the government.

7       Q       Thank you.

8               We can go off the record.

9               [Recess.]

10              ███████  We'll go back on the record.  It is 2:19 p.m.  We'll start our next round of

11   questioning.

12                  BY ███████:

13      Q       Mr. Windom, prior to joining Special Counsel Smith's team -- he was appointed on

14   November 18th, 2022 -- had you previously worked with Mr. Smith?

15      A       No, I don't believe so.

16      Q       And I believe in our first hour you had mentioned speaking with individuals who had

17   maybe worked with Mr. Smith.  Do I have that right?

18      A       Yes.

19      Q       And what did they tell you about Mr. Smith?

20      A       Based on those conversations, I came to view Mr. Smith as somebody with high

21   integrity.

22      Q       Anything else about his reputation that you heard?

1        A       That's the takeaway that I recall.  I assume that there were other specific things that

2    they said, but the gist of the conversations was that he was a person of high integrity.

3        Q       And prior to Mr. Smith's appointment -- and this is in the Washington Post article I

4    admitted into the record earlier -- it appears that Attorney General Garland had summoned

5    prosecutors to Main Justice to flag for them the impending appointment of Mr. Smith and ask that

6    they stay on.

7        Were you involved in this November 18th meeting?

8        A       And, sorry, just to be clear, because I think I know the meeting you're talking about --

9        Q       That's correct.

10       A       -- but if you're talking about something from the article, if you want to point that out to

11   me, I'm happy to read it.  Independent from the article, I think I know what you're talking about.

12       Q       Go ahead.  Let's go with independent.

13       A       Okay.  Was I involved in that meeting?  Yes.

14       Q       And who else was in that meeting besides you and the Attorney General?

15       A       There were a number of people, maybe I can describe --

16       Q       Uh-huh.

17       A       -- coming into the meeting.

18       I was advised that day that I was invited to a meeting or an attendance in the Attorney

19   General's Conference Room that was to take place sometime not long after I was advised of this, like,

20   an hour or two later, I think, is my recollection.  I think it's Friday.

21       I went to the RFK Building, Main Justice, went to the Attorney General's Conference Room.  I

22   don't remember who was there when I arrived versus, you know, who arrived shortly thereafter.

23       Q       Uh-huh.

1    A    So, ultimately, the group of people that I recall:  Mr. Cooney was there.

2    Q    Uh-huh.

3    A    I believe, but I am not certain, that Mr. Crabb and Mr. Graves were there.  Other

4    prosecutors with whom I was working in the District of Columbia on these investigations were there

5    or arrived shortly thereafter.

6    Q    And just to be clear, sorry to interrupt, but the D.C. prosecutors were the line --

7    A    Correct.

8    Q    -- prosecutors that you worked with?

9    A    Correct.

10    Q    Okay.  Please continue, sir.

11    ██████    . Was Jay Bratt one of them?

12    Mr. <u>Windom.</u>  No, but -- sorry.  In response to your question, the answer is no.  In response to

13    her question -- I'll get to that in a moment -- the answer is yes.  Mr. Bratt was present.  He was not

14    one of the people that I was working with in D.C.

15    ██████    . Okay.

16    Mr. <u>Windom.</u>  So that was, kind of, this group of folks.

17    ██████    . Uh-huh.

18    Mr. <u>Windom.</u>  This group of folks, there were people who I knew to be working on what at

19    that time was the separate -- what became the classified documents case.  I believe that Mr. Bratt

20    was there.  I'm not certain, but I believe that he was there.  Other prosecutors who I either knew to

21    be working on that or thereafter learned were working on that.

22    ██████    Uh-huh.

23    Mr. <u>Windom.</u>  Who else?  So that's the folks that were invited.

1          At some point shortly after I arrived, the Attorney General entered the conference room. He

2     had staff with him, a number of them. I don't know if that's two or four or what. My recollection is

3     that Lisa Monaco, the Deputy Attorney General, also came in, either with Attorney General Garland

4     or shortly thereafter, and was present for that brief meeting.

5          BY ████████

6     Q     Was Bradley Weinsheimer in that meeting? He worked in the DAG's Office.

7     A     I know who that is, and I would recognize him. His face is not coming to mind as

8     somebody who was there. He may have been.

9          I think, ballpark numbers, there were at least 20 people there. So -- and I was on, like, one

10    end of a side of the room. So I'm not sure that I -- I just don't remember if he was there.

11    Q     Was there anyone else from the DAG's Office in attendance that you can remember?

12    A     Yes. I believe that at some point during -- and I don't know if they walked in with

13    Ms. Monaco, but I believe that Molly Gaston, whose name you're familiar with, came in at some

14    point. At the time, she was on detail to the Office of the Deputy Attorney General.

15         And I believe at some point Mr. Atkinson, who I named earlier, came in at some point, who I

16    don't believe -- maybe he was on detail. I thought he was an employee in that office.

17    Q     And other than the Attorney General, obviously, who had a speaking role at the

18    meeting?

19    A     The Attorney General did, as you said. I would suspect that Ms. Monaco may have said

20    something, but I don't remember -- I don't remember with any specificity.

21         Attorney General Garland, if you'd like me to say what he said or what I remember --

22    Q     Yes. Please do.

1      A      So Attorney General Garland comes in and is at the head of the table in the Attorney

2    General's Conference Room.  I can't recall if he sits down or if he's standing up.  It's a brief meeting.

3             He says something to the effect of, without recalling the exact words, now 3-ish years ago,

4    you know, "Thank you all for coming on short notice.  I wanted to let you all know that I've decided to

5    appoint a special counsel.  That special counsel is Jack Smith."

6             I don't remember the exact words, but I do recall it was similar to what he either said shortly

7    thereafter when he went to announce this publicly or maybe it was in the order appointing Mr.

8    Smith, but, you know, something about the reason that he was appointing Mr. Smith.

9      Q      Uh-huh.

10     A      And I do recall at least something similar to what you mentioned earlier.  I recall him

11   saying something along the lines of, you know, "I hope that y'all will continue working with Mr.

12   Smith" or that "y'all will consider working with the special counsel," something along those lines.

13     Q      Was Jack Smith in the meeting?

14     A      No.

15     Q      And what was the reasoning for the appointment?  Was it because President Trump had

16   announced his candidacy a few days before?

17     A      I would have to refer you for the exact wording to what I think was the press statement

18   that he made.

19     Q      Uh-huh.

20     A      Because my recollection is, this meeting occurred, and I walked out the door and left,

21   and at that moment the Attorney General was going to -- I don't remember if it was the Great Hall or

22   some other room -- to make this press announcement, where my recollection at the time is he said

23   publicly basically what he told us.

1      Q      And how long after the November 18th meeting that you had with the Attorney General

2  did you officially join Smith's team?

3      A      Within -- so I think I said before, it was a Friday.  It was the Friday before Thanksgiving, is

4  my recollection.  I would have accepted Mr. Smith's -- at some point, Mr. Smith asked me to join the

5  team.  I would have accepted that offer by the first week or so of December --

6      Q      Uh-huh.

7      A      -- maybe the second week, maybe the last week of November, somewhere in that

8  timeframe.

9      Q      And when was your first time meeting Smith?

10      A      Around the first week of December.

11      Q      And how often did you interact with him when you were on the special counsel's team?

12      A      Daily.

13      Q      Daily?

14      Did you have any involvement in the gag order motion that was filed after the indictment on

15  September 15th, 2023?

16      A      I had involvement in an order under Local Rule 57.7, which prohibited both parties, the

17  government and the defense, from making certain statements.  But I'm not going to subscribe to

18  your language of a "gag order."

19      Q      Okay.  And the -- the order was then curbed by a panel of judges; is that correct?  It was

20  narrowed?

21      A      Without agreeing to your first characterization, my recollection is that a unanimous

22  panel of the D.C. Circuit upheld in large part the Rule 57.7 order, did narrow it in some respects.

23  There's an extensive opinion on this.

1    Q    Uh-huh.

2    A    But the basis, my recollection -- and there are filings on this -- for the findings in the

3    District Court and in the Circuit Court were that the 57.7 order should be entered both to protect

4    against threats and intimidation of witnesses and to preserve the integrity of the administration of

5    justice.

6    Q    But the first order sought to keep him from talking about the -- keeping President

7    Trump -- to not allow him to talk about or criticize the case at all. Is that correct?

8    A    You'd have to show me the first order. I don't remember the specific language of it.

9    I do know that the order applied equally, per the local rule, to both parties. And so -- well, at

10    least that's my recollection of it.

11    Q    And then, in December 2023, there was another filing, similar, that would have

12    prohibited President Trump from being able to cite concerns regarding the National Guard, D.C.

13    Mayor, or undercover agents on January 6th. Do you remember this?

14    Mr. Burton. Do you have a date for that filing, ▮▮▮▮▮▮? I'm sorry.

15    ▮▮▮▮▮▮ I have December 27th, 2023.

16    Mr. Windom. And my counsel is showing me a docket, it looks like.

17    Mr. Burton. I'm just showing a docket printout.

18    Mr. Windom. December what?

19    Mr. Burton. What's listed on December 23 on the docket says "motion in limine."

20    ▮▮▮▮▮▮ That's correct.

21    Mr. Burton. Okay. Is that what you're --

22    ▮▮▮▮▮▮ That's the motion --

23    Mr. Burton. -- referring to?

1       ███████ -- I'm referring to.

2       Mr. Burton.  Okay.

3       Ms. Suen.  December 27th?

4       Mr. Burton.  Yes.

5       Ms. Suen.  Okay.

6       Mr. Windom.  If you have that for me to look at -- a motion in limine typically is an exclusion

7   regarding potential trial evidence.  So, if you want me to take a look, I'm happy to take a look at it.  I

8   don't agree or disagree with what you just said on what it is.

9               BY ███████

10      Q      But you were involved with at least the initial filing of the motion on September 15th,

11   2023?

12      A      I was involved in -- I'm sorry, you said the date was?

13      Q      September 15th, 2023.

14      A      I was involved in some capacity with that, yes.

15      Q      And then were you involved with the subsequent litigation regarding that order?

16      A      I was involved with it in some capacity.  I was not the person that argued it in the D.C.

17   Circuit.

18      Q      And who argued that, if you remember?

19      A      Can we hold on just for a second?  I just want to clarify --

20      Q      Yes.

21      A      -- something with my counsel.

22      Q      We'll go off the record.

23              [Discussion off the record.]

1          ██████. We'll go back on the record.

2                BY ██████:

3      Q     Go ahead, sir.

4      A     Sure. I believe that your -- well, why don't you re-pose your question to make sure the

5   record's clear?

6      Q     My question was, you had suggested that you were involved with the various filings

7   regarding the initial motion from September 15th, 2023, and you said, "I was not the one who argued

8   it in court." And so my question was, who argued?

9      A     Sure. My recollection is that in the District Court Ms. Gaston argued that and in the

10  Circuit Court Cecil VanDevender argued that.

11          These are matters of public record. There are transcripts which identify them. I believe that

12  Mr. VanDevender's name is actually on the Circuit Court opinion as the arguing attorney.

13          And, just for clarity, that is something that I wanted to confer with my counsel on to make

14  sure was a matter of public record.

15     Q     Are you aware of an effort to get transcripts from interviews conducted by the House's

16  January 6th Select Committee?

17     A     I am aware that the House Select Committee provided material to the Special Counsel's

18  Office --

19     Q     And --

20     A     -- which included -- I'm sorry. Go ahead.

21     Q     You're okay. I was just going to say, were you in communication with the committee, or

22  was there another person at your office who was in communication with the committee?

1    A    For something specific like that that involves the House Select Committee, to the extent

2    that there were communications, I have not been authorized by the Department to discuss those

3    with you.

4    Q    You can't even answer whether or not you, specifically, were in communication with

5    them?

6    A    That's my understanding of the authorization letter.

7    BY ███████:

8    Q    Did they give the materials to you voluntarily, sua sponte, or did you guys request it

9    from them?

10   A    I think what's a matter of public record and is detailed both in the special counsel report

11   and in Rule 17(c) subpoena litigation in the District Court is that the House Select Committee

12   provided the Special Counsel's Office with a volume of material and that all of that material was given

13   to the defendant during litigation.

14   Q    But did you ask for it, or did they just provide it on their own?

15   Mr. Burton. I think that would implicate Rule 6(e).

16   ███████ Sorry, I don't see that, but -- I mean, we're asking about your communications

17   with the House of Representatives.

18   Mr. Burton. But if they're communications in the course of the grand jury investigation, that

19   would be covered by Rule 6(e).

20   ███████ No --

21   Mr. Burton. As to the government.

22   BY ███████:

23   Q    Have you had any communications with congressional staffers on this case?

1       A       For the same reasons that I said before, if I did, I would be unable to discuss those based

2   on, at a minimum, the lack of authorization to do so from the Department's authorization letter and

3   then possibly, depending on how far down the line we were able to one day go, Rule 6 or other

4   standing orders of the court.

5       Q       Okay. So you're not willing to disclose your communications with the House Select

6   Committee?

7           Mr. Burton. I take characterization of his willingness as incorrect.

8           ▮▮▮▮. You're not going to disclose.

9           Mr. Burton. He is unable to disclose.

10          ▮▮▮▮. So he's not going to disclose. Okay.

11              BY ▮▮▮▮:

12      Q       And if it's helpful, I can point you to the footnote in the Smith report where the

13  discussion of the January 6th Select Committee happens. It's not in the text of the report. It's

14  reserved for a footnote, footnote 251, to be specific, on page 93.

15      A       I'm sorry. Page --

16      Q       Ninety-three. Footnote 251 --

17      A       Okay.

18      Q       -- says, "The Office's investigation included consideration of the report issued on

19  December 22, 2022, by the U.S. House of Representatives' Select Committee to Investigate the

20  January 6th Attack on the United States Capitol, as well as certain materials received from the

21  Committee."

22          What were the certain materials received from the committee?

1      A    So what I can confirm is that this comports with my recollection. If you have -- I don't

2    know that the detail on what was received was specifically public, but it may be. There are some

3    docket entries, which I'm happy to look at if you have them.

4        The defense filed a motion for Rule 17(c) subpoenas. This would've been around September,

5    October, November of 2023. That was litigated. We responded with a responsive brief that included

6    more information, is my recollection, than just what's in this footnote.

7        To the extent that that describes the material with more specificity, I'm happy to go through

8    that with you. But absent recalling what is already public, I don't believe that I can describe with

9    specificity that material.

10      Q    Did you receive transcripts of interviews?

11      A    For the same reasons that I said before, it's entirely possible that the information that

12    you're asking for is public. And if you have the motion that the defense filed and our responsive brief

13    and the court's order -- well, I guess there's a reply brief too -- and the court's order, it likely gives

14    more information than just the sentence that you read.

15      Q    Uh-huh.

16      A    But absent reviewing that right now, I don't recall what is public. And unless it's public, I

17    don't believe that either under the Department's authorization letter or Rule 6 or potentially the

18    protective order in the case, any sealing orders, that I am permitted to tell you with specificity what

19    those materials are.

20      Q    Why didn't you just conduct interviews yourself? You're the Department of Justice.

21    Why did you need the transcripts?

22      A    I'm not sure what the predicate of your question is except it may be assuming that we

23    had certain things, which I have said I'm not sure if that's publicly available.

1          Q        Why would you need to seek transcripts from a House committee if you could conduct

2     the interviews yourself as the Department of Justice?

3          Mr. Burton.  You've mischaracterized.  He has not said he sought transcripts.  He's not said

4     whether he received transcripts.

5          If there is something in the public record that discusses that, as he's referenced, that you

6     want to look at and show, I think he will be comfortable answering with greater specificity.

7          But if it's not in the public record, it implicates not only the scope of the letter but, more

8     importantly in my judgment, Rule 6 and also the protective order entered by Judge Chutkan.

9                    BY █████████:

10         Q        So I take it you're not going to answer that question.  Is that correct?

11         A        Relying on the exact thing my counsel just said.

12         Q        What can you tell us about any communications that the Special Counsel's Office had

13    with Fulton County District Attorney's Office?

14         A        I think that the most I can say is that I was not involved in any

15    communication -- certainly any substantive communication, but any communication -- with

16    Fulton Coun- -- and just for clarity and to make sure that I understand, you're talking about the

17    county in which there was a State indictment against Mr. Trump and a variety of other people?  Is

18    that correct?

19         Q        That's correct.  That would be Fulton County in Georgia.

20         A        Sure.

21         Q        The district attorney there is Fani Willis, if helpful for your recollection.

22         A        My answer stands.  I don't recall being part of any such communication, substantive or

23    otherwise.

1      Q      Were you aware of any ongoing communications that you may not have been a part of?

2      A      The best I can say on that is I am not aware, whether it is me or somebody else in the

3  office that had any substantive conversations there.  If there were anything that I was aware of, I

4  don't think that I would be permitted to discuss it.  But I'm not aware, sitting here today.

5      Q      And on the special counsel's report, footnote 1, which is on page 2, the footnote says,

6  "This section of the report summarizes the evidence uncovered by the office's investigation and,

7  therefore, includes conduct for which the Supreme Court later held Mr. Trump to be immune from

8  prosecution."

9      Did you have any role in the decision to include immune conduct in the report?

10     A      I'm not sure if I can say I had a decision in it.  I certainly was aware of it.

11     The footnote goes on to say that --

12     Q      Uh-huh.

13     A      -- if I remember correctly -- and let me just read the rest of it.

14     Right.

15     So the first section of the report lays out, as it's titled, "The Results of the Investigation."  The

16  information that would have served as proof beyond a reasonable doubt had we gone to trial for the

17  jury to consider did not include discussion of the evidence that the Supreme Court held to be

18  immunized.  And that's reflected right here in this footnote.

19     Q      Uh-huh.  But why include conduct, as the next sentence says -- "that conduct is not

20  included in the superseding indictment that the office obtained after the Supreme Court's decision."

21     So why include conduct that you couldn't charge in the superseding indictment?

22     Mr. Burton.  When you're using "you," you mean the Special Counsel's Office?

23     ██████. Yes.

1      Mr. Burton.  Okay.

2      ███████████  As I've said the whole day, Mr. Burton.  Yes.

3      Mr. Burton.  No.  Sometimes "you" is him personally, and sometimes "you" is special counsel.

4      Mr. Windom.  As you said, the conduct that either the Supreme Court found to be immune or

5      that we believed to be rebuttably immune, some of that conduct was included in the superseding

6      indictment.

7      My understanding of this part of the special counsel report is that it includes information that

8      the Supreme Court determined to be immunized.

9      The ultimate decision on what was included in the report content-wise, sections, structure,

10     that sort of thing, was up to the special counsel.

11     BY ███████████

12     Q     So it was Jack Smith's decision to include immune conduct in the report?

13     A     I think that it was Jack Smith's decision, as he says -- I believe he says in here, to include

14     the information that's included in the report.

15     Q     And what was your involvement in the classified documents case, if any?

16     A     Can you give me a timeframe?

17     Q     Any timeframe.  Just tell us what your involvement was, sir.

18     A     I didn't work on that case.

19     Q     Uh-huh.

20     A     And I will bifurcate this into my time on detail in the U.S. Attorney's Office and my time

21     on detail to the Special Counsel's Office.

22     I recall interactions with the -- at least Mr. Bratt and I believe one other person when they

23     were at the National Security Division when that investigation was ongoing prior to the Special

1      Counsel's Office.  And these interactions were more in the way of informational updates that

2      occurred every so often --

3          Q      Uh-huh.

4          A      -- logistical issues mainly, to make sure that, to the extent any investigative steps that

5      we were -- or maybe not "any" -- but to make sure that investigative steps that we might be

6      undertaking were known to them and vice versa.

7              But I had no input into what their investigative steps were.  They weren't in our office, in the

8      U.S. Attorney's Office for the District of Columbia.  There was just the occasional informational

9      updates.

10             That's the -- that's my time in D.C.

11         Q      Uh-huh.

12         A      My time in the Special Counsel's Office, again, I did not work on that case.  There were

13     interactions.  We all sat on the same floor.  We were occasionally in meetings together if there were

14     updates that affected both sides, both the classified documents case and the election case, or issues

15     that both sides needed to have input on.

16         Q      Did you ever conduct any interviews for the classified documents case?

17         A      I did not, to my recollection, conduct interviews for that case.

18         Q      Uh-huh.

19         A      There were overlapping witnesses.

20         Q      Uh-huh.

21         A      And I believe that there's a public filing on this.

1      When there were witnesses that were interviewed as part of the election case and the same

2   witnesses were interviewed by the classified documents case team, the practice was to produce both

3   of those interviews to the defendant in both of the cases.

4      Q      Uh-huh.

5      A      That was the practice.

6      There were times where, for, you know, logistical reasons, we arranged with -- and by "we", I

7   mean the folks on the election case team, maybe me, maybe not me -- would arrange with

8   prosecutors on the documents team and counsel for a witness to make it easier for everybody,

9   basically, to have the questioning occur by both teams on the same day but not necessarily at the

10  same time.

11     There may have been a time -- I do not recall any time where I was present for one of those

12  interviews when somebody from the classified documents team was asking questions.

13     Q      Okay.

14     So, if The New York Times credited you with conducting 29 interviews in the classified

15  documents case, that's inaccurate?

16     A      I mean, I guess I'm not going to speculate on if The New York Times did.

17     What I can say is, I recall the defense making an argument in litigation -- and I don't know if

18  that was on the election case or on the document case -- that certain prosecutors on one side had

19  conducted certain interviews on the other.

20     My recollection is that the response that the office filed to that was essentially what I just

21  said.  There were overlapping witnesses, and, to the extent that were the case, then it was the

22  practice to produce the interview that occurred on the other case of the same witness in the first

23  case.

1    Q    Did you have any involvement with the search warrant at Mar-a-Lago?

2    A    No.

3    Q    Okay.

4    And once you were detailed, throughout your time on detail to the U.S. Attorney's Office in

5    D.C., November 2021, through your tenure on Smith's team, did you have any communications with

6    Ms. Monaco besides the November 18th meeting that we've just discussed?

7    A    I did.

8    Q    And how many conversations did you have with Ms. Monaco?

9    A    Conversations, two that I recall.  Total interactions, four.

10    Q    And when did the two conversations occur?

11    A    The two conversations occurred in -- the first one I believe was in early 2022, and I don't

12    know if that means January or March or April.

13    Q    Uh-huh.

14    A    That was similar to what I described before, some sort of video teleconference.  It was

15    an update on investigative efforts, to my recollection.  I was not alone in that.

16    The second one was either October or November of 2022, before the appointment of the

17    special counsel.  That was an in-person meeting at the United States Attorney's Office for the District

18    of Columbia.  Similarly, I was not the only person there.

19    Q    Uh-huh.

20    A    I had a speaking role in both of the two, I guess -- I don't know if they're called

21    "conversations" or "meetings."

22    Q    And it was just to update Ms. Monaco on the status of the investigation?

23    A    That's my recollection.

1        Q     And then the four interactions you described, when did those occur?

2        A     So those two meetings that I described are -- I'm including that in the interactions.

3        Q     Okay.  So, then, just two separate interactions and the conversations.

4        A     That's my recollection.

5        Q     Okay.

6        A     The third time I recall being in a room with Ms. Monaco was November 18th.  And,

7    again, that's if she was there --

8        Q     Uh-huh.

9        A     -- because I don't have a clear recollection of her being there.

10       And then the fourth time that I interacted with Ms. Monaco was in January of 2025, this year,

11   and I don't know the date, first or second week.

12       Q     Uh-huh.

13       A     Well, first, second, or third week, I guess.  And -- yeah, that's that time.

14       Q     Okay.

15       And did you ever have any communications with Bradley Weinsheimer,

16   communications/interactions with Bradley Weinsheimer?

17       A     Regarding this case?

18       Q     That's correct.

19       A     Okay.  Like I said before, I know who Brad Weinsheimer is.  I don't recall having any

20   interactions with him.

21       I think that I was on some -- we get a lot of email, a lot of spam email, and I remember

22   hundreds and hundreds of names being on a spam email where he also was -- there were any

23   number of people, not just in the Department, and he also was on there as a name that I recognized.

1     Q     Okay.

2     A     But I had no clue who the spam person was.

3     Q     Beyond the November 18th, 2022, meeting with the Attorney General, did you ever

4     have any other occasion to interact with the Attorney General on this case?

5     A     The only other time that I remember is the same interaction with Ms. Monaco at

6     the -- in January of this year.

7     Q     Uh-huh.

8           And, during your investigation, so including your time on detail up through your time on the

9     Smith team, did you ever interact with anyone that's associated with the Biden White House?

10    A     For that, to the extent that I -- and I can answer that in part.

11    Q     Okay.

12    A     To the extent that there were specific interactions with the incumbent Executive at that

13    time, my understanding is that the Department's authorization letter does not cover that.

14    Q     Uh-huh.

15    A     I can tell you what's publicly available.

16    Q     Okay.

17    A     When -- it is publicly available.  It's included in the report.  We said this in open court.

18    And, also, I believe that there was some media public-access litigation where you can go and find

19    docket entries and affidavits and filings, arguments.

20          In the time period, I think it was around August of 2022 through around March of 2023, we

21    were engaged both while in the D.C. U.S. Attorney's Office and in the Special Counsel's Office in

22    litigation over executive privilege.

23    Q     Uh-huh.

1      A      And I think what the public information is is that, as a predicate to that litigation, the

2      government reached out to the incumbent Executive and also to the former President -- so both the

3      White House Counsel's Office at the time, I believe it was, and then counsel for Mr. Trump -- to

4      determine whether they were going to try to invoke executive privilege over certain witnesses'

5      testimony.

6      Q      Uh-huh.

7      A      I believe that it was 14 witnesses -- this is all public -- it was 14 witnesses.

8              As part of that, as I said, the government reached out to both the White House Counsel's

9      Office and to counsel for Mr. Trump to determine whether they would seek to invoke executive

10     privilege.

11     Q      Would it be accurate to say that if you had communications with the Biden White House

12     it would have been regarding executive-privilege assertions?

13     A      I don't want to define or limit or expand or characterize what those conversations may

14     be if they occurred.  I'm simply not permitted, based on my understanding of the Department's

15     authorization letter, to discuss that one way or the other, if they happened.  What I am able to point

16     you to is what is in the public record.

17     Q      So you could've had conversations with the Biden White House beyond discussions

18     regarding executive-privilege assertions?

19             Mr. Burton.  He can't answer that if they were under the investigatory function.

20             BY ▆▆▆▆▆▆▆:

21     Q      As part of your investigation, did you ever review materials or information provided by

22     FBI confidential human sources?

23     A      I'm trying to think what, if anything, I can respond to this.

1    The most that I could probably say is that the FBI was involved in the investigation.  I reviewed

2    a number of investigative files from ongoing grand jury investigations.  My recollection is that there

3    was some litigation on this, and so there are some public filings which discuss confidential human

4    sources.

5        I think that that is in a motion that the defense filed to compel discovery.  I believe that we

6    would've responded to that in an opposition brief somewhere in December of 2023.  And I believe

7    that the court entered an order that discusses in some respect confidential human sources in August,

8    September, October of 2024.  I don't recall the specifics of those.

9        Q    And there's also a public report from Inspector General Horowitz regarding the use of

10    confidential human sources by the FBI on January 6th.  Were you aware of that?  I believe it came out

11    in December 2024, November or December 2024.

12        A    I think I've heard that such a thing existed.  I don't recall reviewing it.

13        Q    During your investigation, did you ever become aware that the FBI had 26 confidential

14    human sources in the D.C. area on January 6th?

15        A    Again, I think that, if I had become aware of anything, specifics, regarding any number of

16    things related to the investigation, whether it's, you know, confidential human sources or virtually

17    anything else, I would be, A, not authorized to discuss it based on the Department's letter; but, B, and

18    more broadly, prohibited by Rule 6 from discussing anything that was obtained pursuant to

19    then-ongoing grand jury investigations.

20        Q    Were you aware of reports of misconduct to the Office of Professional Responsibility

21    pertaining to individuals working on Jack Smith's investigations?

22        A    I am aware of one.

23        Q    Okay.  And what can you tell us about that?

1    A    I can tell you what I remember of public filings that were made on this issue.

2    Q    Uh-huh.

3    A    My recollection is that there was an allegation that a defendant made in the Southern

4    District of Florida, and I don't recall which one, regarding Mr. Bratt.

5    Q    Does "Walt Nauta" help you out at all --

6    A    I don't know --

7    Q    -- for the name of the defendant?

8    A    -- which one it was.  I know Walt Nauta is one of the named defendants, but I don't

9    know if it was him or a different one.

10    I know that there was an allegation made.  I know that there was a briefing on this in

11    Florida -- I believe that there's a transcript -- at which this was discussed.  And my recollection is that,

12    somewhere along the line, the Special Counsel's Office, in a filing or in a transcript, told Judge Cannon

13    in the Southern District of Florida that it had made a self-referral, I believe the language is, to -- and I

14    think it was OPR, the Office of Professional Responsibility.

15    Q    And do you have any knowledge beyond what was in the public findings regarding the

16    incident between Mr. Bratt and Mr. Nauta's counsel, Stanley Woodward?

17    A    I don't have any firsthand knowledge.

18    BY ███████████:

19    Q    Did Mr. Bratt relate anything to you about the allegation?

20    A    I don't recall Mr. Bratt saying anything to me about the allegation.

21    Q    Were you aware that Mr. Woodward was being considered for a judicial post at any

22    point in time?

23    A    I recall that that was part of the allegation.

1        Q       And were you aware that he was being considered for a judicial post separate from that

2    allegation?

3        A       I don't believe so.

4                BY ▊▊▊▊▊▊:

5        Q       Were you ever in contact with OPR?  Did they seek to interview you, ask you for

6    documents or anything?

7        A       No.  The only thing that I remember about OPR -- and I think it's OPR -- at some point

8    late in 2024, I was advised that somebody from OPR had asked for my email address, which seemed

9    odd to me because, as far as I understood, it was available in the directory.

10       Q       Uh-huh.

11       A       But I never received any sort of contact or communication from them that I know of.

12               BY ▊▊▊▊▊▊:

13       Q       Have you had any communication with the Weaponization Working Group that's

14   currently being operated out of the Deputy Attorney General's Office?

15       A       The -- I'm sorry.  Who's on that?

16       Q       What's that?

17       A       Who is on this?

18       Q       There's an initiative inside the Deputy Attorney General's Office currently, a

19   Weaponization Working Group, and one of their missions is to evaluate the prosecution of President

20   Trump.

21               And my question was, have you had any outreach from them?  Have they sought to interview

22   you?

1       A    Not that I know of. I don't think I was familiar with the name of it. I know generally that

2    there was an Attorney General order of some kind that talked about something like this. But, to my

3    knowledge, I have not received outreach from whoever is doing that.

4       Q    If they do reach out to you, do you intend to cooperate with them?

5       Mr. Burton. I don't think we'll -- if what you discuss happens, we'll assess it at the time it

6    happens.

7       █████. So it's possible you may not choose to cooperate if they reach out for questions?

8       Mr. Burton. I don't -- I'm not going to accept your characterization as to what "cooperation"

9    means.

10       ████████ Uh-huh. Sit for an interview.

11       Mr. Burton. We'll assess -- if that event occurs, we'll assess it at the time.

12       ██████ Uh-huh. But it hasn't happened yet? They haven't reached out to you yet?

13       Mr. Burton. No.

14       BY ███████:

15       Q    The materials that the January 6th Committee provided the Justice Department -- what

16    safeguards were implemented, or guardrails, to evaluate the information and provide it in the

17    context of the political spectrum that they were conducted in?

18       So the January 6th was a committee that operated with no, you know, functioning minority.

19    It was essentially a majority-only committee. And, you know, they were on a political mission,

20    essentially, to damage the President.

21       And so the information they collected and produced to the Justice Department was -- you

22    know, certainly had to be viewed in the prism of political -- you know, it's essentially political

23    opposition research provided to the Justice Department.

1    And I'm asking, to what extent were there guardrails or safeguards put in place to handle that

2    material in such a way?

3    Mr. Burton.  I don't think, to the extent that that material is discussed -- and we're not

4    accepting your characterization of the committee or its function or those issues.  I think there's a

5    limited discussion in the special counsel's report, and that's what he's confined to.

6    ████████.  Uh-huh.

7    Mr. Burton.  He has not confirmed nor denied what, if anything, they received from that

8    committee, other than what is in the public domain.  I think he's referenced there may be other

9    references in other public documents, which I think he can discuss.  But, ████████ I don't think he's

10    able to discuss matters relating to the investigatory phase of the special counsel's investigation.

11    BY ████████

12    Q    So what can you tell us about how the Justice Department handled the materials

13    provided by the January 6th Committee?

14    A    I think that I'm limited to two sources of information.

15    The first is the footnote which ████████ pointed me to earlier on page 93.  That's footnote

16    251.  And a sentence which may be, at least in part, responsive to your question is that those

17    materials, meaning the materials obtained from the House Select Committee, comprised a small part

18    of the office's investigative record, and any facts on which the office relied to make a prosecution

19    decision were developed or verified through independent interviews and other investigative steps.

20    So that was the first source of information.

21    The second source of information are the filings that I have pointed you to, which -- I don't

22    remember the exact content, but they are a matter of public record, and there are many more pages

23    than the few sentences that we've covered today -- which may shed light on this.

1      Q     So do I understand it correctly that the communications that the Special Counsel's Office

2    had with the January 6th Committee you can't talk about because of 6(e)?

3      A     I think that what I said before is, to the extent that there were contacts, my

4    understanding is that, from the authorization letter, I would not be permitted to discuss those, if they

5    occurred, other than what's in the public record.

6         And, beyond that, depending on what the questions were -- and I think it probably would

7    cover everything -- that likely implicates Rule 6(e) and possibly other orders, such as the protective

8    order in this case.

9      Q     Okay. So let's say you got a new authorization letter from the Department specifically

10   authorizing you to speak in an unrestricted manner about any communications you had with the

11   January 6th Committee. Would you then be able to provide us --

12       Mr. Burton.  I think --

13              -- with any information?

14       Mr. Burton.  Are you finished? I didn't want to interrupt you.

15       I'll take your nod as a yes.

16       The Department cannot authorize, as it acknowledges in the June 4th letter, a violation of

17   Rule 6(e). And I think we would have to have a very clear understanding as to whether this

18   committee has sought an order from the court permitting a discussion of Rule 6(e), has the

19   Department sought such an order from the court.

20       So I appreciate that there may be another guidance letter from the Department, but the

21   Department, absent a court order, cannot authorize anyone --

22           So --

23       Mr. Burton.  -- to violate Rule 6(e).

1          ████████████ So is it your position that communications that somebody had on a special

2     counsel team with the January 6th Committee would be covered by 6(e)?

3          Mr. Burton.  I think if it is for the purpose of the investigation, yes, I think that is interpreted

4     broadly by the courts.  And if you or the Department wants to get an order narrowing that, that's

5     your prerogative.

6          ████████████ Okay.

7          Ready to go off the record?

8          ████████████ We can go off the record.

9          [Recess.]

1    [3:16 p.m.]

2            ███████. It is 3:16.  We can go back on the record.

3                    BY ███████:

4        Q    I want to return to the conversation in the earlier hour about the order entered

5    pursuant to local criminal Rule 57.7(c).  You remember that conversation?

6        A    I do.

7        Q    The Special Counsel Smith report page 112 notes that, quote, "A significant" --

8    Ms. Suen.  What page?

9            ███████. Page 112.

10                   BY ███████:

11       Q    Says, "A significant challenge that the office faced after Mr. Trump's indictment was his

12   ability and willingness to use his influence and following on social media to target witnesses, courts,

13   and Department employees, which required the office to engage in time-consuming litigation to

14   protect witnesses from threats and harassment."

15       Do you see where it says that?

16       A    I do.

17                           [Windom Exhibit No. 9

18                           was marked for identification.]

19                   BY ███████:

20       Q    I want to introduce as exhibit 9, the government's motion to ensure that extrajudicial

21   statements do not prejudice these proceedings.  It's document number -- ECF No. 57.

22       A    Thank you.

1      Q    But on the first page of this pleading, the second sentence of the first paragraph reads,

2    "Through his statements, the defendant" -- referring to President Trump -- "threatens to undermine

3    the integrity of these proceedings and prejudice the jury pool, in contravention of the 'undeviating

4    rule' that in our justice system a jury's verdict is 'to be induced only by evidence and argument in

5    open court, and not by any outside influence.'"

6      Do you see where it says that?

7    A    I do.

8    Q    What does it mean to undermine the integrity of the proceedings in this context?

9    A    I think that the remainder of both this motion and the district court's discussion of it on

10    the record kind of bear out with more specificity exactly what that statement means.

11      As a general matter, the Rule 57.7 order that was sought by the special counsel and then

12    ultimately entered by the district court and narrowed but affirmed in large part, is my recollection, by

13    the circuit court sought to, in summary, prevent intimidation and threats to witnesses, and also to

14    protect the integrity of what was then going to be a forthcoming trial by jury.

15    Q    And what was the specific concern about impacting the jury pool?

16    A    I think that there were a few. And if you give me a moment, I'd like to look through here

17    to make sure that I state it correctly.

18      I recall some discussion in this document and at the hearing on the motion about potentially

19    polluting the jury pool with information -- false or disparaging information about witnesses or

20    putative witnesses, prosecutors, the court system. I recall some discussion of a concern that there

21    were a number of false accusations that to that point had been levied. I recall verified threats and

22    harassment that had occurred of witnesses as identified, I think, nonspecifically, because I believe

1    that there's a redacted version or redacted appendix, that to the extent that the intimidation or

2    harassment were successful, it would have had the ability to influence those witnesses' testimony.

3         Q       What about the threats as on page 7 of the pleading?  I don't want to call them threats,

4    but I'll just read from the tweets themselves that are cited here.

5         August 8th, 2023, 4:47 p.m., Donald J. Trump posted, "The Obama-appointed judge in the

6    free speech indictment of me by my political opponent, crooked Joe Biden's Department of Injustice,

7    shared professional ties with the law firm that worked for energy company Burisma."  And it goes on.

8         How is the law firm paid?  "So horrible.  This is a classic conflict of interest."  Gateway pundit,

9    in quotes.

10        And then the following tweet that's included on this page reads, "There's no way I can get a

11    fair trial with a judge, quote/unquote, 'assigned' to the ridiculous freedom of speech/fair elections

12    case.  Everybody knows this, and so does she, exclamation point.  We will be immediately asking for

13    recusal of this judge on very powerful grounds, and likewise for venue change out if" -- a mistake.  I

14    think it's supposed to say "out of D.C."

15        See where it says that?

16        A       I do see that.

17        Q       How did those type of tweets, those type of posts by President Trump, who at this time

18    was the defendant in the case, how did those risk impairing the integrity of the case?

19        A       I think that what we wrote -- or what the special counsel wrote in the filing was that

20    these two specifically were examples of the defendant attacking, undermining, and attempting to

21    intimidate the court and the jury pool.  These are some -- this is one of the categories of information.

22    I think that there are a number of subsections and a number of examples that are used in this motion

23    to describe the conduct.

1          And then there is a section, I believe it starts around page 12, which discusses that it is

2    reasonably likely that statements such as these would prejudice the jury pool.

3          Q      In other words, these types of statements could make it impossible to have a fair trial in

4    this case. Is that a fair statement of the concern with respect to the jury pool?

5          A      I don't know if I would adopt the word "impossible," hence why I will rest on whatever

6    language there is in this pleading. I think, generally speaking, there was a concern that the

7    defendant's statements would lead to intimidation of witnesses and would undermine the integrity

8    of the justice system.

9          Q      So fair to say that the goal of this pleading was to ensure that there could be a fair trial.

10   In other words, this was designed to protect the integrity of the proceedings?

11         A      The intent of this motion, the intent of local Rule 57.7 specifically, which has existed on

12   the books long before the Special Counsel's Office filed a motion on that, my understanding, is to

13   protect the fair administration of justice.

14         Q      And then there was some discussion in the prior hour about the order that was entered

15   by the district court and the court of appeals ruling. I want to introduce those both for the record.

16   We'll do the order from Judge Chutkan, which is ECF No. 105, as exhibit 10. And then we'll do the

17   court of appeals ruling which is dated December 8th, 2023, as exhibit 11.

18                              [Windom Exhibit Nos. 10 and 11

19                                marked for identification.]

20                  BY⬛⬛⬛⬛⬛:

21         Q      And take as long as you'd like to review. And I'm going to ask you if having reviewed

22   this, if it refreshes your recollection about the extent of, first, Judge Chutkan's ruling, and then,

23   ultimately, you said in the prior hour that much of the order was left intact by the D.C. Circuit. And

1  so to ask you if this refreshes your recollection, if you can talk more about what ultimately was left in

2  place. I think the language is perhaps on page 30.

3          A     Sure. This generally comports with my recollection. My recollection is that this

4  obviously was heavily litigated. It was the subject of briefing in the district court. It was the subject

5  of briefing in the circuit court.

6          You may notice that there's a header on the top of the circuit court opinion which says "Public

7  Copy -- Sealed Information Deleted," because there's some redacted portions which my recollection

8  is that that is some of the evidence that supported the motion.

9          And, ultimately, the circuit court affirmed in part the district court's opinion. And it lays out

10  various things that both -- and this is I think important -- both the defendant and the government

11  could not do. So the order, my understanding, is applied to all parties and their counsel.

12          Q     And you said that, in the prior hours, well, that you felt that that was important. Why

13  do you emphasize that point?

14          A     The allegation, if I remember correctly, was made somewhere along the line that this

15  was intended only to apply to the defendant. But my recollection of the local rule, and then now that

16  I'm seeing this again in the circuit court order, was that it applies equally to both parties.

17          Q     I am going to move on. Page 2 of the cover letter accompanying Special Counsel Smith's

18  report about -- in the second full paragraph about halfway through. This is paragraph -- Special

19  Counsel Smith is talking about the work done by the prosecutors on his team. And he says, "The

20  intense public scrutiny of our office, threats to their safety -- referring to prosecutors' safety -- and

21  relentless unfounded attacks on their character and integrity did not deter them from fulfilling their

22  oaths and professional obligations."

23          Do you see where it says that?

1    A    I do.

2         Q    Mr. Windom, were threats and harassment an issue of concern to prosecutors working

3    on this case?

4         A    I will speak for myself.  They were -- I was aware that -- of these -- of the potential for

5    threats and harassment.

6         Q    And how were you aware of that potential?

7         A    Public statements that I saw.  I was generally aware that I -- individuals on the team had

8    received communications of one kind or another.  I was personally made aware that there was some

9    information somewhere on the internet specifically about me in terms of at least what I would

10   consider a threat and at a minimum harassment.  I know just based on the volume of incoming mail

11   that occasionally I saw there was a lot of mail directed to the office that fits the description that the

12   special counsel put in his letter.

13        Q    Did the threats and harassment and the volume of mail that you've described, did that

14   impact your office's ability to do its work?  And I understand you can only speak from your own

15   perspective.

16        A    Not in my mind.

17        Q    Thank you.

18        ▇▇▇▇▇▇▇    We can go off the record.  Thank you.

19        [Discussion off the record.]

20        ▇▇▇▇▇▇▇    Can we go back on the record now?

21        Mr. Burton.  Thank you both, to all staff.

22        With respect to this -- today's voluntary transcribed interview, following the majority's second

23   session of questioning, after which we took a short lunch break, when I came back I was asked by

1    majority staff whether the Department of Justice had contacted us. I advised majority staff that,

2    during the break, I checked my communications. It is my practice to turn off my phone when I am

3    representing a client in a situation like this.

4            And during that second questioning session, I was -- I received a voice mail from two

5    individuals from the Department of Justice's Office of Legislative Affairs. One is not an attorney. The

6    other is, I think, an attorney. I promptly called them back during the break and left my mobile phone

7    number, which is also available on my firm's website. And I have yet, as of the last break, received a

8    responsive communication. So I did try to call them back. I wanted to put that on the record.

9            The second thing is, we had, as majority staff knows, requested that a Department of Justice

10   representative be permitted to be in the room during today's process. I was advised that under the

11   committee rules, that is not the committee's practice, nor is it permitted. But I was advised that a

12   Department representative would be outside if there was a need for consultation. I wanted to put

13   on the record that at no time today was there a Department of Justice person outside at least to

14   identify themselves to us at any time. So thank you.

15           █████████     Thank you. We can go off the record.

16   [Whereupon, at 3:34 p.m., the interview was adjourned.]

1                 Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the answers made

5 by me to the questions therein recorded.

6

7

8

9                        _____

10                               Witness Name

11

12

13                        _____

14                                  Date

15

# EXHIBIT H

ONE HUNDRED NINETEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY
2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

July 21, 2025

Mr. Thomas Windom
Former Senior Assistant Special Counsel
c/o Mr. Preston Burton
Orrick, Herrington & Sutcliffe LLP
2100 Pennsylvania Ave NW
Washington, DC 20037

Dear Mr. Windom:

On April 7, 2025, the Committee requested your voluntary cooperation with our oversight into the programs and operations of the Department of Justice under the Biden-Harris Administration.[1] In particular, you were asked to testify regarding your role as a prosecutor on former Special Counsel Jack Smith's team.[2] On June 12, 2025, during your transcribed interview with the Committee, you declined to answer multiple questions on the basis that the Department had not authorized testimony about those topics. You also declined to answer several questions asserting that your answers would implicate Rule 6(e) of the Federal Rules of Criminal Procedure (FRCP). The Committee is not persuaded by either your assertion that the Department's authorization is a necessary precondition for your testimony or by your overly expansive interpretation of Rule 6(e). Therefore, due to your refusal to answer these questions during your voluntary transcribed interview, the Committee has decided to issue compulsory process to obtain your testimony about these matters.

## A. Your refusal to provide testimony based on the Department's authorization letter is unfounded.

The Committee's April 7 letter requested your testimony on "your role as a prosecutor on former Special Counsel Jack Smith's team" and other related matters.[3] The letter provided a non-exhaustive list of examples of misconduct by the Special Counsel's Office that the Committee sought to examine in greater detail.[4] The Committee's request did not limit the scope of the information sought or condition your testimony on authorization from the Department. As an

---

[1] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Thomas Windom, Former Senior Assistant Special Counsel, (Apr. 7, 2025).
[2] *Id.*
[3] *Id.*
[4] *Id.*

Mr. Thomas Windom
July 21, 2025
Page 2

accommodation to you and in an effort to ensure your thorough and unconstrained testimony, on three occasions—April 24, May 27, and June 2—the Committee provided your attorney topics that it anticipated would be discussed during your transcribed interview.[5]

Despite these accommodations and efforts to ensure that you provided comprehensive testimony, you declined to answer questions on the basis that the Department had not authorized your testimony on those matters.[6] Your reasoning is unpersuasive. As an initial matter, authorization from an Executive Branch entity is not a necessary condition for a witness to testify before Congress.[7] The Committee is not aware of any such Constitutional or statutory requirement, and you have offered none, conditioning a witness's cooperation with a Congressional committee on the basis of the express authorization from his former employer.[8] Such a requirement would contravene fundamental principles of separation of powers and severely restrict Congress's ability to conduct oversight of the Executive Branch.

However, even assuming the Department is required to authorize your testimony, it did so here. In an email dated May 29, 2025—two weeks prior to your testimony—the Department provided your attorney with the anticipated scope for the Committee's interview, a list that included four broad topics and 20 subtopics.[9] On June 4, the Department consolidated and organized these items into five topics, and granted you specific, written authorization to "provide unrestricted testimony to the Committees [*sic*], irrespective of potential privilege," on these topics.[10] Rather than raise concerns or seek clarification about the nature and scope of the Department's authorization and/or the Committee's inquiry in the hope of resolving them prior to your testimony, your attorney chose to lodge unfounded and conspiratorial accusations about amorphous conflicts of interest that allegedly prevented the Department from properly authorizing your testimony.[11]

During your transcribed interview, you relied on an unreasonably narrow interpretation of the testimonial authorization to decline to answer questions about topics specifically identified by the Department as part of the scope of the Committee's inquiry.[12] Those topics included,

---

[5] Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Preston Burke, Counsel for Mr. Thomas Windom (April 24, 2025, 2:00 p.m.); Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Mr. Preston Burke, Counsel for Mr. Thomas Windom (May 27, 2025, 3:00 p.m.); Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Mr. Preston Burke, Counsel for Mr. Thomas Windom (June 2, 2025, 2:00 p.m.).

[6] *See, e.g.,* Transcribed Interview of Thomas Windom, Senior Assistant Special Counsel USAO D.C., at 23, 34, 35, 39-40, 112, 116 (June 12, 2025) [hereinafter Windom Interview].

[7] *See generally Watkins v. United States*, 354 U.S. 178, 187-88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.").

[8] In fact, Congress has repeatedly protected the ability of witnesses to testify freely and fully. *See, e.g.*, Pub. L. No. 118-47, Further Consolidated Appropriations Act Div. B, § 713 (2024); Pub. L. No. 118-83, Continuing Appropriations and Extension Act, 2025 (2024) (extending § 713); Pub. L. No. 119-4, Full-Year Continuing Appropriations and Extensions Act, 2025 (2025) (same).

[9] Email from Ernesto Sampera, Office of Legis. Aff., U.S. Dep't of Just., to Preston Burton, Orrick, Herrington & Sutcliffe LLP (May 29, 2025, 07:37 EST) (on file with the Committee) [hereinafter DOJ Email].

[10] Letter from Brian Nieves, Office of the Deputy Att'y Gen., U.S. Dep't of Just., to Thomas Windom, Esq., (June 4, 2025) (on file with the Committee) [hereinafter Authorization Letter].

[11] *See* Letter from Preston Burton to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, 2 (June 11, 2025).

[12] DOJ Email, *supra* note 9.

Mr. Thomas Windom
July 21, 2025
Page 3

among others, your interactions with (i) the partisan January 6th Select Committee, (ii) Fulton County District Attorney employees, (iii) the National Archives and Records Administration, and (iv) the U.S. Postal Service.[13] In addition, you invoked an absurd and indefensible interpretation of the Department's authorization, refusing to testify about communications with Federal Bureau of Investigation (FBI) officials on the grounds that FBI officials were not included in the definition of "DOJ officials."[14] This position is nonsensical because the FBI is a component of the Department of Justice and the Department specifically informed your attorney that the Committee would inquire about communications with FBI officials.[15] Finally, you refused to provide certain details, including names, about the other prosecutors you worked with during your investigation into President Trump citing lack of specific Department authorization.[16] These positions are in direct conflict with the Department's clear direction to provide "unrestricted testimony" about the topics under inquiry.[17]

### B.  Your reliance on an overbroad interpretation of FRCP Rule 6(e) is misplaced.

The Department did note a limited exception for "information subject to FRCP Rule 6(e)," which protects the secrecy of "matter[s] occurring before the grand jury."[18] However, during your transcribed interview, you adopted an expansive interpretation of Rule 6(e) to decline to answer questions that were, at most, only tangentially related to grand jury proceedings.[19] On this basis, you refused to answer certain questions related to materials obtained from and interactions you may have had with the partisan January 6th Select Committee, as well as your interactions with the FBI to obtain billing records from the Willard Hotel.[20]

Federal courts have been clear that Rule 6(e) does not "require . . . that a veil of secrecy be drawn over *all matters* occurring in the world that happen to be investigated by a grand jury."[21] The "mere fact that information has been presented to the grand jury does not itself permit withholding."[22] Documents and testimony created for an independent purpose, "not directly related to the prospect of a grand jury"[23] do not constitute a "matter before a grand jury"

---

[13] *See* Windom Interview, *supra* note 6, at 35, 39-40, 112, 116.

[14] *See* Windom Interview, *supra* note 6, at 34; *see also* Authorization Letter, *supra* note 10, at 1.

[15] DOJ Email, *supra* note 9. In fact, federal law authorizes the Attorney General, the head of the Department of the Justice, to investigate violation of criminal laws, *see* 28 U.S.C. § 533, an authority that has been delegated to the Director of the FBI. 28 C.F.R. § 0.85. It is simply a bad-faith interpretation of the Department's authorization letter to assert that FBI employees are not included within the meaning of "DOJ officials."

[16] Windom Interview, *supra* note 6, at 23.

[17] Authorization Letter, *supra* note 10, at 2.

[18] Authorization Letter, *supra* note 10, at 2; Fed. R. Crim. P. 6(e)(2)(B).

[19] *See* Windom Interview, *supra* note 6, at 16, 19-21, 33, 34-35, 68, 93, 112-113, 114-115, 124, 129-130. In response to some questions, you listed multiple reasons for refusing to answer the Committee's questions, including unidentified court orders and the Department's authorization letter, in addition to your interpretation of Rule 6(e), and did not make clear your specific basis of refusal. *Id.* at 93, 112-113, 114-116, 129.

[20] Windom Interview, *supra* note 6, at 19-21, 33-34, 92-93, 113-114.

[21] SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (emphasis added).

[22] Labow v. Dep't of Justice, 831 F. 3d 523, 529 (D.C. Cir. 2016).

[23] SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1383 (D.C. Cir. 1980).

Mr. Thomas Windom
July 21, 2025
Page 4

and are thus not protected by Rule 6(e).[24] Quite simply, "there is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers."[25]

During your transcribed interview, you relied on Rule 6(e) as a shield to deny the Committee information that is not properly implicated by Rule 6(e). For example:

- You declined to answer any questions about your knowledge of a February 2021 proposal that J.P. Cooney brought to the FBI to investigate President Trump and the individuals within his orbit on the ground that Rule 6(e) covers all matters in "the course of an investigation."[26] However, the Committee specifically caveated the question to exclude "information you learned from a grand jury,"[27] and your personal knowledge about a potential FBI investigative matter does not constitute a "matter before the grand jury."[28]

- You declined to answer questions about your interactions with FBI officials related to potential evidence in the possession of the Willard Hotel.[29] Our questions on this topic related to your general knowledge and interactions with Department officials, including ADIC Steven D'Antuono, about obtaining this material.[30] Your discussions with Department officials and your general knowledge of potential evidence do not properly qualify as Rule 6(e) material.

- Your counsel advised you against testifying about communications between the Special Counsel's office and the partisan January 6th Select Committee, asserting that they were covered by Rule 6(e) because it was "for the purpose of the investigation."[31] Here, too, there is no serious argument that these interactions could qualify as "matter[s] before the grand jury."[32]

Because these, and similar, questions did not seek to "reveal anything concerning the innerworkings of the grand jury,"[33] there is no legitimate basis for you to refuse to testify about these topics on the basis of Rule 6(e).

The Committee has conducted transcribed interviews of several other current and former Department employees who provided testimony about these and other topics without revealing material protected by Rule 6(e). For example, former Special Counsel's Office senior prosecutor J.P. Cooney testified that he "had communication with staff on the Select Committee about

---

[24] Fed R. Crim. P. 6(e)(2)(B).
[25] Senate of Commonwealth P.R. v. Dep't of Just., 823 F.2d 574, 582 (D.C. Cir. 1987).
[26] Windom Interview, *supra* note 6, at 19-21.
[27] Windom Interview, *supra* note 6, at 21, 33.
[28] Fed. R. Crim. P. 6(e)(2)(B).
[29] Windom Interview, *supra* note 6, at 33-34.
[30] *Id.*
[31] Windom Interview, *supra* note 6, at 130.
[32] Fed. R. Crim. P. 6(e)(2)(B).
[33] Labow v. Dep't of Justice, 831 F. 3d 523, 583.

Mr. Thomas Windom
July 21, 2025
Page 5

obtaining information."[34] Likewise, Department tax attorneys Jack Morgan and Mark Daly testified about their interactions with the FBI, including investigatory steps and evidence collection.[35] Viewed in context of these transcribed interviews, your over-broad interpretation of Rule 6(e) needlessly hampers the Committee's oversight.

### C. Your reliance on unidentified court orders is insufficient.

The Department also included a narrow exception regarding the disclosure of information that is "prohibited by law or court."[36] During your interview, you relied on this narrow exception to refuse to answer questions on certain topics without ever identifying the particular cases or judicial orders preventing your testimony.[37] For example, you asserted vaguely that "potentially the protective order in the case" and "possibly other orders" prohibited you from answering questions related to the partisan January 6th Select Committee and your interactions with congressional staffers.[38] Without offering any specific reference to a court order, the Committee is unable to assess independently whether your testimony would be covered by such order and whether that order still remains in effect. Your reliance on generalized and unspecified court orders is an insufficient basis on which to refuse to testify.

*     *     *

Pursuant to Rule X of the House of Representatives, the Committee has jurisdiction to conduct oversight of the Department to inform potential legislative reforms.[39] These reforms may include, among other proposals, changes to the Special Counsel regulations and codifying language that would prevent the Department from selectively prosecuting current and former elected officials. The Committee sought your voluntary cooperation with our inquiry because, due to your service as a senior official on Special Counsel Jack Smith's team, it believes you possess information that is vital to oversight on this matter. Your refusal to answer several questions in your transcribed interview impedes the Committee's oversight, and your stated bases for declining to cooperate fully are not persuasive.

Accordingly, please find enclosed a subpoena compelling your attendance at a deposition at 10:00 a.m. on September 30, 2025.

---

[34] Transcribed Interview of J.P. Cooney, Deputy Special Counsel, at 66 (June 24, 2025).
[35] *See, e.g.,* Transcribed Interview of Jack Morgan, Trial Attorney, Dep't of Just., Tax Div., at 27 (May 22, 2025); Transcribed Interview of Mark Daly, Senior Litigation Counsel, Dep't of Just., Tax Div., at 69-70, 124 (May 7, 2025).
[36] Authorization Letter, *supra* note 10, at 2.
[37] Windom Interview, *supra* note 6, at 93, 114-115, 129.
[38] Windom Interview, *supra* note 6, at 93, 115.
[39] Rules of the House of Representatives R. X.

Mr. Thomas Windom
July 21, 2025
Page 6

      Thank you for your prompt attention to this matter.

                   Sincerely,

                   Jim Jordan
                   Chairman

cc:    The Honorable Jamie Raskin, Ranking Member

Enclosure

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Thomas Windom

You are hereby commanded to be and appear before the

Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: _____
>
> Date: _____          Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2237 Rayburn House Office Building
>
> Date: September 30, 2025          Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at the city of Washington, D.C. this 21st day of July , 2025.

*Chairman or Authorized Member*

Attest: _____

*Clerk*

# PROOF OF SERVICE

Subpoena for

Thomas Windom

Address  2100 Pennsylvania Ave NW Washington, DC 20037

before the  Committee on the Judiciary

*U.S. House of Representatives*
*119th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

# EXHIBIT I

Home / News / Press Releases

## Chairman Jordan Subpoenas Prosecutor from Former Special Counsel Jack Smith's Team for Deposition

July 21, 2025        Press Release

WASHINGTON, D.C. – Today, House Judiciary Committee Chairman Jim Jordan (R-OH) subpoenaed Thomas Windom for a deposition before the Committee regarding his role as a prosecutor on former Special Counsel Jack Smith's team after Windom refused to answer several questions during a voluntary transcribed interview.

During Windom's transcribed interview with the Committee, he relied on an unreasonably narrow interpretation of the Justice Department's testimonial authorization to decline to answer questions about topics including the partisan January 6th Select Committee and Fulton County District Attorney employees.

Windom also refused to provide certain details about the other prosecutors he worked with during his investigation into President Trump citing lack of specific Department authorization. These positions are in direct conflict with the Department's clear direction to provide "unrestricted testimony" about the topics under inquiry.

Additionally, Windom relied on an overbroad interpretation of Rule 6(e) of the Federal Rules of Criminal Procedure in refusing to answer questions about his interactions with the Federal Bureau of Investigation (FBI) to obtain billing records from the Willard Hotel, his knowledge of a potential FBI investigative matter into President Trump and individuals within his orbit, and communications with the partisan January 6th Select Committee. This position is unsupported by federal court rulings on Rule 6(e) and thus does not create a legitimate basis to refuse to testify.

The Committee has jurisdiction to conduct oversight of the Department to inform potential legislative reforms, including changes to the Special Counsel regulations and codifying language that would prevent the Department from selectively prosecuting current and former elected officials. The Committee believes Thomas Windom possess information that is vital to its oversight on this matter, and Windom's refusal to answer several questions in his transcribed interview impedes the Committee's oversight, making compulsory process necessary.

Read the full subpoena cover letter to Thomas Windom here.

###



Washington DC Office
2138 Rayburn House Building
Washington, DC 20515
Phone: (202) 225-6906

Washington District Office
2142 Rayburn House Building
Washington, DC 20005

Democratic Site

Copyright    Privacy    House.gov    Accessibility    RSS

# EXHIBIT J



**Orrick, Herrington & Sutcliffe LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

+1 202 339 8400
orrick.com

August 5, 2025

*Via E-Mail*

Chairman Jim Jordan
House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, DC  20515-6216

**Preston Burton**

**E**  pburton@orrick.com
**D**  +1 202 349 8065
**F**  +1 202 339 8500

> **Re:**    **U.S. House of Representatives Committee on the Judiciary Subpoena to Thomas P. Windom, Dated July 21, 2025**

Dear Chairman Jordan:

We write on behalf of our client Thomas P. Windom regarding the July 21, 2025, deposition subpoena issued by the U.S. House of Representatives Committee on the Judiciary ("Committee") to Mr. Windom relating to his service in the Office of Special Counsel Jack Smith.  The subpoena commands Mr. Windom's appearance before the Committee on September 30, 2025.

Mr. Windom has cooperated with the Committee, sitting for some five and a half hours of testimony in a voluntary transcribed interview on June 12, 2025.  Yet the cover letter accompanying the subpoena distorts Mr. Windom's testimony and contains numerous factual and legal misrepresentations.  As to the factual record, a tit-for-tat refutation of the many misstatements in the Committee's cover letter is not productive.  Suffice it to say that the record of Mr. Windom's voluntary interview diverges from how the interview is portrayed in the cover letter.

The legal misstatements, however, require a response.  Moreover, as described below, because the Committee failed to seek further guidance and clarification from the Department of Justice ("Department") in advance of Mr. Windom's voluntary interview, it is now incumbent on us to seek such guidance to settle any disputed issues before a deposition occurs.

Prior to Mr. Windom's voluntary appearance, I contacted both Committee staff and Department personnel identified by staff to understand the scope of the Committee's desired testimony and the Department's position.  On April 24, 2025, I asked staff to specify the topics about which the Committee intended to inquire.    Committee staff offered several general, very broad topics, including:    "the constitutionality of [the Special Counsel's] appointment," how the Special Counsel "ran his investigation," how evidence was "mis-ordered in the search at Mar-a-Lago," "the seizure of [Representative] Scott Perry's cell phone," and the "dismissal of the cases" against President Trump.  Contrary to the description in the cover letter, I asked staff for more specificity regarding interview topics on May 27, 2025, and was promised that they would get back to me with greater specificity on topics and documents after they spoke to the Department.  Committee staff then emailed the Department—but not us—listing intended topics, including ones about which the Committee previously had not informed us.  The Department—not staff—shared that list with us, on my request, on May 29, 2025.  I confirmed with staff on June 2, 2025, that the list I was provided by the Department was accurate.  On June 4, 2025, the Department then sent me a letter authorizing Mr. Windom to discuss at his interview a narrower subset of only five of the 20 or so intended topics for which the Committee sought Department authorization.



Chairman Jim Jordan
August 5, 2025
Page 2

Notwithstanding the dissimilarities between the Committee's broad list of intended topics and the narrow topics the Department approved in its authorization letter, the Committee did not, at least to my knowledge, seek clarification or expansion from the Department prior to Mr. Windom's voluntary appearance. Nor, despite your staff's promise to the contrary, was an authorized representative from the Department made available outside the Committee room during Mr. Windom's voluntary testimony to opine on any disagreements over what the Department authorized. Also, the Committee has not, to our knowledge, sought clarification or expansion from the Department in the nearly two months since Mr. Windom voluntarily appeared. This background is absent from the Committee's cover letter.

The cover letter also mischaracterizes and misunderstands the legal restrictions on prosecutors regarding grand jury information. Our interpretation of the scope of Federal Rule of Criminal Procedure 6(e)—informed by legal precedent and my and my client's prior service as federal prosecutors—cannot have been a surprise to the Committee, as we discussed this issue with Committee staff on April 24, 2025; May 27, 2025; and June 2, 2025. Similarly, despite the cover letter's contention to the contrary, we and Mr. Windom identified with specificity—in correspondence prior to Mr. Windom's voluntary interview and on the transcribed record—court orders that limited Mr. Windom's ability to answer certain Committee questions. Rather than place the burden on Mr. Windom to risk violating Rule 6(e) or other court orders, the appropriate course of action would have been for the Committee to seek clarification from the Department or judicial authority. The Committee did not do so, and instead chose to subpoena Mr. Windom without acknowledging that, absent a change in what he is permitted to say, Mr. Windom can only provide pursuant to compulsory process the same answers he already provided voluntarily.

As previously stated, rather than engaging in yet another unproductive debate with Committee staff about the legal authority permitting or restricting Mr. Windom's testimony, we are seeking precise written guidance from the Department directly. Please find attached our letter to the Department. We request that any additional areas of inquiry the Committee intends to pursue be clearly communicated in writing to the Department and to us by Friday, August 15, 2025, so that any disputes can be resolved well in advance of the September 30, 2025, noticed date for Mr. Windom's deposition.

Sincerely,

Preston Burton

Rachel Li Wai Suen

Attachment (Department Letter)

cc:    The Hon. Jamie Raskin, Ranking Member, U. S. House of Representatives Committee on the Judiciary
       Dario Camacho, Supervisory Official, Department of Justice Office of Legislative Affairs
       Ernesto Sampera, Department of Justice, Office of Legislative Affairs.

# EXHIBIT K



**Orrick, Herrington & Sutcliffe LLP**

2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

+1 202 339 8400
orrick.com

August 5, 2025

*Via E-Mail*

Dario Camacho, Supervisory Official
Ernesto Sampera
Office of Legislative Affairs
United States Department of Justice
Main Justice Building Room 1137
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

**Preston Burton**

E pburton@orrick.com
D +1 202 349 8065
F +1 202 339 8500

Re:    **U.S. House of Representatives Committee on the Judiciary Subpoena
to Thomas P. Windom, Dated July 21, 2025**

Dear Mr. Camacho and Mr. Sampera:

We write on behalf of our client Thomas P. Windom regarding the July 21, 2025, deposition subpoena issued by the U.S. House of Representatives Committee on the Judiciary ("Committee") to Mr. Windom relating to his service in the Office of Special Counsel Jack Smith. A copy of the subpoena and its accompanying cover letter is attached as Exhibit 1. The subpoena commands Mr. Windom's appearance before the Committee for a deposition on September 30, 2025.

As you both know, Mr. Windom appeared voluntarily before the Committee for a transcribed interview on June 12, 2025. We understand from the Committee that the purpose of the compulsory deposition is to re-ask certain questions Mr. Windom declined to answer during his voluntary interview based on legal and ethical considerations. *See* Exhibit 1 at 1 ("Therefore, due to your refusal to answer these questions during your voluntary transcribed interview, the Committee has decided to issue compulsory process to obtain your testimony about these matters."). For example, Mr. Windom declined to answer certain questions because the June 4, 2025, authorization and guidance letter to Mr. Windom from the Office of the Deputy Attorney General (attached as Exhibit 2) did not authorize him to provide a substantive response, as described more fully below.

Furthermore, consistent with the June 4 letter's acknowledgement that Mr. Windom must comply with Federal Rule of Criminal Procedure 6(e) and court orders, Mr. Windom also declined to respond to questions that implicated his obligations under Rule 6(e), sealing orders issued by federal judges in the Middle District of Pennsylvania and the District of Columbia, and the protective order in *United States v. Trump*, Case No. 23-CR-257 (D.D.C.). Mr. Windom also clearly stated throughout the interview his willingness to answer questions regarding publicly accessible litigation documents.

The Committee's cover letter accompanying the subpoena cites Mr. Windom's efforts to comply with court orders and other legal requirements during his voluntary interview to justify compelling his deposition. The Committee's letter is replete with misstatements regarding what occurred during the voluntary interview. Rather than engage in fruitless exchanges with the Committee or undertake a point-by-point debunking of its misstatements and rhetoric, it is now incumbent upon us to do what the Committee failed to do: obtain additional information and clarification from the Department to enable Mr. Windom to comply with his obligations to the Department, the courts, and the Committee. We have copied the Committee on this letter to furnish it the opportunity to identify any additional areas of deposition inquiry beyond those described in its July 21 cover letter.

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 2



### 1.  Scope of Authorization from the Department of Justice

#### A.  Department position on constitutionality and validity of House subpoena

As a threshold matter, we seek the Department's position on whether the Committee's deposition subpoena is unconstitutional and invalid.  As the June 4 authorization letter acknowledges, historically the Department has carefully governed the information it provides to Congress to account for relative constitutional interests.  This is why, as the authorization letter notes, it is relatively unprecedented for the Department to permit Congress to question line-level prosecutors regarding their work for the Department.

Given the unusual and infrequent nature of such inquiries, clear Department guidance necessitates the involvement of agency counsel at a deposition.  Indeed, during President Trump's first term, the Department's Office of Legal Counsel issued a formal legal opinion that congressional subpoenas—such as the one served on Mr. Windom—compelling depositions but barring the presence of agency counsel are unconstitutional and invalid and cannot result in civil or criminal liability for failure to comply.  *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. 131, 131 (2019) (stating that "Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement").  The Office of Legal Counsel has specifically advised that "where…a committee deposition is likely to inquire into privileged communications, the committee may not validly prevent an Executive Branch witness from receiving the assistance of agency counsel." *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. 286, 289 (2019); *see also* 43 Op. O.L.C. at 141 ("The Executive Branch cannot foresee every question or topic that may arise during a deposition, but if questions seeking privileged information are asked, agency counsel, if present, can ensure that the employee does not impermissibly disclose privileged information.").  The Office of Legal Counsel's legal opinion holding such subpoenas unconstitutional and invalid applies to former Department attorneys like Mr. Windom.  *See* 43 Op. O.L.C. at 140 ("When employees testify about information created or received during their employment, they are disclosing the Executive Branch's information.  The same thing is true for former employees.").

Here, the Committee has indicated that Department counsel will not be permitted to attend Mr. Windom's deposition.  The House of Representatives rules furnished to Mr. Windom along with the July 21, 2025, deposition subpoena state, *inter alia*:

> Witnesses may be accompanied at a deposition by two designated personal, non-governmental attorneys to advise them of their rights.  Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's two designated attorneys are permitted to attend.  *Other persons, including government agency personnel, may not attend.*

171 Cong. Rec. H146 (daily ed. Jan. 14, 2025) (emphasis supplied).

Prior to Mr. Windom's voluntary interview, we requested that the Committee permit Department counsel to be present in the room during that interview.  *See* June 11, 2025, Letter to Chairman Jim Jordan (attached hereto as Exhibit 3) at 3 n.3.  The Committee rejected our request, notwithstanding that—unlike its rules for depositions—no House rule bars agency counsel from attending voluntary interviews.  Instead, Committee staff assured us that a Department representative would be present outside of the interview room during Mr. Windom's interview to provide additional guidance, if necessary.  However, no such

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 3



Department representative was present.[1]  Given that disputes over scope occurred during the voluntary interview, they may occur again during a compelled deposition.  It therefore is important to have the ability to consult with agency counsel, consistent with the concerns prompting the issuance of the Office of Legal Counsel's 2019 legal opinion.  Accordingly, please advise us whether the Department deems the deposition subpoena to Mr. Windom unconstitutional and invalid, consistent with the Office of Legal Counsel's 2019 legal opinion.  To be clear, Mr. Windom takes no position on the constitutionality of the subpoena, but requests that the Department advise him of its position on this issue well in advance of the noticed deposition date.

      B.   The scope of the Department's authorization

The Committee claims that its inquiry of Mr. Windom was not, and cannot be, conditioned on Department approval.  The Committee's position is directly contrary to the Department's June 4 authorization letter.  *Compare* Exhibit 1 at 2 ("As an initial matter, authorization from an Executive Branch entity is not a necessary condition for a witness to testify before Congress.") *with* Exhibit 2 at 1 ("Department attorneys are obligated to protect non-public information that they learn in the course of their work.").  Mr. Windom was a line prosecutor whose knowledge of the matters the Committee wishes to explore is subject to the Department's attorney-client, work product, and executive privileges.  Notwithstanding the Committee's legally flawed contention to the contrary, Mr. Windom cannot testify about such matters without Department authorization.  *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020) ("recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation" and "have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege").  The Committee well knows this, which is why it sought such authorization from the Department in the first place, and suggested during the interview that it may obtain a new authorization letter and bring Mr. Windom back.  And, as the Department acknowledged in the June 4 authorization letter, it typically resists such requests from Congress regarding line prosecutors.  *See* Exhibit 2 at 2 n.1 (citing the Linder Letter).

The Department's June 4 authorization letter was by its plain terms limited to the voluntary transcribed interview.  *See* Exhibit 2 at 1 ("The Department of Justice . . . understands that you have been requested by the U.S. House of Representatives Committee on the Judiciary . . . to provide a transcribed interview relating to your service in the Office of Special Counsel Jack Smith.  In this interview, you are authorized . . . . ").  Should the Department elect to authorize Mr. Windom to testify pursuant to the deposition subpoena, we request that it confirm any such authorization in writing.

If the Department intends to authorize Mr. Windom to testify at a deposition about the topics identified in the June 4 authorization letter, the scope of that authorization is disputed, and we request that the Department provide more specific guidance.  The Committee takes a broad view of the narrow permission granted under the existing authorization letter.  The Committee's cover letter cites the following as matters about which Mr. Windom declined to testify as outside the scope of the Department's authorization, namely interactions with:

      (i)     "the partisan January 6th Select Committee";

---

[1] As I stated on the record at the conclusion of the voluntary transcribed interview, the two of you left a voicemail message on my office phone, not mobile phone, during the interview.  During an interview break, we learned about the call, returned it, and left a message, providing my mobile number.  The interview then continued and eventually concluded, and we are not aware of any further attempts by you to contact us during the interview, despite me checking for messages during the afternoon breaks.

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 4



      (ii)      "Fulton County District Attorney employees";[2]
      (iii)     "the National Archives and Records Administration"; and
      (iv)     "the U.S. Postal Service."

Exhibit 1 at 2-3.[3]  It also cites Mr. Windom's declination to name certain non-supervisory line prosecutors, and to discuss his interactions with Federal Bureau of Investigation (FBI) agents or other federal law enforcement agents who supported either the Special Counsel's Office or work related to Mr. Windom's detail to the United States Attorney's Office for the District of Columbia prior to his service in the Special Counsel's Office.  Critically, the Committee's authorization request to the Department in May 2025, *see* Exhibit 3 at Exhibit A, specified each of these areas of potential inquiry (save the names of individual line prosecutors), but the Department's June 4 authorization letter does not reference any of them.  The Committee's May 2025 request to the Department also identified two specific FBI Washington Field Office individuals as requested topics; the June 4 Department response did not include those individuals' names or reference the FBI at all.  Rather, the Department's June 4 authorization letter permitted discussion of Mr. Windom's interaction with "DOJ officials" and immediately thereafter named two particular *supervisory* Department attorneys within the Special Counsel's Office.  Exhibit 2 at 1.

      Accordingly, if the Department wishes to approve Mr. Windom's naming of line-level Department attorneys, FBI agents, federal law enforcement agents, or other individual Department or agency employees with whom he interacted but whose names are not on a publicly available docket, Mr. Windom requests specific written authorization from the Department.  Absent expansion of the June 4 authorization letter or additional clarification by the Department, we cannot assume that the Department has authorized the disclosure of such information.  Further, if the Department does permit such an expanded scope of testimony, we request assurance that Mr. Windom's compelled sharing of such personal information to the Committee does not violate the Privacy Act or other applicable law.  *See* United States Department of Justice Office of Privacy and Civil Liberties, *Overview of the Privacy Act: 2020 Edition*, https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/disclosures-third-parties ("Federal officials handling personal information are 'bound by the Privacy Act not to disclose any personal information and to take certain precautions to keep personal information confidential.'") (quoting *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 650 (7th Cir. 2013)); *Bartel v. Fed. Aviation Admin.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984) ("The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records.").

**2.  Rule 6(e) Disclosure Prohibitions**

      Committee staff take a narrow view of the restrictions regarding grand jury secrecy set forth in Federal Rule of Criminal Procedure 6(e), characterizing it as a "limited exception."  *See* Exhibit 1 at 3.  This is legally wrong; permitted disclosure of Rule 6(e) information is actually the limited exception.  *See, e.g.*, *In re Capitol Breach Grand Jury Investigations within the Dist. Of Columbia*, 339 F.R.D. 1, 8 (D.D.C. 2021) (Howell, C.J.) (A "district court must 'hew strictly to the list of exceptions to grand jury secrecy' set out in Rule 6(e)(3), which … are 'exhaustive,' and 'must be narrowly construed.'" (citing *McKeever v. Barr*, 920 F.3d 842, 845–47 (D.C. Cir. 2019))).

---

[2] The Committee's assertion that Mr. Windom "decline[d] to answer questions about" any "interactions with . . . Fulton County District Attorney employees" is false.  In fact, in response to a question about communications that the Special Counsel's Office had with the Fulton County District Attorney's Office, Mr. Windom stated that he did not recall being part of any such communication, and further that he was not aware of anyone in the Special Counsel's Office having substantive communications with that office.

[3] The issues regarding some of these topics appear less related to a scope concern than a Rule 6(e) concern, as addressed more fully below.

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 5



The Committee incorrectly suggests that Rule 6(e) protects only "information [Mr. Windom] learned from a grand jury." Exhibit 1 at 4. Decades of caselaw take a broader view. *See generally* Michael A. Foster, *Federal Grand Jury Secrecy: Legal Principles and Implications for Congressional Oversight*, Cong. Rsch. Serv., R45456 11 nn.84-87 (2019) (citing cases). Indeed, the D.C. Circuit has confirmed that Rule 6(e) is *not* limited to information a prosecutor "learns from a grand jury"; rather, it broadly encompasses a range of information including "the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, *the strategy or direction of the investigation*, the deliberations or questions of jurors, and the like." *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499-500 (D.C. Cir. 1998) (internal quotations omitted, emphasis supplied). "Disclosure of which documents the grand jury considered reveals, at the very least, the direction of the grand jury's investigation and the names of persons involved, and thus falls within Rule 6(e)(2)." *In re: Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986).

The Department clearly stated in its June 4 authorization letter, consistent with authority in the D.C. federal courts, that Mr. Windom was not authorized to share Rule 6(e) information with the Committee. *See* Exhibit 2 at 2; *see also In re Grand Jury Impaneled Oct. 2, 1978 (79-2)*, 510 F. Supp. 112, 116 (D.D.C. 1981) (denying congressional committee request for grand jury materials "to fulfill its oversight responsibilities" because no Rule 6(e) exception applied). In addition, the determination of whether something has occurred before a grand jury for purposes of applying Rule 6(e) is reserved to the judicial branch, not the executive or legislative branches. *See In re Grand Jury Impaneled Oct. 2, 1978 (79-2)*, 510 F. Supp. at 114 (court determining whether Rule 6(e) permitted production of certain documents by DOJ to congressional committee); *see also Dow Jones*, 142 F.3d at 499-500 (court interpreting meaning of phrase "matters occurring before the grand jury").

The D.C. Circuit also has emphasized that disclosure of matters occurring before a grand jury—even for a long-closed investigation—is permitted only under limited enumerated circumstances. *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019). Accordingly, the fact that grand jury matters, such as the relevant ones on which Mr. Windom worked, are now closed, does not, absent a court order pursuant to one of the limited Rule 6(e) exceptions or a judicial finding that the requested information is not "occurring before a grand jury," permit a former (or even current) government attorney to disclose such information on their own assessment. *See, e.g.*, Memorandum Opinion and Order, *In re: Grand Jury Nos. 16-3, 18-1, and 19-1*, 1:21-gj-26 (D.D.C. Aug. 6, 2021) (holding that the Department "must demonstrate that the subpoenaed documents 'would not necessarily reveal a connection to the grand jury'" and ultimately rejecting the Department's request to disclose to other federal government components for civil or administrative enforcement purposes documents produced in response to grand jury subpoenas issued in an investigation that had closed without criminal charges).

The Committee's generic instruction to simply avoid disclosing material "learned" from a grand jury does not resolve this issue. And the cases cited by the Committee most certainly do *not* stand for the proposition that Rule 6(e) permits the questioning of a former prosecutor regarding the direction and inner workings of a grand jury investigation. *See, e.g.*, Exhibit 1 at 3 (citing *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1383 (D.C. Cir. 1980), in which the court determined that documents requested by SEC "were created for an independent corporate purpose" and were not covered by Rule 6(e) solely because they were also produced to a grand jury in a separate investigation). In any event, the Committee has not sought relief from the District Court and instead seeks to place the burden upon Mr. Windom to interpret Rule 6(e) perfectly, with criminal contempt of court looming as a potential penalty for any proven misstep in doing so.

The Committee's cover letter cites the following as matters about which Mr. Windom declined to testify on Rule 6(e) grounds:

(i)     Requests to describe "materials obtained from and interactions you may have had with the partisan January 6th Select Committee";

(ii)    Possible "interactions with the FBI to obtain billing records from the Willard Hotel";

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 6



      (iii)    Mr. Windom's knowledge of an alleged February 2021 investigative proposal by another Assistant United States Attorney.[4]

Exhibit 1 at 3, 4.

      The basis for the Committee's questions regarding the Willard Hotel is a Washington Post article referenced by Committee staff. The article describes a purported discussion involving serving a grand jury subpoena on the Willard Hotel in connection with developing evidence related to several unindicted persons, at least in the grand jury matters in issue, described as being involved in conduct under criminal investigation. *See* Carol D. Leonnig and Aaron C. Davis, FBI Resisted Opening Probe into Trump's Role in Jan. 6 for More than a Year, Wash. Post (June 19, 2023), https://www.washingtonpost.com/investigations/2023/06/19/fbi-resisted-opening-probe-into-trumps-role-jan-6-more-than-year.

      The Committee's questions related to the article's claim that Mr. Windom's request to issue a grand jury subpoena to the Willard Hotel was rebuffed by an FBI individual. When asked during his voluntary transcribed interview about the interaction claimed in the newspaper article, Mr. Windom stated that he did not recall an episode like this occurring and, given the relative responsibilities of agents and prosecutors, he would find it surprising that such an episode would have taken place. (As the Department is well aware, an Assistant United States Attorney does not require FBI approval or assistance to issue and serve a grand jury subpoena on an entity.)

      Although the Department's June 4 authorization letter permitted Mr. Windom to discuss "subpoenas issued (including those related to the Willard Hotel)," that authorization was cabined only to information that did not implicate Rule 6(e) or other court orders. *See* Exhibit 2 at 1-2. Testimony related to any such conversation about whether to issue a grand jury subpoena as described in the newspaper article would directly implicate longstanding grand jury secrecy considerations, which are particularly important as related to unindicted persons.[5] As such, the scenario being pursued by the Committee bespeaks caution for Department attorneys asked to testify about such matters in the absence of very clear Department and judicial authority. We do not know what questions were posed to the other witnesses described in the Committee's cover letter, Exhibit 1 at 4-5, or what they or their attorneys regarded as authorized or permissible areas of testimony. We do know that the Department contested in federal court in Washington, D.C., the Committee's efforts to require Messrs. Daly and Morgan to testify. *See* Docket, *Comm. on the Judiciary of the United States House of Representatives v. Daly*, 24-cv-815 (D.D.C.).

      Again, rather than debate the point with the Committee or have Mr. Windom risk an incorrect assessment of where precisely the Rule 6(e) line should be drawn, please advise us no later than Friday, August 15, 2025, as to the Department's position on whether it believes these topics implicate the restrictions set forth in Rule 6(e), including whether the Department has obtained or intends to obtain court guidance on these issues. *Accord In re: Capitol Breach Grand Jury Investigations Within the Dist. Of Columbia*, 339 F.R.D. 1, n.7 (D.D.C. 2021) (Howell, C.J.) (commending government for seeking advance permission to disclose vast amounts of grand jury materials to outside litigation support vendor to assist it in providing discovery materials to defense and ultimately rejecting same because no exception permitted this disclosure of grand jury materials to non-government personnel).[6]

---

[4] The reason for the Committee's inquiry of Mr. Windom on this latter topic is unclear. At the time the investigative proposal allegedly was made in February 2021, Mr. Windom served in the United States Attorney's Office for the District of Maryland, not the District of Columbia.

[5] The Washington Post article names several unindicted individuals affiliated with President Trump in connection with the purported reasons for issuing a grand jury subpoena to the Willard Hotel.

[6] Our recollection is that Mr. Windom also may have declined to respond based on Rule 6(e) concerns when asked certain questions about the seizure pursuant to a warrant of Congressman Scott Perry's cell phone and about

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 7



### 3. Court Orders

Similarly, the Committee's July 21 cover letter states that Mr. Windom, in his voluntary interview, cited court orders to "refuse to answer questions on certain topics without ever identifying the particular cases or judicial orders preventing [his] testimony." Exhibit 1 at 5. This is not true. In the very next sentence of its letter, the Committee acknowledges that Mr. Windom referenced "the protective order in the case"—the case being *United States v. Trump*, before Judge Tanya S. Chutkan in the United States District Court for the District of Columbia. Mr. Windom referenced this order at least twice, and we further specifically referenced it as well. Additionally, Mr. Windom cited certain public access litigation, both in the Middle District of Pennsylvania and the District of Columbia, which resulted in heavily redacted documents being released to the public while also maintaining a judicial seal over other information. *See, e.g.*, *In re Application of Penn Live*, No. 22-mc-00756, ECF No. 105 (M.D. Pa. April 4, 2025) (order unsealing documents including warrant for Congressman Perry's cellphone); *In the Matter of the Search and Forensic Copy of the Cell Phone of Representative Scott Perry*, No. 22-sc-02144, ECF No. 45 (D.D.C. Feb. 24, 2023) (order unsealing records regarding the Congressman Perry cell phone litigation in the District of Columbia).

We also referenced these orders with the Committee in advance of Mr. Windom's testimony. *See* Exhibit 3 at 2. Setting aside that the Committee cannot credibly claim these references are too vague for it to "assess" (Exhibit 1 at 5), Mr. Windom made it abundantly clear multiple times in his voluntary testimony that he was willing and able to answer the Committee's questions regarding publicly available documents, should the Committee show him any—even going so far as to specifically identify publicly available documents the Committee may wish to review. Any suggestion that Mr. Windom was not forthcoming or that he was unwilling to answer questions when he voluntarily appeared before the Committee is demonstrably false. We request that the Department advise us in writing of its position on the continued viability of the protective order issued by Judge Chutkan and sealing orders issued by federal courts in the Middle District of Pennsylvania and the District of Columbia and, again, whether it has sought any guidance from the pertinent courts on this matter.

\*     \*     \*

Mr. Windom sat for an extensive voluntary interview and wishes to cooperate with the Committee, but he also is bound by ethical rules and legal obligations as recognized and confirmed by the Department. Resolving the disputed issues identified above is of urgent and paramount importance, given that Mr. Windom must adhere to those responsibilities and has now been compelled to appear yet again before the Committee. We therefore request that the Department provide us its position on each of the issues identified in this letter and summarized below no later than Friday, August 15, 2025:

(i)    Whether the July 21, 2025, subpoena, which does not permit counsel from the Department to be present, is invalid, consistent with the Office of Legal Counsel's opinion in *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. 131 (2019).

(ii)   Whether the Department authorizes Mr. Windom to testify pursuant to the July 21 deposition subpoena.

---

allegations regarding the use of confidential human sources by the FBI on January 6th. These issues are not mentioned in the Committee's letter. Similarly, the Committee's letter omits some topics where Mr. Windom may have declined to respond based on a lack of Department authorization, including questions regarding communications with the White House. It is unclear whether the Committee intends to revisit any of these other topics at Mr. Windom's deposition.

Dario Camacho, Supervisory Official
Ernesto Sampera
August 5, 2025
Page 8



(iii)  The specific scope of the Department's authorization, if any, for Mr. Windom to testify pursuant to the July 21 deposition subpoena.  In particular, please specify whether Mr. Windom is authorized to name line-level Department attorneys, FBI agents, federal law enforcement agents, or other individual Department or agency employees with whom he interacted but whose names are not on the publicly available docket.

(iv)  If the Department intends to expand its authorization from what it previously provided in its June 4 letter regarding Mr. Windom's voluntary interview, to permit Mr. Windom to testify regarding the specific non-supervisory individuals referenced in item (iii) above, please state the Department's position regarding whether such disclosure by Mr. Windom would violate the Privacy Act (5 U.S.C. § 552a) or other applicable law.

(v)  The Department's position as to whether the topics described on pages 5-6 above, and in footnote 6, implicate the restrictions on disclosure set forth in Federal Rule of Criminal Procedure 6(e). Also, please advise whether the Department has obtained or intends to obtain a judicial ruling on this issue.

(vi)  The Department's position on whether the protective order issued by Judge Chutkan in *United States v. Trump*, 23-CR-257 (D.D.C.), and the relevant sealing orders issued by courts in the Middle District of Pennsylvania and the District of Columbia remain valid.  Please also advise whether the Department has obtained or intends to obtain judicial rulings on these issues.

Thank you for your prompt attention to this matter.  As previously stated, we are copying the Committee on this request to furnish them with the opportunity to identify in the same timeframe—in writing and with specificity—any additional issues or topics it intends to question Mr. Windom about at a deposition.

Sincerely,

Preston Burton

Rachel Li Wai Suen

Attachments:   July 21, 2025, Committee Deposition Subpoena to Thomas Windom and accompanying letter and attachments (Exhibit 1)
June 4, 2025, Letter from Brian Nieves to Thomas Windom (Exhibit 2)
June 11, 2025, Letter from Preston Burton and Rachel Li Wai Suen to Chairman Jim Jordan, including attached exhibits (Exhibit 3)

cc:   The Hon. Jim Jordan, Chair, U. S. House of Representatives Committee on the Judiciary
The Hon. Jamie Raskin, Ranking Member, U. S. House of Representatives Committee on the Judiciary

# EXHIBIT 1

ONE HUNDRED NINETEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

July 21, 2025

Mr. Thomas Windom
Former Senior Assistant Special Counsel
c/o Mr. Preston Burton
Orrick, Herrington & Sutcliffe LLP
2100 Pennsylvania Ave NW
Washington, DC 20037

Dear Mr. Windom:

On April 7, 2025, the Committee requested your voluntary cooperation with our oversight into the programs and operations of the Department of Justice under the Biden-Harris Administration.[1] In particular, you were asked to testify regarding your role as a prosecutor on former Special Counsel Jack Smith's team.[2] On June 12, 2025, during your transcribed interview with the Committee, you declined to answer multiple questions on the basis that the Department had not authorized testimony about those topics. You also declined to answer several questions asserting that your answers would implicate Rule 6(e) of the Federal Rules of Criminal Procedure (FRCP). The Committee is not persuaded by either your assertion that the Department's authorization is a necessary precondition for your testimony or by your overly expansive interpretation of Rule 6(e). Therefore, due to your refusal to answer these questions during your voluntary transcribed interview, the Committee has decided to issue compulsory process to obtain your testimony about these matters.

## A. Your refusal to provide testimony based on the Department's authorization letter is unfounded.

The Committee's April 7 letter requested your testimony on "your role as a prosecutor on former Special Counsel Jack Smith's team" and other related matters.[3] The letter provided a non-exhaustive list of examples of misconduct by the Special Counsel's Office that the Committee sought to examine in greater detail.[4] The Committee's request did not limit the scope of the information sought or condition your testimony on authorization from the Department. As an

---

[1] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Thomas Windom, Former Senior Assistant Special Counsel, (Apr. 7, 2025).
[2] *Id.*
[3] *Id.*
[4] *Id.*

Mr. Thomas Windom
July 21, 2025
Page 2

accommodation to you and in an effort to ensure your thorough and unconstrained testimony, on three occasions—April 24, May 27, and June 2—the Committee provided your attorney topics that it anticipated would be discussed during your transcribed interview.[5]

Despite these accommodations and efforts to ensure that you provided comprehensive testimony, you declined to answer questions on the basis that the Department had not authorized your testimony on those matters.[6] Your reasoning is unpersuasive. As an initial matter, authorization from an Executive Branch entity is not a necessary condition for a witness to testify before Congress.[7] The Committee is not aware of any such Constitutional or statutory requirement, and you have offered none, conditioning a witness's cooperation with a Congressional committee on the basis of the express authorization from his former employer.[8] Such a requirement would contravene fundamental principles of separation of powers and severely restrict Congress's ability to conduct oversight of the Executive Branch.

However, even assuming the Department is required to authorize your testimony, it did so here. In an email dated May 29, 2025—two weeks prior to your testimony—the Department provided your attorney with the anticipated scope for the Committee's interview, a list that included four broad topics and 20 subtopics.[9] On June 4, the Department consolidated and organized these items into five topics, and granted you specific, written authorization to "provide unrestricted testimony to the Committees [*sic*], irrespective of potential privilege," on these topics.[10] Rather than raise concerns or seek clarification about the nature and scope of the Department's authorization and/or the Committee's inquiry in the hope of resolving them prior to your testimony, your attorney chose to lodge unfounded and conspiratorial accusations about amorphous conflicts of interest that allegedly prevented the Department from properly authorizing your testimony.[11]

During your transcribed interview, you relied on an unreasonably narrow interpretation of the testimonial authorization to decline to answer questions about topics specifically identified by the Department as part of the scope of the Committee's inquiry.[12] Those topics included,

---

[5] Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Preston Burke, Counsel for Mr. Thomas Windom (April 24, 2025, 2:00 p.m.); Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Mr. Preston Burke, Counsel for Mr. Thomas Windom (May 27, 2025, 3:00 p.m.); Phone Call Between Comm. Staff, H. Comm. on the Judiciary, and Mr. Preston Burke, Counsel for Mr. Thomas Windom (June 2, 2025, 2:00 p.m.).

[6] *See, e.g.,* Transcribed Interview of Thomas Windom, Senior Assistant Special Counsel USAO D.C., at 23, 34, 35, 39-40, 112, 116 (June 12, 2025) [hereinafter Windom Interview].

[7] *See generally Watkins v. United States*, 354 U.S. 178, 187-88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.").

[8] In fact, Congress has repeatedly protected the ability of witnesses to testify freely and fully. *See, e.g.*, Pub. L. No. 118-47, Further Consolidated Appropriations Act Div. B, § 713 (2024); Pub. L. No. 118-83, Continuing Appropriations and Extension Act, 2025 (2024) (extending § 713); Pub. L. No. 119-4, Full-Year Continuing Appropriations and Extensions Act, 2025 (2025) (same).

[9] Email from Ernesto Sampera, Office of Legis. Aff., U.S. Dep't of Just., to Preston Burton, Orrick, Herrington & Sutcliffe LLP (May 29, 2025, 07:37 EST) (on file with the Committee) [hereinafter DOJ Email].

[10] Letter from Brian Nieves, Office of the Deputy Att'y Gen., U.S. Dep't of Just., to Thomas Windom, Esq., (June 4, 2025) (on file with the Committee) [hereinafter Authorization Letter].

[11] *See* Letter from Preston Burton to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, 2 (June 11, 2025).

[12] DOJ Email, *supra* note 9.

Mr. Thomas Windom
July 21, 2025
Page 3

among others, your interactions with (i) the partisan January 6th Select Committee, (ii) Fulton County District Attorney employees, (iii) the National Archives and Records Administration, and (iv) the U.S. Postal Service.[13] In addition, you invoked an absurd and indefensible interpretation of the Department's authorization, refusing to testify about communications with Federal Bureau of Investigation (FBI) officials on the grounds that FBI officials were not included in the definition of "DOJ officials."[14] This position is nonsensical because the FBI is a component of the Department of Justice and the Department specifically informed your attorney that the Committee would inquire about communications with FBI officials.[15] Finally, you refused to provide certain details, including names, about the other prosecutors you worked with during your investigation into President Trump citing lack of specific Department authorization.[16] These positions are in direct conflict with the Department's clear direction to provide "unrestricted testimony" about the topics under inquiry.[17]

## B. Your reliance on an overbroad interpretation of FRCP Rule 6(e) is misplaced.

The Department did note a limited exception for "information subject to FRCP Rule 6(e)," which protects the secrecy of "matter[s] occurring before the grand jury."[18] However, during your transcribed interview, you adopted an expansive interpretation of Rule 6(e) to decline to answer questions that were, at most, only tangentially related to grand jury proceedings.[19] On this basis, you refused to answer certain questions related to materials obtained from and interactions you may have had with the partisan January 6th Select Committee, as well as your interactions with the FBI to obtain billing records from the Willard Hotel.[20]

Federal courts have been clear that Rule 6(e) does not "require . . . that a veil of secrecy be drawn over *all matters* occurring in the world that happen to be investigated by a grand jury."[21] The "mere fact that information has been presented to the grand jury does not itself permit withholding."[22] Documents and testimony created for an independent purpose, "not directly related to the prospect of a grand jury"[23] do not constitute a "matter before a grand jury"

---

[13] *See* Windom Interview, *supra* note 6, at 35, 39-40, 112, 116.

[14] *See* Windom Interview, *supra* note 6, at 34; *see also* Authorization Letter, *supra* note 10, at 1.

[15] DOJ Email, *supra* note 9. In fact, federal law authorizes the Attorney General, the head of the Department of the Justice, to investigate violation of criminal laws, *see* 28 U.S.C. § 533, an authority that has been delegated to the Director of the FBI. 28 C.F.R. § 0.85. It is simply a bad-faith interpretation of the Department's authorization letter to assert that FBI employees are not included within the meaning of "DOJ officials."

[16] Windom Interview, *supra* note 6, at 23.

[17] Authorization Letter, *supra* note 10, at 2.

[18] Authorization Letter, *supra* note 10, at 2; Fed. R. Crim. P. 6(e)(2)(B).

[19] *See* Windom Interview, *supra* note 6, at 16, 19-21, 33, 34-35, 68, 93, 112-113, 114-115, 124, 129-130. In response to some questions, you listed multiple reasons for refusing to answer the Committee's questions, including unidentified court orders and the Department's authorization letter, in addition to your interpretation of Rule 6(e), and did not make clear your specific basis of refusal. *Id.* at 93, 112-113, 114-116, 129.

[20] Windom Interview, *supra* note 6, at 19-21, 33-34, 92-93, 113-114.

[21] SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (emphasis added).

[22] Labow v. Dep't of Justice, 831 F. 3d 523, 529 (D.C. Cir. 2016).

[23] SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1383 (D.C. Cir. 1980).

Mr. Thomas Windom
July 21, 2025
Page 4

and are thus not protected by Rule 6(e).[24] Quite simply, "there is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers."[25]

      During your transcribed interview, you relied on Rule 6(e) as a shield to deny the Committee information that is not properly implicated by Rule 6(e). For example:

- You declined to answer any questions about your knowledge of a February 2021 proposal that J.P. Cooney brought to the FBI to investigate President Trump and the individuals within his orbit on the ground that Rule 6(e) covers all matters in "the course of an investigation."[26] However, the Committee specifically caveated the question to exclude "information you learned from a grand jury,"[27] and your personal knowledge about a potential FBI investigative matter does not constitute a "matter before the grand jury."[28]

- You declined to answer questions about your interactions with FBI officials related to potential evidence in the possession of the Willard Hotel.[29] Our questions on this topic related to your general knowledge and interactions with Department officials, including ADIC Steven D'Antuono, about obtaining this material.[30] Your discussions with Department officials and your general knowledge of potential evidence do not properly qualify as Rule 6(e) material.

- Your counsel advised you against testifying about communications between the Special Counsel's office and the partisan January 6th Select Committee, asserting that they were covered by Rule 6(e) because it was "for the purpose of the investigation."[31] Here, too, there is no serious argument that these interactions could qualify as "matter[s] before the grand jury."[32]

Because these, and similar, questions did not seek to "reveal anything concerning the innerworkings of the grand jury,"[33] there is no legitimate basis for you to refuse to testify about these topics on the basis of Rule 6(e).

      The Committee has conducted transcribed interviews of several other current and former Department employees who provided testimony about these and other topics without revealing material protected by Rule 6(e). For example, former Special Counsel's Office senior prosecutor J.P. Cooney testified that he "had communication with staff on the Select Committee about

---

[24] Fed R. Crim. P. 6(e)(2)(B).
[25] Senate of Commonwealth P.R. v. Dep't of Just., 823 F.2d 574, 582 (D.C. Cir. 1987).
[26] Windom Interview, *supra* note 6, at 19-21.
[27] Windom Interview, *supra* note 6, at 21, 33.
[28] Fed. R. Crim. P. 6(e)(2)(B).
[29] Windom Interview, *supra* note 6, at 33-34.
[30] *Id.*
[31] Windom Interview, *supra* note 6, at 130.
[32] Fed. R. Crim. P. 6(e)(2)(B).
[33] Labow v. Dep't of Justice, 831 F. 3d 523, 583.

Mr. Thomas Windom
July 21, 2025
Page 5

obtaining information."[34] Likewise, Department tax attorneys Jack Morgan and Mark Daly testified about their interactions with the FBI, including investigatory steps and evidence collection.[35] Viewed in context of these transcribed interviews, your over-broad interpretation of Rule 6(e) needlessly hampers the Committee's oversight.

### C. Your reliance on unidentified court orders is insufficient.

The Department also included a narrow exception regarding the disclosure of information that is "prohibited by law or court."[36] During your interview, you relied on this narrow exception to refuse to answer questions on certain topics without ever identifying the particular cases or judicial orders preventing your testimony.[37] For example, you asserted vaguely that "potentially the protective order in the case" and "possibly other orders" prohibited you from answering questions related to the partisan January 6th Select Committee and your interactions with congressional staffers.[38] Without offering any specific reference to a court order, the Committee is unable to assess independently whether your testimony would be covered by such order and whether that order still remains in effect. Your reliance on generalized and unspecified court orders is an insufficient basis on which to refuse to testify.

\*      \*      \*

Pursuant to Rule X of the House of Representatives, the Committee has jurisdiction to conduct oversight of the Department to inform potential legislative reforms.[39] These reforms may include, among other proposals, changes to the Special Counsel regulations and codifying language that would prevent the Department from selectively prosecuting current and former elected officials. The Committee sought your voluntary cooperation with our inquiry because, due to your service as a senior official on Special Counsel Jack Smith's team, it believes you possess information that is vital to oversight on this matter. Your refusal to answer several questions in your transcribed interview impedes the Committee's oversight, and your stated bases for declining to cooperate fully are not persuasive.

Accordingly, please find enclosed a subpoena compelling your attendance at a deposition at 10:00 a.m. on September 30, 2025.

---

[34] Transcribed Interview of J.P. Cooney, Deputy Special Counsel, at 66 (June 24, 2025).
[35] *See, e.g.,* Transcribed Interview of Jack Morgan, Trial Attorney, Dep't of Just., Tax Div., at 27 (May 22, 2025); Transcribed Interview of Mark Daly, Senior Litigation Counsel, Dep't of Just., Tax Div., at 69-70, 124 (May 7, 2025).
[36] Authorization Letter, *supra* note 10, at 2.
[37] Windom Interview, *supra* note 6, at 93, 114-115, 129.
[38] Windom Interview, *supra* note 6, at 93, 115.
[39] Rules of the House of Representatives R. X.

Mr. Thomas Windom
July 21, 2025
Page 6

     Thank you for your prompt attention to this matter.

              Sincerely,

              Jim Jordan
              Chairman

cc:    The Honorable Jamie Raskin, Ranking Member

Enclosure

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Thomas Windom
_____

You are hereby commanded to be and appear before the

Committee on the Judiciary ▼
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: _____
>
> Date: _____        Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2237 Rayburn House Office Building
>
> Date: September 30, 2025        Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____        Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff
_____
_____  to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 21st day of July , 2025.

*Chairman or Authorized Member*

Attest: _____

*Clerk*

# PROOF OF SERVICE

Subpoena for

Thomas Windom

Address 2100 Pennsylvania Ave NW Washington, DC 20037

before the Committee on the Judiciary

*U.S. House of Representatives*
*119th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

# EXHIBIT 2



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC 20530*

June 4, 2025

Thomas Windom, Esq.
Washington, DC

Dear Mr. Windom:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on the Judiciary (Committee) to provide a transcribed interview relating to your service in the Office of Special Counsel Jack Smith. In this interview, you are authorized to provide information that you learned while at the Department as described more fully below.

The Committee has identified specific topics of inquiry about which they have requested information from you. These topics are:

1. The process by which you were selected to serve on the Special Counsel team and your prior interactions with Special Counsel Jack Smith;

2. Your interactions with DOJ officials, including JP Cooney and Jay Bratt, and any matters related to allegations of ethical lapses or investigations by the Office of Professional Responsibility (OPR);

3. Your knowledge of interviews conducted, subpoenas issued (including those related to the Willard Hotel), and the contents of court filings you personally signed in that case;

4. Your involvement, if any, in the investigation concerning classified documents involving former President Donald J. Trump;

5. Your role in the seizure of Representative Scott Perry's cell phone, including the basis for the seizure, the scope of the investigation, who conducted the imaging of the phone and why, and the contents of any related court filings you signed.

Department attorneys are obligated to protect non-public information that they learn in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the

Thomas Windom, Esq.
Page 2

Department has sought to balance the Executive Branch's confidentiality interests with Congress' legitimate need to gather information.[1]

In addition, Department attorneys must protect deliberations concerning investigations and prosecutions that were ongoing while they serve in the Department. The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations. If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."[2] Discussion of pending criminal cases and possible charges could also violate court rules and implicate rules of professional conduct governing extra-judicial statements.

Further, the Department has a longstanding policy of making only appropriate supervisory personnel – and not line attorneys or agents – available to respond to congressional oversight requests. This policy reflects the reality that Department decisions are made by its supervisory personnel, not line employees and, over the years, this policy has allowed Congress to "fulfill its oversight responsibilities without undermining the independence of line attorneys and agents."[3]

Nevertheless, the extraordinary events underlying this matter constitute exceptional circumstances warranting an accommodation to Congress in this particular case. Given these extraordinary circumstances, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, as limited in paragraphs 1–5 above. This accommodation is unique to the facts and circumstances of this particular matter.

Although you are authorized to provide information responsive to the topics outlined above, you are not authorized to reveal information the disclosure of which is prohibited by law or court, including classified information and information subject to Federal Rule Criminal Procedure 6(e).

---

[1] *See* Letter to Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, at 2 (Jan. 27, 2000) [hereinafter Linder Letter] ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

[2] Linder Letter at 5–6.

[3] Linder Letter at 6.

Thomas Windom, Esq.
Page 3


        If you have questions with respect to the direction detailed above, please contact the
Office of Legislative Affairs.

                                        Sincerely,

                                        Brian Nieves
                                        Office of the Deputy Attorney General

# EXHIBIT 3



**Orrick, Herrington & Sutcliffe LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

+1 202 339 8400
**orrick.com**

June 11, 2025

Chairman Jim Jordan
House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, DC 20515-6216

**Preston Burton**

E  pburton@orrick.com
D  +1 202 349 8065
F  +1 202 339 8500

Re:     Thomas P. Windom Voluntary Transcribed Interview

Dear Chairman Jordan:

We represent Thomas P. Windom.  Until his unlawful termination in January 2025, Mr. Windom served with distinction as a career Department of Justice prosecutor for twelve years.

We are in receipt of the Committee's April letter requesting that Mr. Windom voluntarily appear for a transcribed interview.  We strongly disagree with the letter's characterization that Special Counsel Jack Smith, Mr. Windom, or any other attorneys assigned to the Special Counsel's Office pursued a "partisan and politically motivated prosecution of Donald J. Trump."  That statement is false and unfounded—as confirmed by the United States District Court when President Trump's counsel made similar allegations. Rather, Mr. Windom faithfully executed his prosecutorial duties and responsibilities.  The Indictment and the Superseding Indictment charging President Trump with federal felonies related to the 2020 presidential election were the result of a thorough and impartial investigation guided by the facts and applicable law, and they were returned by the citizens who served on the grand juries convened by the United States District Court.

Notwithstanding the false premise underlying the Committee's request, we have engaged with Committee staff in good faith.  Mr. Windom intends to voluntarily appear tomorrow for the requested interview.

During our discussions with Committee staff, we requested that they provide specific topics, questions, and documents in advance of the voluntary interview.  We were instead provided with broad topic descriptions and advised that the Committee would be using only unspecified publicly available documents, including newspaper articles and Volume One of the January 7, 2025, Final Report of the Special Counsel.

We requested specificity not only to enable Mr. Windom a reasonable opportunity to prepare for his interview, but also to enable the Department of Justice to meaningfully consider its position with respect to privileged and confidential information implicated by the Committee's request.  To that end, we reached out to the Department for guidance, and it advised us that the Committee provided it with a broad list of

Chairman Jim Jordan
June 11, 2025
Page 2



potential topics, which the Department then shared with us.  *See* May 29, 2025, email to Preston Burton from Ernesto Sampera (listing the Committee's intended scope) (attached hereto as Exhibit A).

The Department thereafter provided us with written guidance that, as it acknowledges, breaks with decades of Department policy regarding congressional requests to interview career Department attorneys.[1] Specifically, the Department authorizes Mr. Windom to provide the Committee with information limited to five specific topics.  *See* June 4, 2025, letter to Thomas Windom, Esq., from Brian Nieves, U.S. Department of Justice, Office of the Deputy Attorney General (attached hereto as Exhibit B).  The Department did not, however, respond to our request for written confirmation that former members of President Trump's personal legal team, including the Deputy Attorney General and Principal Associate Deputy Attorney General, recused themselves from deciding whether to authorize Mr. Windom's testimony.  *See* May 20, 2025, email from Preston Burton to Ernesto Sampera (attached hereto as Exhibit C).  Its failure to provide any such confirmation is especially troubling since the Department official who authorized Mr. Windom's limited testimony is Deputy Chief of Staff in the Office of the Deputy Attorney General and, until a few months ago, was Deputy Chief Counsel for the Committee.[2]

Notwithstanding its abrogation of decades of policy, the Department's guidance letter confirms that Mr. Windom is legally barred from discussing matters covered by Federal Rule of Criminal Procedure 6(e), other laws, or court orders.  As such, Mr. Windom is unable to discuss matters occurring before the grand jury.  Nor is he able to discuss classified information, 26 U.S.C. § 6103 information, or information covered by protective orders and sealing orders issued during the relevant investigation and prosecution.  We are not aware of any effort by the Department or the Committee to seek relief from these laws, orders, and obligations regarding the Committee's inquiry.  We trust that the Committee, and especially its attorney staff, will eschew posing questions that may attempt to induce Mr. Windom to breach his professional and legal obligations with respect to the five limited topics that the Department approved, as doing so would implicate their own professional ethical duties.  *See, e.g.*, D.C. Bar Rule of Professional Conduct 8.4.

The Committee has also advised us of its intention to video record the transcribed interview.  Given previous and additional anticipated threats and harassment to members of the Special Counsel's Office and their families, we requested that the Committee not video record Mr. Windom's voluntary interview.

---

[1] Notably, the Department during the first Trump Administration invoked these longstanding privileges in response to similar congressional requests to probe the activities of another Special Counsel's Office. *Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files*, 43 Op. O.L.C. 1, 1-2 (2019) (Attorney General request for assertion of executive privilege over the Office of the Special Counsel's investigative files, including "law enforcement information, information about sensitive intelligence sources and methods, and grand-jury information that the Department is prohibited from disclosing by law").  And just two months ago, the Department sought to invoke these same confidentiality policies to attempt to prevent testimony by a former Department attorney.  *See* April 4, 2025 Letter from Kendra Wharton (Department of Justice, Associate Deputy Attorney General).

[2] The Department's response to the Committee's inquiry is clouded with potential for conflicts of interest. For example, the Department is adverse to Mr. Windom in ongoing litigation regarding his unlawful termination.

Chairman Jim Jordan
June 11, 2025
Page 3



The Committee declined our request, and we have little recourse.[3]  We requested that the Committee agree to provide us with reasonable advance notice of its intention to publish any video recording.  We did not receive a response, and we repeat that request now.  The Committee did agree to provide us the customary opportunity to review the interview transcript for accuracy and correction before it is finalized.  We will seek confirmation of that agreement and a response to our outstanding request on the record at the outset of the voluntary interview.

Finally, consistent with our request to the Department of Justice, to the extent that members of the Committee or their staff participated in any way in the various investigations or legal actions (be they civil, criminal, administrative, or congressional matters) concerning the attack on the United States Capitol on January 6, 2021, or in unlawfully contesting the outcome of the 2020 Presidential election, we request that those individuals recuse themselves from this process or at a minimum that they disclose any such roles and affiliations to us before Mr. Windom appears.

Sincerely,

Preston Burton

Rachel Li Wai Suen

Attachments:    May 29, 2025, email from E. Sampera to P. Burton
                June 4, 2025, DOJ Guidance Letter to Thomas Windom
                May 20, 2025, email from P. Burton to E. Sampera

cc:    The Hon. Jamie Raskin, Ranking Member (w/attachments)

---

[3] We also requested that Department counsel be present in the room along with the undersigned during the interview to address Department interests and to provide further guidance if necessary.  In doing so, we noted that we are personally aware from other matters before congressional committees that agency counsel have been permitted to be present simultaneously with personal counsel during voluntary transcribed interviews.  That request also was denied.

# EXHIBIT A

**Burton, Preston**

| | |
|---|---|
| **From:** | Sampera, Ernesto (OLA) ████████████████████ |
| **Sent:** | Thursday, May 29, 2025 7:37 PM |
| **To:** | Burton, Preston; Camacho, Dario (OLA) |
| **Cc:** | Li Wai Suen, Rachel |
| **Subject:** | Re: Thomas Windom |

**[EXTERNAL]**

Hi Preston,

Good to hear from you! Yes, I have received their intended scope and am currently working on drafting an authorization letter for your client. We will have that sent to you by next Thursday, per your request.

Here is the scope I was provided by the Judiciary Committee:

- Jack Smith's Team
  - Selection process
  - Prior interactions with Smith before he became Special Counsel
  - Interactions with Cooney, Bratt
  - Allegations of ethical lapses and OPR investigation
- January 6 investigation and case involving President Trump
  - Beginning of investigation prior to special counsel being named
  - Interactions with FBI, including ADIC Steven D'Antuono and ASAC Timothy Thibault
  - Interactions with JP Cooney
  - Temporary role at USAO-DC
  - Initiation of full investigation
  - Interactions with USPS-OIG
  - Interactions with NARA and Archives-OIG
  - Possible interactions with January 6Select Committee or other state/local prosecutors
  - Interviews conducted and subpoenas issued, including possible subpoenas to Willard Hotel
  - Contents of court filings in the case, specifically filings signed by Windom
- Any involvement with classified documents case involving President Trump
- Seizure of Rep. Perry's Cell Phone
  - Involvement in investigation
  - Roles and responsibilities
  - Scope of investigation
  - Reason for seizure at airport
  - Who imaged the phone and why that entity
  - Contents of court filings in the case, specifically filings signed by Windom

Let me know if you have any questions!

Thanks,

Ernie

Get Outlook for iOS

---

**From:** Burton, Preston ███████████████
**Sent:** Thursday, May 29, 2025 11:10 AM
**To:** Camacho, Dario (OLA) ████████████ Sampera, Ernesto (OLA)

**Cc:** Li Wai Suen, Rachel ████████████████
**Subject:** [EXTERNAL] Thomas Windom

Good morning,
We spoke with Caroline Nabity on Tuesday and have agreed in principal to a June 12 interview date, contingent on, among other things, the Committee providing you with their intended scope in sufficient detail to permit the Department to provide us with meaningful guidance at least a week prior to that interview.   We would appreciate knowing if you have received a description of the scope (and, if so, we would request a copy of any such description) and whether we can expect to receive written guidance from the Department by next Thursday.
Thanks,
Preston

**Preston Burton**
Partner
Orrick
Washington, DC  ⊙
████████████



orrick

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT B



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC 20530*

June 4, 2025

Thomas Windom, Esq.
Washington, DC

Dear Mr. Windom:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on the Judiciary (Committee) to provide a transcribed interview relating to your service in the Office of Special Counsel Jack Smith. In this interview, you are authorized to provide information that you learned while at the Department as described more fully below.

The Committee has identified specific topics of inquiry about which they have requested information from you. These topics are:

1. The process by which you were selected to serve on the Special Counsel team and your prior interactions with Special Counsel Jack Smith;

2. Your interactions with DOJ officials, including JP Cooney and Jay Bratt, and any matters related to allegations of ethical lapses or investigations by the Office of Professional Responsibility (OPR);

3. Your knowledge of interviews conducted, subpoenas issued (including those related to the Willard Hotel), and the contents of court filings you personally signed in that case;

4. Your involvement, if any, in the investigation concerning classified documents involving former President Donald J. Trump;

5. Your role in the seizure of Representative Scott Perry's cell phone, including the basis for the seizure, the scope of the investigation, who conducted the imaging of the phone and why, and the contents of any related court filings you signed.

Department attorneys are obligated to protect non-public information that they learn in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the

Thomas Windom, Esq.
Page 2

Department has sought to balance the Executive Branch's confidentiality interests with Congress' legitimate need to gather information.[1]

In addition, Department attorneys must protect deliberations concerning investigations and prosecutions that were ongoing while they serve in the Department. The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations. If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."[2] Discussion of pending criminal cases and possible charges could also violate court rules and implicate rules of professional conduct governing extra-judicial statements.

Further, the Department has a longstanding policy of making only appropriate supervisory personnel – and not line attorneys or agents – available to respond to congressional oversight requests. This policy reflects the reality that Department decisions are made by its supervisory personnel, not line employees and, over the years, this policy has allowed Congress to "fulfill its oversight responsibilities without undermining the independence of line attorneys and agents."[3]

Nevertheless, the extraordinary events underlying this matter constitute exceptional circumstances warranting an accommodation to Congress in this particular case. Given these extraordinary circumstances, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, as limited in paragraphs 1–5 above. This accommodation is unique to the facts and circumstances of this particular matter.

Although you are authorized to provide information responsive to the topics outlined above, you are not authorized to reveal information the disclosure of which is prohibited by law or court, including classified information and information subject to Federal Rule Criminal Procedure 6(e).

---

[1] See Letter to Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, at 2 (Jan. 27, 2000) [hereinafter Linder Letter] ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

[2] Linder Letter at 5–6.

[3] Linder Letter at 6.

Thomas Windom, Esq.
Page 3


     If you have questions with respect to the direction detailed above, please contact the Office of Legislative Affairs.

                    Sincerely,

                    Brian Nieves
                    Office of the Deputy Attorney General

# EXHIBIT C

**Burton, Preston**

| | |
|---|---|
| **From:** | Burton, Preston |
| **Sent:** | Tuesday, May 20, 2025 3:29 PM |
| **To:** | Sampera, Ernesto (OLA) |
| **Subject:** | RE: Thomas Windom Transcribed Interview |

Ernie,

Thank you for your message. We had reached out to DOJ a few weeks ago regarding the Committee's request to interview Mr. Windom and we would like to speak with you at your earliest convenience.

As we consider the Committee's request, we need guidance from the Department regarding the substantial Executive Branch confidentiality interests implicated by any potential interview. Such guidance is particularly important in situations, as here, where the Committee seeks information on a broad set of topics from a career Department attorney and where those topics involve a grand jury investigation. The Department has a long-standing policy of asserting its confidentiality interests in response to congressional requests as summarized in the Department's often-referenced Linder Letter. Any guidance should be in writing and approved by attorneys at appropriate levels of seniority and authority within the Department.

Notwithstanding our need for written guidance before further considering the Committee's request, we are also concerned about potential, substantial conflicts impacting the Department's ability to provide such guidance. Attorneys in senior roles in the Department served as the President's personal counsel in the very investigation about which the Committee seeks to question Mr. Windom. The Department currently is adverse to Mr. Windom in a legal proceeding before the Merit Systems Protection Board stemming from the Department's unlawful termination of Mr. Windom's employment. Prior to, or concurrent with, the Department providing the required written guidance, we request written confirmation from the Department's Office of Professional Responsibility that the Department is not conflicted from doing so, and that any attorneys who previously represented the President as his personal counsel were recused or abstained from considering the Committee's request, the decision whether to provide guidance, and what guidance to provide.

We look forward to discussing these and other related issues with you. Please let us know your availability for a call or meeting.

Best,

Preston

---

**From:** Sampera, Ernesto (OLA) ████████████████████
**Sent:** Monday, May 19, 2025 2:04 PM
**To:** Burton, Preston ███████████████
**Subject:** Thomas Windom Transcribed Interview

[EXTERNAL]

Good afternoon,

I am reaching out regarding the House Judiciary Committee's request to conduct a transcribed interview of your client, Thomas Windom.

I am working on scheduling this as soon as possible but first wanted to reach out to you to see if Mr. Windom needs anything from DOJ or has any questions before we proceed with setting a date on the calendar.


Best,
Ernie




**Ernie Sampera**
Office of Legislative Affairs, U.S. Department of Justice
Work Cell ▮▮▮▮▮▮▮▮▮
Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

# EXHIBIT L

| | |
|---|---|
| **From:** | Burton, Preston |
| **Sent:** | Friday, August 29, 2025 2:09 PM |
| **To:** | Camacho, Dario (OLA); Sampera, Ernesto (OLA) |
| **Cc:** | Li Wai Suen, Rachel |
| **Subject:** | RE: July 21, 2025 Deposition Subpoena to Thomas P. Windom |

Good afternoon,

I am checking in again for any information you may be able to share.

Thanks,

Preston

---

**From:** Burton, Preston
**Sent:** Monday, August 25, 2025 2:43 PM
**To:** Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>; Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** RE: July 21, 2025 Deposition Subpoena to Thomas P. Windom

Good afternoon,

I hope you both had a good weekend. I just left a voicemail message with Dario. Is there a time we could speak later today or tomorrow so we can get a sense of when the Department will respond and, if possible, its position on the issues we identified?

Thanks,

Preston

---

**From:** Burton, Preston
**Sent:** Friday, August 22, 2025 11:04 AM
**To:** Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>; Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** RE: July 21, 2025 Deposition Subpoena to Thomas P. Windom

Good morning,

Just checking in again to see if you had a sense of when we could expect the Department's response to our letter.

Thanks,

Preston

---

**From:** Burton, Preston
**Sent:** Monday, August 18, 2025 10:18 AM
**To:** Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>; Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** RE: July 21, 2025 Deposition Subpoena to Thomas P. Windom

Good morning,

Do you have a sense of when the Department's response will be ready?

Thanks,

Preston

---

**From:** Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>
**Sent:** Thursday, August 14, 2025 1:59 PM
**To:** Burton, Preston <pburton@orrick.com>; Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** RE: July 21, 2025 Deposition Subpoena to Thomas P. Windom


**[EXTERNAL]**

Hello Preston, the Department is currently working on a response.


Thank you,

Dario Camacho
Supervisory Official
Office of Legislative Affairs
U.S. Department of Justice
202-353-9069


---

**From:** Burton, Preston <pburton@orrick.com>
**Sent:** Thursday, August 14, 2025 1:44 PM
**To:** Sampera, Ernesto (OLA) <Ernesto.Sampera@usdoj.gov>; Camacho, Dario (OLA) <Dario.Camacho@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** [EXTERNAL] FW: July 21, 2025 Deposition Subpoena to Thomas P. Windom

Gentlemen,
Good afternoon.  I just wanted to check in and see if the Department was going to be providing us with the requested guidance on the issues we identified in our August 5 letter (and whether the Committee has identified any additional topics it intends to explore at the deposition).
Thanks,
Preston

---

**From:** Burton, Preston
**Sent:** Tuesday, August 5, 2025 2:44 PM
**To:** Nabity, Caroline <caroline.nabity@mail.house.gov>; greta.gao@mail.house.gov; Sampera, Ernesto (OLA) <ernesto.sampera@usdoj.gov>; Camacho, Dario (OLA) <dario.camacho@usdoj.gov>
**Cc:** Li Wai Suen, Rachel <rliwaisuen@orrick.com>
**Subject:** July 21, 2025 Deposition Subpoena to Thomas P. Windom

Please see the attached letters.

**Preston Burton**
Partner
Orrick
Washington, DC  Ⓥ

T 202-349-8065
pburton@orrick.com

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE APPLICATION OF THOMAS P. | : | Case No. _____ |
| WINDOM FOR ORDER DETERMINING | : | |
| WHETHER CERTAIN INFORMATION | : | Chief Judge James E. Boasberg |
| IS PROTECTED FROM DISCLOSURE | : | |
| BY FEDERAL RULE OF CRIMINAL | : | **ORAL ARGUMENT REQUESTED** |
| PROCEDURE 6(e) | : | |
| | : | **UNDER SEAL** |

**[PROPOSED] ORDER**

On consideration of the application filed by Thomas P. Windom, the governing law, and the argument of the parties:

IT IS HEREBY ORDERED that the Application of Thomas P. Windom for Order Determining Whether Certain Information is Protected from Disclosure by Federal Rule of Criminal Procedure 6(e) is GRANTED.

IT IS FURTHER ORDERED that the below topics are protected from disclosure by Mr. Windom pursuant to Federal Rule of Criminal Procedure 6(e):

- Possible "interactions with the FBI to obtain billing records from the Willard Hotel";
- Mr. Windom's knowledge of an alleged February 2021 investigative proposal by another Assistant United States Attorney;
- The seizure pursuant to a warrant of Congressman Scott Perry's cell phone; and
- Allegations regarding the use of confidential human sources by the FBI on January 6th.

DATED: _____, 2025          _____